**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

NATALYA PAYKINA, on behalf of her minor child, E.L.,

                        Plaintiff,                9:19-cv-00061 (BKS/DJS)

v.

DONNA LEWIN, in her individual and official capacities
as Superintendent of Hudson Correctional Facility;
ANTHONY J. ANNUCCI, in his individual and official
capacities as Acting Commissioner of the New York
Department of Corrections and Community Supervision;
JOHN DOE 1, in his individual and official capacities as
Deputy Commissioner of the New York Department of
Corrections and Community Supervision; and
JOHN DOE 2, in his individual and official capacities as
Unit Supervisor for the Hudson Correctional Facility
Adolescent Offender Segregation Unit,

                        Defendants.

---

**Appearances:**

*For Plaintiff:*
Mario B. Williams
Dallas S. LePierre
Nexus Derechos Humanos Attorneys, Inc.
44 Broad Street, NW, Suite 200
Atlanta, GA 30303

*For Defendants Donna Lewin and Anthony J. Annucci:*
Letitia A. James
Attorney General of the State of New York
Helena O. Pederson
Shannan C. Krasnokutski
Assistant Attorneys General
The Capitol
Albany, NY 12224

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.     INTRODUCTION

Plaintiff Natalya Paykina brings this action under 42 U.S.C. § 1983 on behalf of her son, E.L., a minor who is in the custody of the New York Department of Corrections and Community Supervision ("DOCCS") and who allegedly suffers from severe mental illness. (*See generally* Dkt. No. 1). The Complaint alleges that E.L.'s confinement in a segregated unit at Hudson Correctional Facility ("Hudson") constitutes cruel and unusual punishment in violation of the Eighth Amendment to the U.S. Constitution. (*Id.* at 1–2, 6–7, 15).[1] Plaintiff seeks declaratory and injunctive relief, as well as punitive damages, against four DOCCS officers: Defendant Donna Lewin, Hudson's Superintendent; Defendant Anthony J. Annucci, Acting Commissioner of DOCCS; an unnamed officer whose title is Deputy Commissioner of DOCCS; and another unnamed officer whose title is Unit Supervisor for Hudson's Adolescent Offender Separation Unit ("AOSU"). (Dkt. No. 1, at 17).

Presently before the Court is Plaintiff's motion for preliminary injunctive relief under Rule 65 of the Federal Rules of Civil Procedure, seeking an order directing the release of E.L. from disciplinary segregation. (Dkt. No. 5). After an initial hearing, the Court granted Plaintiff's requests for limited discovery, permitted supplemental briefing, and scheduled an evidentiary hearing on the motion. (Dkt. Nos. 28–36). On May 16 and 17, 2019, the Court held an evidentiary hearing at which eight witnesses, including E.L., testified. The following constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52(a)(2).

---

[1] E.L. is in custody for a youthful offender adjudication under section 720.20 of the New York Criminal Procedure Law. The parties agree that his claim was properly brought under the Eighth Amendment and not the Due Process Clause of the Fourteenth Amendment. (Dkt. No. 43, at 1–2; Dkt. No. 44, at 5).

## II.    FINDINGS OF FACT[2]

### A.    E.L.'s Background

### 1.    History of Mental Illness and Behavioral Issues

E.L. is a 17-year-old male adolescent offender ("AO")[3] in the custody of DOCCS. E.L. has exhibited symptoms of mental illness since early childhood, but he received his first diagnosis at age 10 while hospitalized at Four Winds after "a violent act in the house." Plaintiff testified that she and E.L.'s father tried various approaches to help E.L. after his hospitalization:

> We saw therapists, we saw psychiatrists, tried to be supportive. At some point . . . we decided to send him to a therapeutic boarding school called Diamond Ranch Academy. We tried two military schools, back then it was popular to believe that behavior could be modified by discipline, and people like E.L. would be commended to be sent to a structured disciplinarian setting, but unfortunately it did not work.

Both military academies expelled him. When he was 15 years old, E.L. was arrested and placed in the custody of the New York State Office of Children and Family Services ("OCFS"). ███████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████.[4] █████████████████████████████████

---

[2] The facts are taken from the pleadings, the parties' submissions, and the evidence presented at the hearing. *See J.S.R. ex rel. J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018) ("In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence."); *Fisher v. Goord*, 981 F. Supp. 140, 173 n.38 (W.D.N.Y. 1997) (noting that a "court has discretion on a preliminary injunction motion to consider affidavits as well as live testimony, given the necessity of a prompt decision"). The "findings are provisional in the sense that they are not binding on a motion for summary judgment or at trial and are subject to change as the litigation progresses." *trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 721 (S.D.N.Y. 2017); *accord Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 364 (2d Cir. 2003). Citations to exhibits admitted into evidence are denoted as "P-" or "D-" followed by the exhibit number.

[3] Per DOCCS Directive No. 4932A, an AO is one "who has been sentenced under New York State Raise the Age Law and/or has been assigned to a NYS DOCCS Adolescent Offender Facility, regardless of age." (P-19, § III.A).

[4] The Court has found that E.L.'s mental health records are judicial documents to which there is a "strong presumption of access" under both the common law and the First Amendment, but that E.L.'s strong privacy interest in such records outweighs the public interest in disclosure. (Dkt. No. 56); *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 121 (2d Cir. 2006).

██████████████████████████████████████████████████████████████████

█████████████████████████. Plaintiff recounted that E.L. "seemed to be doing

remarkably better" at Red Hook and benefitted from its trauma-based therapy approach and very

safe environment. ████████████████████████████████████

████████████

E.L.'s parents tried to keep E.L. on his medications and treatment, but E.L. did not want

to continue. According to Plaintiff, E.L. "also went to day camp treatment center . . . for his drug

addition," but "that didn't work out well either." He "got in touch with his peers from OCFS

from the first facility, Highland, and he gravitated toward that crowd and he was introduced to

drugs and drug distribution, basically got mixed in, started skipping school, being defiant, not

coming home." Plaintiff stated it was "very hard for [E.L.] to fit in in the community after he

was released from OCFS." He was "having nervous breakdowns" and was "very anxious." He

was "self medicating" with Xanax, marijuana, alcohol, and "probably" other drugs as well.

Eventually, a few months after his release from Red Hook, E.L. was arrested for firing a shot in a

neighbor's house. According to Plaintiff, the circumstances were murky, but apparently E.L. had

a dispute with drug dealers who had taken his drugs. █████████████████████████

█████ Rockland County Correctional Facility for approximately nine months ████████

██████████████████████████████████████████████

---

The testimony of Kim Tedaldi and Dr. Louis Kraus concerning E.L.'s mental health records and treatment is sealed and has been redacted from the publicly filed decision. Both parties sought to have the courtroom closed for testimony concerning the mental health treatment and diagnosis of E.L., and agreed that the compelling privacy concerns of E.L. in his mental health records and his effective treatment outweighed the public interest in open proceedings. The Court granted that request after finding that E.L. had a compelling privacy interest in his sensitive mental health records and treatment, and that closure of the courtroom during that limited testimony would prevent a substantial probability of prejudice to E.L.'s compelling privacy interest. *See Huminski v. Corsones*, 396 F.3d 53, 82 (2d Cir. 2005).

In accord with these rulings, portions of this decision are redacted, and the original unredacted decision is filed under seal.

### 2. Medication History

E.L. has been on various medications over the years. When he was first hospitalized and diagnosed with a mental illness, his doctors prescribed Abilify. █████████████████ ████████████████████████████████████████████████████████████ ████████████████████. E.L. was not taking medication at the time he was arrested in 2017. Within one week of being placed at Rockland County Correctional Facility, E.L. was put back on medication. During his detention there, he was prescribed Zyprexa, Lithium, Depakote, and various other drugs.

### B. E.L.'s Confinement at Hudson

### 1. Placement in General Population and AOSU

E.L. was admitted to Hudson in August 2018 after his conviction. (D-4). Hudson is a correctional facility in New York that house AOs—inmates that are either 16 or 17 years old. The AOs are housed in single-room units in cottages that are separate from the adult population. From August to early November 2018, E.L. was placed in a cottage in "general population" along with other AOs. While in general population, E.L. was caught "cheeking" his medications. On November 3, 2018, as a result of this disciplinary violation, he was placed in the Adolescent Offender Separation Unit ("AOSU"); he has remained there for almost seven months. The AOSU contains approximately 20 cells. At the time of the evidentiary hearing, there were approximately 33 or 34 AOs at Hudson, 11 of which were in the AOSU.

### 2. DOCCS Directives Relating to Adolescent Offender Separation Unit

According to DOCCS Directive No. 4933C, the AOSU "consists of single occupancy cells grouped so as to provide separation from the general population, and may be used to house AOs confined to such units" in accordance with DOCCS policies. (P-18, § I.C). AOs admitted to the AOSU are to "be confined in a cell/room for no more than eighteen hours per day, five days

per week (excluding holidays), with six hours of out-of-cell time consisting of a minimum of four hours of out-of-cell programming for education, or other appropriate out-of-cell programming," as well as "two hours out-of-cell outdoor activities (weather permitting) seven days a week." (*Id.* § I.B.2). Describing differences between the general population cottages and the AOSU, Defendant Lewin testified:

> General population, inmates are able to move around freely, they go to school, they go to their meals, they go to their programs, they go to recreation, any other program that is established for them. In AOSU, they don't have free movement. The movement is supervised, they're moved singly from their cell to their classrooms, they're moved singly from their cells to the recreation area, and for any other program, they are supervised directly.

For movements in and out of their cells, AOs in the AOSU are placed in handcuffs and escorted by prison staff. Anita Tomlin, Hudson's deputy superintendent of programs, explained that AOs in general population receive six hours of programming and one hour of structured recreation time, whereas AOs in the AOSU have four hours of programming and two hours of unstructured recreation time in the recreation pens. She stated that AOs in the AOSU, unlike those in general population, do not have access to vocational training.

As relevant here, admission to the AOSU is a disciplinary sanction for AO misbehavior. (*See* P-18, § II.B, II.F). As Defendant Hudson Superintendent Lewin testified, if AOs "break any of the rules, if they don't conduct themselves according to the rules that we have established, they'll get a misbehavior report, we'll do a hearing, and they'll be sanctioned to the AOSU." Under DOCCS Directive No. 4932A, "[e]very incident of AO misbehavior involving danger to life, health, security, or property" must be reported in a misbehavior report, (P-19, § IV.B.6), which constitutes the "formal charge" at a "Disciplinary Hearing" (also known as a Tier II Hearing), (*id.* § IV.D.3), or "Superintendent's Hearing" (also known as a Tier III Hearing), (*id.* § IV.E.3). Defendant Lewin explained that the different tiers "represent the severity of the

infraction," with Tier III being the most severe. A Tier II violation "could be something that comes from repeated direction from an officer, a staff, a teacher, that [the AOs] continue to ignore," or it "could be something that they have been disciplined for before" but continue doing. A Tier III violation is "more serious" and involves "something that calls into . . . the safety of the other inmates or staff or breaking of a rule that . . . we feel is very serious."

If the charge is affirmed at a Tier II hearing, the hearing officer may order the confinement of an AO to the AOSU "under keeplock admission" for up to 30 days. (P-19, § IV.D.7.a(1)(c)). If the charge is affirmed at a Tier III hearing, the hearing officer may confine an AO to the AOSU "for a specified period." (*Id.* § IV.E.7.a(1)(c)). In both cases, any penalty imposed runs "consecutively to any other like penalty previously imposed." (*Id.* § IV.D.7.a(2), E.7.a(2)). Kim Tedaldi—the New York State Office of Mental Health ("OMH") unit chief for the Coxsackie, Greene, and Hudson Correctional Facilities, and the head of E.L.'s treatment team—testified that ███████████████████████████████████████████████ ███████████████████████████████████████████████

### 3. E.L.'s Conditions of Confinement

#### a. Cell Time and Schedule

E.L. spends a minimum of 18 hours a day in a cell the size of a parking space. (*See* P-1, at PAYKINA000003–6). On weekdays, the remaining time is scheduled to consist of two hours of educational programming, two hours of "therapy" programming, and two hours of recreation. However, as described below, E.L. was often confined in his cell more than 18 hours a day on weekdays. On weekends, there is no programming, and E.L. is confined to his cell for at least 22 hours. AOs are permitted to shower once a day for 10 to 15 minutes. According to E.L., each shower is the size of a shoe closet.

E.L. testified that he spends 20 hours a day in his cell "every day that [he is] not on deprivation."[5] He goes "to one program" and "to one rec": "I don't go to the first program because I sleep in the morning. . . . I go to sleep late because it's loud." He further specified that he sleeps in because otherwise he would "only be getting five hours of sleep." He "[a]lmost never" spends only 18 hours a day in his cell, unless he decides to "leave and go to morning program." In his cell, E.L. reads, works out, and listens to the radio. Describing his cell, E.L. testified that, at one point, he wrote "I need a doctor" on one of the walls, (*see* P-1, at PAYKINA000016), because he was on a deprivation for the 10th day, nobody would talk to him, and he was self-harming. To the right side of his cell door, E.L. wrote "Help me." (*See* P-1, at PAYKINA000020). He wrote that phrase because he was "on deprivation again and [he] was just tired of it."

**b.      Out-of-Cell Time**

DOCCS provides AOs two hours of education programming conducted by a full-time teacher five days a week. During that time, AOs study for their high-school-equivalency exam. AOSU inmates receive educational instruction in rooms fitted with special "Restart" desk chairs to which inmates are secured. (*See* P-1 at PAYKINA000059 to 70). To prevent fights, AOs are shackled and fastened to the chairs with leg restraints so that "they can't come away from the chair." According to Adam Ramirez, Hudson's deputy superintendent of security, to transport an AO to the room, the officer pat-frisks the AO outside his cell, puts on hand restraints, and escorts the AO to a location outside of the classroom where the AO has to kneel on a bench while leg restraints are put on. The officers then brings the AO into the classroom and, after securing him

---

[5] *See infra* Part II.B.3.c (discussion of deprivation orders).

into the Restart chair, removes the handcuffs. Officers follow the same procedure, in reverse, to return the AO to his cell.

Because E.L. already had his high school diploma," Tomlin surmised that "the academic classes were boring for him." Defendant Lewin testified that she and her team were able to place E.L. into a creative writing class. DOCCS contacted a creative writing teacher, who agreed to give E.L. one-to-one creative writing courses. To Tomlin's knowledge, E.L. would not regularly come out for the two hours of educational programming before he started working with the creative writing teacher. Because of E.L.'s interest in college, and given his relatively high level of education, Hudson staff included a precollege class in his programming. Defendant Lewin and her team coordinated with E.L.'s education supervisor and his parents and are in the process of securing correspondence college courses for E.L. Defendant Lewin testified that E.L. would "be starting classes shortly."

DOCCS schedules two hours of therapeutic programming per day administered by offender rehabilitation coordinators. The program is called "Risks and Decisions." According to Tomlin, it is a 30-day "evidence-based program" that is designed to help AOs reflect on past decisions and behaviors. It employs cognitive behavioral therapy but also touches on substance abuse, peer pressure, and other topics. Risks and Decisions is not designed to treat mental illness or address any specific inmate's individual mental health needs. E.L. described the program as follows:

> Q.    When you're in this room, what are you doing?
>
> A.    They call it, I guess it's like lifestyle, lifestyle decision points, some program called that, but it's really basically we don't do anything.
>
> Q.    Do they give you any written materials to work with?
>
> A.    Yes, but it's—if I may give you an example, it's like, Tommy's mother is a crack addict, what should he do?

> Q. And is that graded at the end of any given day?
>
> A. No, just hand it in.
>
> Q. Do you ever receive anything back from those?
>
> A. No.

According to Tomlin, programming is not taken away from AOs for disciplinary reasons, but if AOs refuse to go to programming, DOCCS will not force them to go. Likewise, Ramirez testified that, although programming is considered "mandatory," DOCCS does not force inmates to come out of their cells. Tomlin remarked that E.L. "doesn't really care for" therapeutic programming; to her knowledge, he did not regularly come out for the two hours of therapeutic programming.

For recreation, AOs are permitted to go outside for two hours every day. Hudson has four multiple-occupancy recreation pens with usually two people in each pen and four single-occupancy pens. Ramirez testified that the four single-occupancy pens were initially used only when an AO was under a restraint order. However, since November 2018, because of fights between inmates, Ramirez received authorization to "use all eight pens individually for separation purposes and safety purposes." E.L. testified: "Up till recently I was using the . . . single recs but now I'm in double pens most of the time." That changed "[e]ver since the lawsuit." The pens are open to the weather, with a roof that covers the back half of the pen. In the winter, the temperature is freezing; although the AOs are provided a sweater and a jacket, E.L. stated it was not enough to feel comfortable. He sometimes chose not to go out.

### c. Deprivation and Exceptional-Circumstance Orders

E.L. testified that, when he is placed on "deprivation," he cannot leave his cell for 24 hours, except for a visit. He stated that he has been put on deprivation a minimum of eight times for at least 75 days. In his experience, each deprivation lasts "from a week to 13 days."

Additionally, E.L. stated that he was placed on water deprivation orders, where prison officials "turn off your water" and "every four or eight hours you get like 15 minutes worth of water." Other kinds of deprivation orders include "shower and recreation deprivations," but "most of the time it's placed on everything, except water." According to E.L., when he is on a shower deprivation order, he cannot "go to showers at all unless [he has] a visit."

███████████████████████████████████████████

███████████████████████. Ramirez explained that deprivation orders are not punitive; instead, they are the result of "a determination that the individual coming out of his cell could create a situation for himself . . . and jeopardize the safety and security of the staff, other inmates in the unit." Deprivation orders can limit out-of-cell time for recreation and showers only, and some deprivations orders can restrict water use or empower DOCCS to take property away. The supervisor for the unit is responsible for writing up the deprivation order based on the incident, the watch commander reviews it, and Ramirez is notified. Ramirez reviews the order on a daily basis; it can be continued and typically lasts three to five days. After seven days, the order "can be renewed again depending on the [AO's] behaviors." With water deprivation orders, DOCCS shuts off water to a cell and turns it back on at least five times a day before meals or bathroom breaks. Those orders usually last no longer than one or two days and are issued when an "inmate attempts to flood [his] cell or continues to throw water at staff when they're walking back and forth." According to Ramirez, E.L. has received close to 20 deprivation orders.

The typical scenario for the issuance of an exceptional-circumstance order is when inmates fight. ████████████████████████████████████████████

███████████████ Ramirez stated that an exceptional-circumstance order is more stringent than a deprivation order and that, under such an order, an AO is confined to his cell for a day or two

and is not permitted to come out for educational or therapeutic programming. DOCCS officers must specify the reason for the order, and once Ramirez receives the misbehavior report, he and Superintendent Lewin must review the order, sign it, and send it to DOCCS's assistant commissioner for special housing for final review and approval.

Defendants did not provide records evidencing how many days E.L. was on deprivation orders depriving him of recreation time or under "exceptional circumstances" preventing him from leaving his cell. Given E.L.'s likely disorientation from the time he has spent isolated in AOSU, the Court cannot fully credit his testimony regarding the number of days he has been confined to his cell for 24 hours.

### C. Misbehavior and Disciplinary Violations

During his testimony, Ramirez summarized E.L.'s disciplinary record as follows:

> It's pretty extensive . . . probably about 40 plus, there about 50 percent tier two, tier three, and some of the tier threes are pretty severe to include assault on staff, unhygienic acts, which is pretty severe in our department, and . . . he has a lot.
>
> . . . .
>
> As of right now, and I've been there since day one, there's only one other inmate who's no longer at Hudson who had a more extensive disciplinary than he does.

Ramirez testified about several specific incidents. First, he recounted an incident on January 11, 2019, when E.L. defecated on a food tray and handed the tray back to the officer with a threatening note. (*See* D-22, at DOCCS000524). That same day in the evening, another incident took place. An officer went to E.L.'s cell to give him his evening medication and noticed "a large puddle of yellow liquid." (D-22, at DOCCS000523). E.L. told the officer that he had urinated in a cup and thrown it under the door. (*Id.*). For both incidents, E.L. was charged with unhygienic acts. Two days later, E.L. received a misbehavior report for tying clothes to his door hatch. (*See* D-24). Ramirez related that E.L.

> started hanging his hands out of the hatch, . . . then he took hostage
> [sic] of the bottom hatch there's a foot hatch down there, he had his
> hands through there, they couldn't get it closed, at one point the
> sergeant actually grabs his hands and puts them inside the cell at
> which time he bites the sergeant, and they were finally able shortly
> after that to get it secured.

E.L. was charged with assault on staff and violent conduct. Ramirez recounted incidents involving property damage, including one incident when E.L. tore out electrical wiring from the ceiling in his cell. (*See* D-19). Defendant Lewin testified that E.L. had had approximately 39 disciplinary incidents since his admission to Hudson. (*See* D-42). A number of these incidents involved use of force.

E.L. acknowledged misbehaving in the AOSU. He testified that he once threw feces on other AOs in the recreation pen area "after they spit" on him, and he admitted to throwing feces at people twice. Asked how many times he spit at people, E.L. responded, "A good amount of times." E.L. conceded that he flooded his cell twice and had his water turned off as a result. And on April 5, 2019, E.L. threw a Restart chair and broke the window in the programming room. (*See* D-40). ████████████████████████████████████████ E.L. agreed that his "incidents in the AOSU kind of go in waves."

Because of the stacking of disciplinary penalties, the theoretical end date of E.L.'s confinement in the AOSU is in 2023. DOCCS, however, will not keep E.L. in the AOSU past his 18th birthday in June 2019. █████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████ Likewise, Ramirez expressed concerns: "[E.L. is] explosive, he's fast reacting, . . . some of his actions in the AOSU have caused some AOs who are no longer in the AOSU, in general population to miss things which they take very seriously, and I just fear for his safety if he went into general population."

### D.  Treatment at Hudson

### 1.  Mental Health Services Provided by OMH Generally

Bill Vertoske, a forensic program administrator at the OMH and currently the acting director of corrections-based operations for Central New York, testified that OMH's "services are designed by level" and that a facility is graded level one through six—with level one representing the highest degree of mental health services provided—to "match the treatment needs of the inmate population that are housed in that facility." Vertoske described level-one individuals as those "who have serious mental illness or significant behavioral disorders that require treatment where there's the highest degree of on-tide staff available." In level-one facilities like Hudson, OMH has full-time mental health treatment staff, including a full-time psychiatric staff. In some facilities, OMH provides residential mental health treatment services for the seriously mentally ill, but such services are not yet available to the adolescent population.

Describing the services available to AOs, Vertoske stated:

> Right now we have . . . full-time clinical staff at the adolescent offender units, individuals who are on the mental health caseload receive [a] minimum of two out-of-cell therapy callouts per month, [an] individualized treatment plan is developed in conjunction with the adolescent and the family if indicated, and if there's medications, the medications are prescribed and monitored by a psychiatrist. Mostly it's the clinic model, since we don't have any residential services available.

After the initial screening, OMH staff[6] monitor whether the treatment plan and care level that AOs receive continue to be appropriate. Under OMH protocol, AOs admitted to the AOSU are screened by a mental health clinician within 24 hours of admission to the unit. OMH clinicians are to monitor any deterioration in the individual's mental health condition in the AOSU. If an

---

[6] At Hudson, E.L.'s treatment team comprises a licensed social worker, a licensed psychologist, a psychiatrist, and, in some instances, Kim Tedaldi, OMH's unit chief for the Coxsackie, Greene, and Hudson facilities.

AO exhibits self-harming behavior or presents a suicidal risk, OMH staff "initially look at increasing the observation status of the individual, and if indicated, could access inpatient hospitalization at Central New York Psychiatric Center in Marcy, New York." But because the Marcy facility primarily houses adults, juveniles admitted there "would be managed specifically by the inpatient operations unit" and kept separated from the adult population. OMH does not currently have a juvenile-only inpatient facility. On cross-examination, Vertoske recognized that OMH would be responsible for providing residential inpatient treatment to a juvenile if needed.

### 2. Mental Health Treatment Provided to E.L.

Upon his arrival at Hudson, ███████████████████████. ████████████ OMH reassessed him as a level one ████████████████████████████ E.L. continued his prescriptions for BuSpar and Wellbutrin. In the AOSU, his medication regimen included at first Remeron, Zoloft, and Wellbutrin. In the last three or four months, E.L. has been on Abilify and Depakote. His Depakote prescription is now provided in liquid form because of his history of cheeking pills.

In the AOSU, E.L.'s treatment schedule provides for visits with his psychologist twice a month and visits with his psychiatrist once a month.[8] The visits are scheduled to be out-of-cell private meetings—referred to as "callouts"—████████████████████████████ ████████████████████████████████████████████████ ████████████████████████

---

[7] ████████████████████████████████████████████████ ███████████████████████.

[8] E.L. testified that, "[e]ver since this lawsuit against Hudson, I started seeing them more, they started seeing me a lot more." He stated that, in the last month and a half, his mental health professionals visited "[a]bout once a week, 45 minutes, 40 minutes."

According to E.L., the twice-a-month sessions take place "through the cell door if [he is] on deprivation"; otherwise, he "get[s] called out . . . out of [his] cell to speak with them." █████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████.

Besides the private callouts, mental health professionals stop by E.L.'s cell daily to check up on him. ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████.

According to E.L., the interaction with mental health professionals during these rounds is short. They ask him how he is and if he has any problems; if not, they continue making their rounds.

████████████████████████████████████████████████████████████████

███████████████████████.

**E. Effects of Confinement**

**1. Testimony of E.L. and Plaintiff**

Asked about how the AOSU affected him, E.L. testified:

> Well, you get more angry, . . . you get anxious, you get more panic attacks, start wanting to hurt yourself, . . . your behavior gets worse and worse every day, and it's just you don't feel like yourself. You start to turn on yourself, like if you look at a wall, one time I looked at a wall and I saw the color was brighter and then it got to regular, then it went back to color like being bright.

He stated that he "wouldn't really be sleeping that well." And it was difficult for him to control his emotions. He lost track of time; "some days would go quickly, some days would go slowly."

Additionally, E.L. testified that he was self-harming during his placement on deprivation by

cutting himself with pieces of metal on his left forearm. He showed the cutting marks in open

court. ███████████████████████████████████████████████████████████████████

███ .

Plaintiff testified that she tries to visit her son, E.L., almost every weekend for at least

two hours. She has observed changes in E.L. since his confinement in the AOSU. She stated that

E.L. "was becoming a different person, hypervigilant, more anxious than usual, depressed." She

"noticed maybe after one or two weeks, he wasn't himself." He was "physically scared," and he

told her that "it was very hard for him to control himself, and he felt aggressive."

### 2.      Testimony of Plaintiff's Expert

#### a.      Qualifications

Plaintiff called Dr. Louis Kraus, M.D., to testify. He is licensed as a physician in Illinois,

Florida, and Arizona, and he is board certified in general psychiatry, child and adolescent

psychiatry, and forensic psychiatry. Dr. Kraus is the chief of child and adolescent psychiatry and

director of forensic psychiatry at Rush University Medical Center and also works in private

practice. He described his experience with adolescents and the mentally ill in solitary

confinement and mentioned his clinical activities, research, publications (including peer-

reviewed articles), policy work, and speaking engagements. Based on these qualifications, and

with no objection, the Court admitted Dr. Kraus as an expert witness in the areas of child and

adolescent psychiatry and forensic psychiatry.

#### b.      Effects of Solitary Confinement Generally

Dr. Kraus summarized the position statements on solitary confinement of the American

Academy of Child and Adolescent Psychiatry ("AACAP"), the American Psychiatric

Association ("APA"), and the American Medical Association ("AMA"). The "most stringent"

position is that of the AACAP, which opposes any type of solitary confinement—"any type of a

placement where a child is removed from their regular routine, social interactions, education, dining, et cetera, essentially without exception"—and maintains that solitary confinement should not "be used for punitive purposes."[9] The APA and the AMA are also against the use of solitary confinement, "except in very extreme circumstances." Exceptional circumstances include situations where one is acutely suicidal and needs a protective environment, or where one has an infectious disease or broken bone and needs to be segregated from the general population. Dr. Kraus also mentioned the policy of the National Commission on Correctional Health Care—"one of the major accrediting agencies for prisons and jails throughout the country—which has a "very clear policy against the use of solitary confinement on juveniles."

Dr. Kraus defined solitary confinement as removing individuals "from their typical interactions within a facility."[10] For adolescents, this means "modifying or removing them from school"; "changing their eating," for example, "eating in their rooms instead of in the cafeteria with other kids where there's some amount of socializing"; and "having limited rec time," for example, restricting recreation time to "some level of solitary" time "in a cage," as opposed to activities "done in group." He specified that solitary confinement is not defined by a specific number of hours that the individual spends alone. Dr. Kraus noted that "there can be a bit of a shell game" around the terminology, and that some institutions practice solitary confinement but label it something else—"segregation," "administrative holds," or "behavioral dorms," for example.

---

[9] Dr. Kraus testified that the psychiatric and medical community is "a hundred percent" against the use of solitary confinement on juveniles and the mentally ill as a punitive measure.

[10] According to Dr. Kraus, the National Commission on Correctional Health Care similarly "define[s] solitary confinement as not so much in hours but in the removal of youth from their day-to-day activities."

Having reviewed DOCCS' AOSU policies and observed the conditions of confinement in Hudson's AOSU, Dr. Kraus opined that "it is a form of solitary confinement." Further, he stated that the policies and conditions of E.L.'s confinement, based on his personal review and observation, as well as the standards in his field, constitute solitary confinement under the policy statements of the three professional associations mentioned above. He described the recreation pens as a place "where the kids would spend a period of time and they could get some fresh air, but nothing more than that."

Asked about the effects of solitary confinement, Dr. Kraus pointed out that 60 to 70% of juveniles placed in correctional facilities across the country, like E.L. here, have mental health issues and are at a "higher risk for sequelae of solitary confinement." Research points to "worsening mood symptoms, depression, higher risk for suicide, suicide attempt, suicidal thought, self-mutilatory behavior, anxiety," and "hypervigilance" (an increased distrust of others). Some juveniles may have "permanent sequelae." He added that juveniles are particularly susceptible to worsening mental health problems as a result of solitary confinement because "juvenile brains are continuing to develop" until about age 25. Additionally, Dr. Kraus noted that the APA opposes placing the mentally ill in solitary confinement. Indeed, the "mentally ill are going to be at much higher risk for worsening symptomology, sometimes at a catastrophic level." Mentally ill juveniles, Dr. Kraus concluded, are particularly vulnerable to the effects of solitary confinement.

### c.    Effects of Solitary Confinement on E.L.



**3. Testimony of Defendants' Witnesses**

Vertoske conceded that the use of solitary confinement on mentally ill juveniles is not appropriate and should not be used as a punitive measure. However, in his view, confinement in the AOSU does not constitute solitary confinement.

████████████████████████████████████████████

████████. Defendant Lewin denied that confinement to a cell for 18 hours or even 20 hours a day constitutes solitary confinement, but she was unable to articulate a definition of solitary confinement. Ramirez stated that the AOSU is different from the special housing unit ("SHU") for adults because "there's more entitlements, more mandates for out of cell" time in the AOSU. Ramirez opined, apparently based on his view that only SHU amounts to solitary confinement, that solitary confinement means 22 hours of cell time per day.

## III.    STANDARD OF REVIEW

Rule 65 of the Federal Rules of Civil Procedure governs temporary restraining orders and preliminary injunctions. In the Second Circuit, the standard for a temporary restraining order is the same as the one for a preliminary injunction. *See Fairfield Cty. Med. Ass'n v. United Healthcare of New Eng.*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), *aff'd*, 557 F. App'x 53 (2d Cir. 2014); *AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*, 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010).

A party seeking a preliminary injunction must establish that: (1) it is likely to suffer irreparable harm in the absence of preliminary relief; (2) either (a) it is likely to succeed on the merits, or (b) there are sufficiently serious questions going to the merits of its claims to make them fair ground for litigation; (3) the balance of hardships tips decidedly in its favor; and (4) a preliminary injunction is in the public interest. *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011); *accord N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). However, a "party seeking to enjoin 'governmental action taken in the public interest pursuant to a statutory or regulatory scheme' cannot rely on the 'fair ground for litigation' alternative even if that party seeks to vindicate a sovereign or public interest." *Id.* (quoting *Monserrate v. N.Y. State Senate*, 599 F.3d 148, 154 (2d Cir. 2010)).

Courts refer to preliminary injunctions as prohibitory or mandatory; a prohibitory injunction "maintains the status quo pending resolution of the case," while a mandatory injunction "alters it." *N. Am. Soccer League*, 883 F.3d at 36. "Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.'" *Id.* (quoting *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)). The "status quo . . . is, 'the last actual, peaceable uncontested status which preceded the pending controversy.'" *Id.* at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014)). In the prison context, courts must review a preliminary injunction request "with great caution so as not to immerse the federal judiciary in the management of . . . prisons." *V.W. ex rel. Williams v. Conway*, 236 F. Supp. 3d 554, 581 (N.D.N.Y. 2017) (quoting *Fisher v. Goord*, 981 F. Supp. 140, 167 (W.D.N.Y. 1997)). Under the Prison Litigation Reform Act, preliminary injunctive relief in any civil action with respect to prison conditions must be narrowly drawn, extend no further than necessary to correct the harm, and be the least instructive means necessary to correct the harm. *See* 18 U.S.C. § 3626(a)(2). Courts must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief." *Id.*

Here, Plaintiff does not dispute that E.L. committed disciplinary violations, nor does she challenge DOCCS's disciplinary procedures or power to mete out punishment for inmate misbehavior. Instead, Plaintiff claims that the particular form of punishment used by DOCCS— confining E.L. to prolonged solitary confinement in the AOSU—is a cruel and unusual punishment in violation of the Eighth Amendment. In these circumstances, the "last actual, peaceable uncontested status" was Plaintiff's placement in the AOSU for disciplinary violations, and the controversy arises from the length of his confinement there. Plaintiff's request that E.L.

be released from the AOSU while this case is pending thus disrupts the status quo. Accordingly, Plaintiff must show a clear or substantial likelihood of success on the merits.

## IV.    CONCLUSIONS OF LAW

### A.    Irreparable Harm

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). "Irreparable harm is 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (quoting *Forest City Daly Hous., Inc. v. Town of North Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999)). "The relevant harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010).

Plaintiff has made the requisite showing of irreparable harm here. First, a court will presume that a plaintiff has established irreparable harm in the absence of preliminary relief if her claim involves the alleged deprivation of a constitutional right. *See Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (quoting 11C Charles A. Wright et al., Federal Practice and Procedure § 2948 (1st ed. 1973))); *Donohue v. Mangano*, 886 F. Supp. 2d 126, 150 (E.D.N.Y. 2012) ("[A]s a general matter, there is a presumption of irreparable harm when there is an alleged deprivation of constitutional rights.").

Further, Plaintiff has shown that DOCCS's prolonged confinement of E.L. in the AOSU is subjecting him to present and future psychological damage. ████████████████████████
████████████████████████████████████████████████████████████████

[REDACTED] Mentally ill juveniles are particularly vulnerable to the effects of solitary confinement. [REDACTED] [REDACTED].

While there was testimony that E.L.'s behavior went through ebbs and flows, that fact alone does not contradict evidence of the imminent psychological damage and the general worsening of symptoms E.L. faces by additional confinement in the AOSU. Indeed, the accumulation of disciplinary incidents in the AOSU—a fact on which Defendants placed much emphasis[13]—suggests a deterioration of E.L.'s mental health. The Court credits Dr. Kraus's testimony that [REDACTED] Based on this credible expert testimony, as well as E.L.'s and Plaintiff's description of the negative effects on E.L. of confinement in the AOSU, the Court finds that Plaintiff has established irreparable harm. *See V.W. ex rel. Williams*, 236 F. Supp. 3d at 588–89 (finding that "defendants' continued use of solitary confinement on juveniles puts them at serious risk of short- and long-term psychological damage"); *A.T. ex rel. Tillman*, 298 F. Supp. 3d at 417 (same).

---

[12] The testimony clearly established that E.L. has been placed repeatedly on deprivation while in the AOSU; during deprivation, E.L. loses two hours of recreation time and must spend 20 hours a day in his cell.

[13] At the hearing, Defendants did not address the likely impact that the isolation imposed had on E.L. behavior. Nor did they evince concern about the stacking of disciplinary punishment, which has resulted in confinement in the AOSU for almost seven months and meant that E.L.'s confinement in the AOSU would theoretically last until 2023.

## B.      Clear Likelihood of Success on the Merits

"A claim for violations of the Eighth Amendment requires (1) an 'objectively sufficiently serious . . . denial of the minimal civilized measure of life's necessities' and (2) a 'sufficiently culpable state of mind' on the part of the responsible official." *Willey v. Kirkpatrick*, 801 F.3d 51, 66 (2d Cir. 2015) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). The conditions-of-confinement inquiry thus has both objective and subjective elements.

### 1.      Unreasonable Risk of Serious Damage to Health

Under the objective prong, a plaintiff must "show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health," *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013), which includes the risk of serious damage to his "physical and mental soundness," *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972). As the Second Circuit recently reiterated, "[d]epending on their severity, psychiatric or psychological conditions can present serious medical needs in light of our contemporary standards." *Charles v. Orange County*, No. 17-3506-pr, 2019 WL 2236391, at *9 (2d Cir. May 24, 2019) (publication in Federal Reporter forthcoming).[14] The Second Circuit has underscored that "there is no 'static test' to determine whether a deprivation is sufficiently serious," *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012), and the "conditions themselves must be evaluated in light of contemporary standards of decency," *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995).

As Dr. Kraus testified, the mental health community defines solitary confinement as the removal of an individual from his typical interactions within a social setting—for example, by removing the individual from school, ordering that he eat alone, or preventing him from

---

[14] *Charles* involved a Fourteenth Amendment claim about the medical needs of pretrial detainees, *see* 2019 WL 2236391, at *8, but the objective prong analysis is the same under both the Eighth and Fourteenth Amendments, *see Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017).

participating in group activities. That definition does not strictly depend on the number of hours that the individual spends alone in his cell. Defendants' witnesses did not engage with this definition, nor did they articulate an alternative one. Instead, they appeared to equate solitary confinement with the conditions prevailing in SHU. Notably, they did not provide any basis for such a narrow definition of solitary confinement.

In the AOSU, E.L. has spent a minimum of 18 hours (and sometimes 20 hours) per day on weekdays and (except for visits) 22 hours on weekends alone in his cell. Further, his social interaction out of cell is severely limited: he is escorted within the facility in handcuffs, restrained and tied to a chair during programming and, until recently, has spent his recreation time alone in a cage. The testimony showed that E.L. has regularly skipped programming and recreation time, and that he has at times been deprived of recreation time. The fact that E.L. may have voluntarily passed up out-of-cell time does not mitigate this situation; when a mentally ill juvenile is left alone in his cell for prolonged periods of time, such confinement can seriously harm a juvenile's mental health. E.L.'s self-harming behavior bears this out.

Testimony at the hearing supports a finding that E.L.'s mental health in the AOSU has deteriorated. ██████████████████████████████████████████████████████████

██████████████████ he was later reassessed as a level one—i.e., as someone who has "serious mental illness or significant behavioral disorders"—██████████████████████████████████

████████████████████████ As discussed above, E.L. has also been self-harming in the AOSU. And his mother has observed a deterioration of his mental health, noting that he has become "a different person, hypervigilant, more anxious than usual, depressed." Dr. Kraus testified that juveniles are especially susceptible to worsening mental health problems from solitary

confinement because "juvenile brains are continuing to develop" until about age 25.[15] 

The Court deems this testimony credible and finds that E.L.'s conditions of confinement in Hudson's AOSU pose a risk of serious damage to his "physical and mental soundness."[16] *LaReau*, 473 F.2d at 978. Accordingly, the Court concludes that Plaintiff has established a clear likelihood of success on the merits with respect to the objective prong of her Eight Amendment claim.

### 2. Knowledge and Disregard of Excessive Risk to Health

Under the subjective prong, the plaintiff must show that the defendant acted with deliberate indifference, which is "something more than mere negligence." *Farmer*, 511 U.S. at 835. For his conduct to rise to the level of deliberate indifference, a "prison official must know of, and disregard, an excessive risk to inmate health or safety." *Jabbar*, 683 F.3d at 57. "Evidence that a risk was 'obvious or otherwise must have been known to a defendant' may be

---

[15] This opinion is widely shared. Courts around the country have called attention to the problem of placing mentally ill individuals, especially juveniles, in solitary confinement. In *A.T. ex rel. Tillman v. Harder*, for example, United States District Judge David N. Hurd cited the "numerous examples from around the country where courts have found that the imposition of solitary confinement violated the constitutional rights of *adult* inmates with mental conditions," and observed that the risks were "even greater" for adolescents, "given that *juveniles* share the same increased vulnerability to long-term, or even permanent, psychological damage." 298 F. Supp. 3d 391, 414–15 (N.D.N.Y. 2018) (noting that "the federal government and at least 21 states have prohibited the use of disciplinary isolation for juveniles (and in fact, the State of New York has also largely eliminated the practice)"). These cases have followed on the heels of Supreme Court precedents stressing the special situation of juvenile offenders. *See Miller v. Alabama*, 567 U.S. 460 (2012) (observing that youth "is a moment and condition of life when a person may be most susceptible to influence and to psychological damage," and holding that juveniles cannot be subjected to life without parole under a mandatory sentencing scheme, even in cases of homicide (internal quotation marks omitted)); *Graham v. Florida*, 560 U.S. 48, 82 (2010) (holding that juveniles cannot be sentenced to life without parole for offenses short of homicide); *Roper v. Simmons*, 543 U.S. 551, 568 (2005) (forbidding the imposition of the death penalty on juveniles).

[16] The Court does not opine on the use of the AOSU under other circumstances and as to other juveniles.

sufficient for a fact finder to conclude that the defendant was actually aware of the risk." *Walker*, 717 F.3d at 125 (quoting *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003)). In the Eighth Amendment context, the deliberate indifference standard is truly subjective in the sense that there must be "proof of an official's actual awareness of the harms associated with the challenged conditions." *Darnell*, 849 F.3d at 30; *Farmer*, 511 U.S. at 837 (holding that an official "cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety"; the official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference").

As Plaintiff's expert noted, the deleterious effects of solitary confinement on mentally ill juveniles are a matter of common knowledge in the medical and psychiatric communities, including among mental health professionals working in correctional settings. The AACAP, the APA, and the AMA all condemn solitary confinement of juveniles and mentally ill individuals for punitive purposes, and they further oppose solitary confinement of juveniles except in exceptional circumstances. The National Commission on Correctional Health Care is similarly against the use of solitary confinement on juveniles. Although Defendants' witnesses did not consider detention in the AOSU to be solitary confinement, Defendants do not assert that they were unaware of these organizations' policy statements or of the risks of solitary confinement. Nor could they. In prior litigation, DOCCS agreed to reduce the use and duration of solitary confinement of adult inmates. *See* Order Granting the Parties' Joint Motion for Preliminary Approval of Class-Action Settlement, *Peoples v. Fischer*, No. 11-cv-2694 (S.D.N.Y. Dec. 23, 2015), ECF No. 144, at 14; *Peoples v. Annucci*, 180 F. Supp. 3d 294 (S.D.N.Y. 2016) (giving final approval to class-action settlement in solitary confinement case). That agreement indicates

that DOCCS decisionmakers have known for some time about the problems posed by solitary confinement generally, and it strains credulity for Defendants not to be aware of the even greater risk to mentally ill juveniles. As Judge Hurd noted in *A.T. ex rel. Tillman*, "there is a broad and growing consensus among the scientific and professional community that juveniles are psychologically more vulnerable than adults." 298 F. Supp. 3d at 414. Even DOCCS's directives acknowledge that adolescents are a special category of inmates because of their age. (*See* P-19, § I.A (enjoining DOCCS staff to "carefully consider the age of the AO when determining the penalty" for misbehavior)). At the very least, Defendants received notice through this litigation. *See Farmer*, 511 U.S. at 846 (stating that courts may consider "developments that postdate the pleadings and pretrial motions" to determine whether officials knowingly disregarded a serious risk of harm). The inescapable conclusion is that Defendants were aware of the serious risks that solitary confinement pose to mentally ill juveniles.

Furthermore, the evidence presented at the hearing firmly establishes that Defendants knew the serious psychological harms suffered by E.L. in the AOSU. They knew that E.L. was frequently not attending programming and recreation and therefore spending prolonged periods of time alone in his cell. (*See, e.g.*, Dkt. No. 14-1, ¶ 30 (Defendant Lewis asserting that E.L. had refused programming 66 times and recreation 43 times)). As discussed above, E.L. was recategorized as level one, the highest level of mental health severity, after only a few months in the AOSU. His accumulating disciplinary violations and self-mutilating behavior confirmed that his mental health was deteriorating. There can be no dispute that the Hudson officials who had E.L. in their care, including Defendant Lewin,[17] knew of these developments. Based on these

---

[17] In light of the testimony from Dr. Kraus, the plaintiff, and E.L., as well as the institution's own mental health assessment of E.L., the Court does not credit Defendant Lewin's assertion in her opposition affidavit that his disciplinary incidents were "a direct result of his extremely poor behavior" and "not the result of any mental health concerns." (Dkt. No. 14-1, ¶ 28). Further, the Court does not credit Lewin's statement that E.L.'s "time in the AOSU

facts, the Court concludes that Plaintiff has established a clear likelihood of success on the merits with respect to the subjective prong.

## C.      Balance of Hardships

The Court recognizes that Defendants have a strong interest in maintaining safety and security at Hudson. These strong interests, however, do not override E.L.'s interest in avoiding serious, possibly long-term, damage to his mental health condition from serving any more time in confinement in Hudson's AOSU. *See V.W. ex rel. Williams*, 236 F. Supp. 3d at 589 ("[I]nvoking safety and security does not provide corrections officials with *carte blanche* to deprive incarcerated youth of the guarantees promised by federal law."). Defendants also assert that an injunction directing E.L.'s removal from the AOSU would be burdensome, interfere with Hudson's operations, and require "the expenditure of funds for extra staffing and other administrative changes." (Dkt. No. 14-1, ¶ 34). The Court takes these concerns very seriously, as it must under 18 U.S.C. § 3626(a)(2). But other than a generic assertion in Defendant Lewin's affidavit, Defendants have not submitted evidence that removing E.L. from the AOSU would be unduly costly or significantly disrupt Hudson's operations. Furthermore, the Court must consider the other side of the equation—the serious harm attendant on E.L.'s mental health demonstrated at the evidentiary hearing. Based on this evidence, the Court concludes that the balance of hardships decidedly favors granting a preliminary injunction enjoining the Defendants from confining E.L. at the AOSU. This narrow remedy leaves Defendants room for determining proper alternatives that do not infringe on E.L.'s constitutional rights.

---

at Hudson has not affected his mental health to the extent that he would need to be removed from the AOSU." (*Id.*). At the hearing, Lewin noted that she does not have any mental health education or experience and that she does not have any role in screening any of the AOs for mental health.

### D. Public Interest

The public interest generally supports granting a preliminary injunction where, as here, a plaintiff has established a clear likelihood of success on the merits and made a showing of irreparable harm. *See V.W. ex rel. Williams*, 236 F. Supp. 3d at 589. This is especially true where constitutional rights are at stake. *Sajous v. Decker*, No. 18-cv-2447, 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018) ("The public interest is best served by ensuring the constitutional rights of persons within the United States are upheld."); *Ligon v. City of New York*, 925 F. Supp. 2d 478, 541 (S.D.N.Y. 2013) ("[T]he public interest lies with the enforcement of the Constitution."). For all of the reasons described above, the Court finds that the public interest favors the grant of a preliminary injunction.

## V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's motion for preliminary injunctive relief (Dkt. No. 5) is **GRANTED** as; and it is further

**ORDERED** that Defendants are immediately enjoined and restrained from confining E.L. in Hudson's AOSU pending the final resolution of this action.

**IT IS SO ORDERED.**

Dated: May 31, 2019
Syracuse, New York

Brenda K. Sannes
U.S. District Judge