VOLUME I (UNSEALED PORTION)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---------------------------------------------x

NATALYA PAYKINA, on behalf of
her minor child, E.L.,

Plaintiff,

vs. 9:19-CV-61

DONNA LEWIN, et al.,

Defendants.

---------------------------------------------x

Transcript of an Evidentiary Hearing held on May 16, 2019, at the James Hanley Federal Building, 100 South Clinton Street, Syracuse, New York, the HONORABLE BRENDA K. SANNES, United States District Judge, Presiding.

*Jodi L. Hibbard, RPR, CSR, CRR*
*Official United States Court Reporter*
*100 South Clinton Street*
*Syracuse, New York 13261-7367*
*(315) 234-8547*

A P P E A R A N C E S

For Plaintiff: NEXUS DERECHOS HUMANOS ATTORNEYS, INC.
Attorneys at Law
44 Broad Street, NW
Suite 200
Atlanta, Georgia 30303
BY: DALLAS S. LePIERRE, ESQ.
MARIO WILLIAMS, ESQ.

McFADDEN & SHOREMAN
Attorneys at Law
1050 Connecticut Ave., NW
Suite 500
Washington, D.C. 20036-5334
BY: JOHN M. SHOREMAN, ESQ.

For Defendants: STATE OF NEW YORK
Office of Attorney General
The Capitol
Albany, New York 12224-0341
BY: SHANNAN COLLIER KRASNOKUTSKI, ESQ.

Also Present: Marat Shkolnik, Esq.

I N D E X O F T E S T I M O N Y



| Witnesses | Direct | Cross | Redirect | Recross |
| --- | --- | --- | --- | --- |
| E.L. | 11 | 40 | 47 | -- |
| Louis Kraus | 49 | 79 | 92 | 101 |
| Natalya Paykina | 104 | 112 | -- | -- |
| William Vertoske | 115 | 128 | 136 | 138 |
| Kim Tedaldi | 139 | 162 | 179 | 181 |
| Donna Lewin | 184 | 211 | -- | -- |
| Anita Tomlin | 215 | 230 | -- | -- |
| Adam Ramirez | 233 | -- | -- | -- |

(Open Court, 9:01 a.m.)

THE CLERK: Case is Natalya Paykina versus Donna Lewin, 19-CV-61, Counsel, please state your appearances for the record.

MR. LePIERRE: Morning, Dallas LePierre for the plaintiff, your Honor.

THE COURT: I'm sorry, what was your name?

MR. LePIERRE: I'm sorry, Dallas LePierre.

THE COURT: Okay, thank you.

MS. KRASNOKUTSKI: Shannan Krasnokutski, Assistant Attorney General, for the defendants.

THE COURT: Good morning.

MS. KRASNOKUTSKI: Good morning.

MR. WILLIAMS: I want to introduce myself, your Honor.

THE COURT: Yes.

MR. WILLIAMS: Mario Williams, also for the plaintiff.

MR. SHOREMAN: And John Shoreman also for the plaintiff, good morning, your Honor.

MR. WILLIAMS: Thank you, your Honor.

THE COURT: Thank you, Counsel. We are here today for the evidentiary hearing on the plaintiff's motion for injunctive relief, and as a preliminary matter I want to address the confidentiality concerns about E.L.'s mental

health records and let me just -- is E.L. present in the courtroom?

MR. LePIERRE: E.L. is not here as of yet, your Honor. I'm told that he has arrived, he should be here shortly.

THE COURT: Okay. And do counsel -- I would like to make a ruling regarding what counsel have requested with respect to the sealing of the courtroom. Is there any objection to doing that without E.L. present?

MR. LePIERRE: No, your Honor, no objection to a procedural matter first.

MS. KRASNOKUTSKI: No objection. It's our understanding that they were on the road from the facility before 6 a.m. so it's also our understanding that he should be here.

COURT SECURITY OFFICER: He's in the cell, your Honor.

THE COURT: Okay, can we bring him in then. I understand that plaintiff's counsel wants E.L. present, is that correct?

MR. LePIERRE: Yes, your Honor, we would request him through the hearing. Again, we can deal with the preliminary procedural matter like sealing of the courtroom decision before he gets here, but for the actual testimony, we do want him present, yes, your Honor.

THE COURT: Okay. So maybe, Ms. Hohl, could you tell them to hold off, I'll do the ruling first then.

MS. KRASNOKUTSKI: Actually, your Honor, just to address another procedural matter, it's come to my attention that although there was a -- although there was a writ issued to have E.L. brought to court today, there was not a writ issued to have him brought tomorrow were the hearing to continue into tomorrow so just to ensure his presence tomorrow, we will need another writ issued today in order to have -- DOCCS is willing of course to bring him, we just need another writ issued to do that.

THE CLERK: The writ covered it. The writ says any recessed date which usually DOCCS is fine with.

THE COURT: The writ, as I understand it, the writ says any recessed date, and DOCCS is usually fine with that.

MS. KRASNOKUTSKI: Okay. I'm sorry, as long as that's on the record, sure, we're fine with that.

THE COURT: Okay.

MS. KRASNOKUTSKI: Okay.

THE COURT: Okay. So let me just say as a preliminary matter, I want to address the confidentiality concerns about E.L.'s mental health records and testimony concerning his mental health diagnoses. Both parties recognize the significant privacy concerns in these records and in his testimony. Parties have cited to the federal law

protections under HIPAA, the New York State Mental Health Hygiene Law provisions concerning confidentiality, there's a stipulation of confidentiality order in place in this case, and the New York State Office of Mental Health records have been filed under seal. As I understand it, both counsel seek to have the courtroom closed for testimony concerning the mental health treatment and diagnosis of E.L. Both counsel agree that the compelling privacy concerns of a minor and his mental health treatment outweigh the public interest in open proceedings and both counsel further agree that it's in the minor's best interest not to be present for the testimony opining on his mental health and mental health treatment. And as I understand it, that request is that the minor not be present during the mental health treatment and diagnosis testimony of the plaintiff's expert, Dr. Louis Kraus, who evaluated the plaintiff, and the Office of Mental Health employee Kim Tedaldi, who's expected to testify about the treatment of the plaintiff. Is that correct?

MR. LePIERRE: Yes, your Honor.

MS. KRASNOKUTSKI: Yes, your Honor.

THE COURT: Okay. And can you describe the rationale for not having E.L. present in the courtroom for that testimony?

MS. KRASNOKUTSKI: The rationale is that, first of all, there are the confidentiality concerns mentioned as well

as the issues that were raised in the parties' briefing. Significantly, there is a concern with respect to -- Ms. Tedaldi is one of the treating providers of E.L., we seek to maintain that treating relationship, we don't want to damage that relationship. And in the interest of that, and additionally, Ms. Tedaldi, as well as other providers of E.L. have, you know, have indicated to us that it would be in -- detrimental to E.L.'s mental health to hear some of the testimony that may be offered regarding his treatment.

THE COURT: Thank you, Ms. Krasnokutski.

MR. LePIERRE: And your Honor, I understand and agree to the defendant's concerns and we also agree to the exclusion of E.L. during our plaintiff expert's testimony because he is also going to be relying on past mental health records but as well as mental health records that would be generated while he's at Hudson Correctional which would be the OMH records at issue, so for that reason, your Honor, we join and agree to stipulate to the exclusion during our expert's testimony as well.

THE COURT: Okay. And have you discussed this with the minor's mother, Ms. Paykina?

MR. LePIERRE: Yes, I believe we did. I do not recall the outcome of that but I did speak with her about that briefly and she had no objections that I recall, so there was no, you know, effort on her part to have him

present during that testimony.

THE COURT: Okay. So I will grant the parties' request, and for the record, I will say the Second Circuit has held that "the First Amendment...secure[s] to the public and to the press a right of access to civil proceedings," and I'm citing to the *Huminski v. Corsones* case, 396 F.3d 53 at 82, Second Circuit case, 2005. In order to overcome this presumption of access, the court must make specific on-the-record findings that closure of a proceeding is narrowly tailored to meet a higher government value. See *New York Civil Liberties Union v. New York City Transit Authority*, 675 F.Supp.2d 411, 439, Southern District of New York case at 2009.

"To establish a compelling interest in closure the movant must demonstrate 'a substantial probability of prejudice to a compelling interest of [an individual], which closure would prevent,' including...[an individual's] 'privacy interests,'" and that's the *Huminski* case, 396 F.3d at 86.

A court must [also] "consider whether alternatives were available to protect the interests of the [persons] that the...court's orders sought to guard." Again, that's the same *Huminski* case with the same cite. And, "Any closure order should be narrowly tailored to its purpose."

Here, I find that protecting the privacy interests

of a minor child in testimony concerning his sensitive mental health records and treatment is a compelling interest and that closure of the courtroom during that testimony would prevent a substantial probability of prejudice to the minor's compelling privacy interest.

For the same reason, and the reasons identified by both counsel, the minor has a compelling interest in his effective mental health treatment and excluding him from the courtroom during the portion of the above-described testimony would prevent a substantial probability of prejudice to the minor's compelling privacy interest.

Therefore, the courtroom will be closed and the minor plaintiff will be excluded and the testimony will be sealed, that will only be for the portion of the testimony that concerns the minor's mental health records and treatment. I therefore ask counsel to organize the testimony of Dr. Kraus and Ms. Tedaldi accordingly, and I ask you to please begin the testimony of these witnesses with the aspects of the testimony that do not concern the minor's mental health records and treatment, and then notify the court when you reach the point that implicates the concerns that I've just identified.

MR. LePIERRE: Yes, your Honor.

MS. KRASNOKUTSKI: Yes, your Honor.

THE COURT: Okay. And at this point, we are ready

for E.L.

(E.L. joins the proceedings.)

THE COURT: And I will ask plaintiff to call their first witness.

MR. LePIERRE: Yes, your Honor, our first witness is going to be E.L.

THE COURT: You may step up to the witness stand, and my courtroom deputy will swear -- ask you to swear that you're about to tell the truth, the whole truth, nothing but.

THE CLERK: Can you please raise your right hand.

E . L . , called as a witness and being duly sworn, testifies as follows:

THE COURT: You may proceed.

MR. LePIERRE: Thank you, your Honor.

DIRECT EXAMINATION BY MR. LePIERRE:

Q Can you state your name, please?
A E.L.
Q Mr. E.L., how old are you?
A 17.
Q And where are you currently housed?
A Hudson Correctional Facility, AOSU.
Q What does AOSU mean?
A Adolescent offender segregation unit.
Q Mr. E.L., can you tell me how long you've been in the

adolescent offender segregation unit?
A About seven months.
Q Since about November then?
A November 3rd.
Q Have you been prescribed medications while you're in the adolescent segregation unit?
A Yes, sir.
Q Can you tell me what medications you are currently prescribed?
A Abilify and Depakote.
Q Do you know the dosages of those medications?
A Abilify, 5 milligrams a day, and Depakote, 1250 milligrams a day.
THE COURT: If you could slow down just a little bit, there's a court reporter right in front of you that needs to write down everything that you're saying.
A Depakote, 1250 milligrams.
Q Are those the only medications you've been prescribed while you're in the AOSU?
A No, sir.
Q Can you tell me, what was the medications you were prescribed before those?
A Remeron, Zoloft, and Wellbutrin.
Q How long have you been taking your current medications?
A About three, four months.

Q How many times have your medications changed while you're in the AOSU?
A Two or three times.
Q Are your medications provided you in the same form they were provided to you in originally?
A No, sir.
Q Can you tell me what the difference is?
A They're crushed and liquified.
Q Do you know why they're crushed and liquified?
A Because I received a disciplinary ticket for not taking them and cheeking them.
Q Before you were housed in the Hudson Correctional AOSU, where were you housed?
A In the C cottage.
Q Where was C cottage located?
A In general population.
Q How long were you in general population?
A About a month and a half, two months.
Q Were you on medications when you were in general population?
A Yes, sir.
Q Can you tell me what that medication was?
A Wellbutrin -- actually I was also on Buspar, and I think that's it.
THE COURT: And do you have the spelling of that?

MR. LePIERRE: Buspar or Wellbutrin?

THE COURT: Both.

MR. LePIERRE: B-u-s-p-a-r to my memory, and Wellbutrin is W-e-l-l-b-u-t-r-i-n, and forgive me, that's to my memory, I could be wrong.

Q Was that the only medication you were taking while you were in general population?

A Yes, sir.

Q Before you were in C cottage of general population, where were you housed?

A In 1B in general population.

Q And where was 1B general population located?

A More up front in the facility.

Q Okay. How long were you there?

A Sixteen, seventeen days, I went to C cottage for a program.

Q And were you on medication when you were in C cottage?

A Yes, sir.

Q I'm sorry, take that back, were you on medication when you were in 1B?

A Yes, sir.

Q What medication was that?

A Same medication, Wellbutrin and Buspar.

Q And before you were in 1B, where were you housed?

A A cottage.

Q And where was A cottage located?
A Right across C cottage.
Q And were you there -- I'm sorry, how long were you there?
A About 15 days.
Q And were you on the same medications at that time?
A Yes, sir.
Q And before you were at Hudson Correctional, where were you housed?
A Rockland County Jail.
Q How long were you at Rockland County Jail?
A About eight and a half, nine months.
Q While you were at Rockland County Jail, were you on medication?
A Yes, sir.
Q And can you tell me what medication you were on?
A I was on numerous amounts of medications. Um, Zyprexa, lithium, Depakote, a lot like -- probably 15 different types, they all switched.

THE COURT: Let me just -- can you spell those just so we have an accurate record, as best you can?

MR. LePIERRE: Lithium is l-i-t-h-i-u-m, Depakote is D-e-p-a-k-o-t-e, Zyprexa, your Honor, I could not even begin to guess. I will look that up in just a moment, see if I can find it.

THE COURT: Thank you.
Q And -- excuse me. And why were you at Rockland Correctional Facility?
A Um, for my crime.
Q Were you a pretrial detainee or was it after you had your trial?
A Pretrial.
Q When you were arrested for your crime that sent you to Rockland Correctional, were you on medication?
A No, sir.
Q Were you prescribed medication when you came into Rockland Correctional?
A Yes, sir.
Q And how long after you came into Rockland Correctional were you prescribed medication?
A Within a week.
Q Has anyone ever told you that you have a mental illness, Mr. E.L.?
A Yes, sir.
Q Can you tell me who told you that?
A Four Winds, Rockland, Rockland County Psychiatric Center, Carrier Clinic, and different independent psychiatrists.
Q What was the first time -- or I'm sorry, how old were you the first time you were told you had a mental illness?

A Ten years old.
Q What facility told you that?
A Four Winds.
Q And why were you in Four Winds?
A For a violent act in the house.
Q Were you hospitalized there?
A Yes, sir.
Q And for how long?
A Week and a half.
Q Did Four Winds prescribe you medication?
A Yes, sir.
Q Can you tell me what that medication was?
A I think it was Abilify.
Q Has anyone at Hudson Correctional told you that you have a mental illness?
A On and off, yes.
Q Can you tell me what that means, on and off?
A Sometimes they say yes but if I'm being prescribed a psychotropic medication, then I guess I have a mental illness.
Q And then you said sometimes they don't?
A Sometimes they say I do, sometimes they say I don't. They don't say the ones that I'm diagnosed with, they say I don't have bipolar but they give me bipolar medication.
Q Can you tell me who it was that was telling you that?

A Dr. Hughes and Dr. Tsandikos.

Q How often do you typically see a mental health professional at Hudson Correctional?

A Once every two weeks for about five minutes.

Q And when you say five minutes, can you describe that interaction for me?

A How are you doing, E.L., any problems? No, okay, I got to make my rounds.

Q And where would you have that meeting?

A Usually through the cell door if I'm on deprivation. If not, very rarely I get called out to -- out of my cell to speak with them.

Q And who would it be that you're seeing on those biweekly visits?

A Tsandikos usually but once every single month I see Dr. Hughes.

Q Has the amount of time that you've been seeing a mental health professional at Hudson Correctional been changing?

A Yes.

Q How so?

A Ever since this lawsuit against Hudson, I started seeing them more, they started seeing me a lot more.

Q And how has it changed in the frequency? You said more but can you describe that a little more?

A About once a week, 45 minutes, 40 minutes.

Q And how long has that been going on?
A For about a month now, month and a half.
Q Have you had a visit recently from a mental health professional?
A Yes, I talked to one for five minutes.
Q And have you had a visit from a mental health professional that was to discuss something other than your mental health?
A No, mostly just self-harm and that's pretty much it.
Q Has any mental health professional spoke to you about this case?
A Not really, they just want to get to know me better before the case.
Q And what do you mean by get to know you better before the case?
A Since I'm going to be a witness or whatever, that's what they said.
Q And who said that?
A One of the mental health ladies.
Q Do you know her name?
A No, I never found out.
Q Have you met her before?
A Yes.
Q And where did you meet her when she said she's going to be a witness at your case?

A About two weeks ago.
Q What was the substance of that meeting?
A Just to see how I am, get to know me I guess, ask questions about my life and hospitalizations.
Q Do you have any individual therapy sessions at Hudson Correctional?
A Short ones, five minutes where it's not really therapy, just ask me how my day is.
Q Do they ask you about your medications at those meetings?
A If they're doing all right, if -- any side effects.
Q You said you're currently housed in the AOSU?
A Yes, sir.
Q Do you know where in the segregation unit you're housed?
A On the first floor, fourth cell.
Q Do you know how many cells are in that particular unit?
A Say about 20.
Q Do you know how many are occupied?
A Say about 12.
MR. LePIERRE: If I may approach, your Honor, I have the exhibits.
THE COURT: Yes.
MR. LePIERRE: And if your Honor has no objection, this is plaintiff's composite Exhibit 1 I'm going to show it

to the witness in parts and then admit the entire exhibit at the end.

THE COURT: Okay. Any objection to the admission of Plaintiff's Exhibit 1?

MS. KRASNOKUTSKI: If I could see the exhibit.

I don't, subject to the stipulations we previously reached regarding any redactions that may be necessary regarding security issues on the photographs.

MR. LePIERRE: And yes, your Honor, we have redacted copies that we will provide after the hearing.

THE COURT: Okay.

MS. KRASNOKUTSKI: Thank you.

THE COURT: Are you moving for the admission of the exhibit now?

MR. LePIERRE: I can move for admission of the exhibit now, your Honor, on stipulation.

THE COURT: Okay. Plaintiff's Exhibit 1 is admitted.

MR. LePIERRE: If I may approach, your Honor.

THE COURT: Yes, you may.

Q Mr. E.L., I hand you a series of pictures, if you could take a moment to review those.

A (Witness complies.)

THE COURT: And Counsel, just in terms of the record, do all counsel agree that the plaintiff should be

referred to as E.L. or perhaps Mr. E.L. for the purposes of the public transcript?

MR. LePIERRE: Yes, your Honor.

MS. KRASNOKUTSKI: For the public transcript, I think that's correct.

MR. LePIERRE: Yes, your Honor, I think that's perfectly acceptable and preferred.

Your Honor, we have Exhibit 1 in redacted paper and redacted digital format, I can submit that whichever form you prefer.

THE COURT: Either is fine.

MR. LePIERRE: Perfect, thank you, your Honor.

Q Mr. E.L., looking at the very first photo that was in front of you, you see -- do you see that photo?

A Yes, sir.

Q It should say Paykina 000001?

A Yes, sir.

Q Can you tell me what that is?

A My cell door.

Q I believe looking at the bottom right side there's a small flap and like little lever on it?

A Yes, sir.

Q Is that the flap referred to earlier when you said they speak to you through the door?

A Mostly speak through the window right there, it slides.

Q So looking to the right of the window there's a little grill, is that where you're talking about?
A Yes, but they can't open it, there's a lock on it.
Q Okay. How long were those visits through the flap?
A At most five minutes, at most three minutes, just -- because she does a round every day but it's just like, I got to do my rounds, how are you doing? Okay, you're doing good, I got to go do my rounds now.
Q Was that going on through the entirety of your time at AOSU?
A Yes, sir.

MR. LePIERRE: Your Honor, permission to show demonstrative exhibit, it's a larger version of one of the photos received.

THE COURT: Okay.

Q Looking at this photo, Mr. E.L., do you recognize that room?
A Yes, sir.
Q Can you tell me what that room is?
A My cell.
Q Is that an accurate photo of your cell?
A Yes, sir.
Q Can you tell me about how large that cell is, Mr. E.L.?
A About a parking space.
Q Can you tell me what the temperature in that cell is

like in the winter?
A Hot to the point where you're sweating if you're just sitting down doing nothing, I say about 85.
Q Can you tell me about the temperature of that room in the summer?
A I've never been there in the summer but from what everybody else tells me, it's about the same.
Q Can you tell me about what the temperature is in that room right now in the spring?
A It's pretty cold because there's no heat.
Q How many hours a day do you typically spend in that cell?
A The most, the most you can stay out of your cell is six hours but I do about -- I stay out about -- I stay out about four hours, so 20 hours.
Q Looking at this photo, and if I may, your Honor, there's some writing on the wall right about here (indicating)?
A Yes, sir.
Q Do you know what that writing is?
A Me asking for a doctor.
Q Can you tell me who wrote that?
A Me.
Q Can you tell me why you wrote that?
A Because I was on deprivation for about the 10th day and

nobody would talk to me and I was self-harming.
Q And what do you mean by you were on deprivation?
A Twenty-four hours with -- can't leave your cell for nothing but a visit.
Q And what do you mean when you say you were self-harming?
A I was cutting myself, pieces of metal.
Q Where were you cutting yourself?
A My forearm.
MR. LePIERRE: Your Honor, if I may?
THE COURT: Yes.
Q Can I see your arm, Mr. E.L.?
A I got handcuffs on, I can't lift it up.
MR. LePIERRE: If I may, can I roll the witness' sleeve up?
THE COURT: Yes.
Q You said it's your right arm?
A No, left arm.
Q Left arm, I'm sorry.
A It goes all the way up here (indicating).
Q I'm just going to get a little bit so we can see it.
If your Honor could see?
THE COURT: I see.
MS. KRASNOKUTSKI: If I could, just to see. Thank you.

MR. LePIERRE: And if I may, your Honor, put his sleeve back down?

THE COURT: Yes, and for the record, the court and defense counsel have witnessed the cutting marks on his left arm.

Q And Mr. E.L., you said you were cutting yourself when you were on 24 and 0, is that correct?

A Yes.

Q Can you tell me, is that typically something you do when you're on 24 and 0 deprivation?

A Yes, sir.

Q I'm showing you another photo. Mr. E.L., can you identify that photo?

A My cell door.

Q Is that from the inside or the outside?

A The inside.

Q And can you tell me, is that an accurate photograph of your cell door?

A Yes, sir.

Q Looking to the right side of the door if I may, right here, can you see what's written there?

A "Let me out."

Q Just above it right here, if I may approach, your Honor?

THE COURT: Yes.

Q Tried to get one big enough but -- right here?
A Oh, yeah.
Q What does that say?
A "Help me."
Q And who wrote that, Mr. E.L.?
A Me.
Q Can you tell me why you wrote that?
A 'Cuz I was on deprivation again and I was just tired of it.
Q Was this a separate deprivation than the one which you wrote, "I need a doctor"?
A Yes, sir.
Q Can you tell me, Mr. E.L., how many times have you been on 24 and 0 deprivation?
A Say at least eight times.
Q And in the last five months that you've been in segregation, can you tell me about how many -- how many days have you been on 24 and 0?
A At least, at least 75.
Q And how long is each typical 24 and 0 deprivation?
A Anywhere from a week to 13 days, my experience.
Q Are there any other kinds of deprivation orders that you've been subject to?
A Water deprivation where they turn off your water and like every four or eight hours you get like 15 minutes' worth

of water and there could be just shower and recreation deprivations, most of the time it's placed on everything, except water, except water.

Q And what does water deprivation typically consist of?

A You just get water once, 15 minutes, but most the time COs don't even give you water.

Q Have you had any water deprivation where you were deprived of water for an extended period of time?

A Yes, sir.

Q Can you describe that experience?

A I kept asking for water and they wouldn't give me water like they said they would give -- they said they would give me water but they wouldn't turn on the water.

Q Did you eventually get a drink?

A Yes, sir.

Q And how did you do that?

A I had to wait until the next shift.

Q And you said there was a shower deprivation order, could you describe that to me?

A Can't go to showers at all unless you have a visit, then you can get like a little five-minute shower.

Q How often are you permitted to shower when you're not on deprivation order?

A Every day.

Q Mr. E.L., do you recognize that photo?

A Yes, sir.
Q Can you tell me what that's a photo of?
A That's a clean shower.
Q I'm going to need you to explain that to me; what do you mean that's a clean shower?
A Well, before your visit everybody clean, they wax the floors, buff them, make sure everything was swept up, bleach the showers, all that so usually it's lot more dirty, writing on the wall and all of that.
Q Is that the shower you typically use?
A Yes, sir.
Q Can you tell me about how large that shower is?
A About a closet, little shoe closet.
Q And when you said it's typically not that clean, what would it typically look like?
A Have bars of soap on the ground, hair all over the floor, rags, writing on the walls, all that, they painted those, they painted over most of it.
Q And how long are you permitted to take a shower?
A Ten minutes, fifteen minutes.
Q Once you finish with your shower, where do you go?
A Back into your cell.
Q Where do your dirty clothes go when you're done showering?
A Inside our laundry bag, wait until Wednesday.

Q And then what happens on Wednesday?
A Send it out.
Q How do you send it out?
A Through the slot.
Q Slot in your cell door?
A Yes.
Q And how do you get it back, how do you get your laundry back?
A You wait until the end of the day, then they give it to you clean.
Q When they give it to you where do they give it to you?
A Through the slot.
Q In your cell door?
A Yes, sir.
Q You said you typically have four to six hours outside of your cell a day, is that correct?
A Yes, sir.
Q And for four of those, two to four of those hours it's called programming, is that correct?
A Yes, sir.
Q Look at that photo, Mr. E.L., do you recognize that room?
A Yes, sir.
Q Can you tell me what that room is?
A Program room.

Q Is that an accurate photo of the programming room you're in?
A Yes, sir.
Q Can you tell me what the temperature is like in the programming room?
A Little bit colder than the room usually.
Q Is it significantly colder?
A Yes, sir.
Q Can you tell me, there are chairs in this room. Would those be the chairs in which you would sit?
A Yes, sir.
Q How long per day would you spend in that room at a time?
A Two hours at a time.
Q When you're in this room, are you attached to those chairs in any way?
A Yes, sir, you're shackled and then you're bolted down to the floor with a lock.
Q And where would that bolt be located?
A Right where -- right where the desk meets the floor.
MR. LePIERRE: And if I may?
THE COURT: Yes.
Q Would that be that area right there (indicating)?
A Yes, sir.
Q Those shackles, are they attached just to your feet?

A Yes, sir.
Q Have you been on an order called a restraint order?
A Yes, sir.
Q Can you tell me what that is?
A Basically this (indicating), you go everywhere like this.
Q And have you been on that order while you were in programming rooms?
A Yes, sir.
Q How frequently?
A Few times.
Q And when you're on that order would the shackles still be attached to the chair?
A Yes, sir.
Q Would you be able to reach the top of the desk?
A Barely.
Q Would you be able to reach above the desk?
A Barely.
Q When you're in this room, what are you doing?
A They call it, I guess it's like lifestyle, lifestyle decision points, some program called that, but it's really basically we don't do anything.
Q Do they give you any written materials to work with?
A Yes, but it's -- if I may give you an example, it's like, Tommy's mother is a crack addict, what should he do?

Q And is that graded at the end of any given day?
A No, just hand it in.
Q Do you ever receive anything back from those?
A No.
Q During the time that you're in this room, are you permitted to use a restroom if you need to?
A No, sir.
Q If you have to use the restroom, is there anything that you can do?
A Go back to your cell.
Q Are you permitted back into the re -- I'm sorry, the programming room after that?
A No, sir.
Q So to go to the restroom you have to end your out-of-cell time?
A Yes, sir.
Q Once you've completed the two hours programming in that room, where do you go?
A Back to my cell. There's no programming on the weekends so you only get about two hours outside of your cell.
Q So the programming room, how many days a week do you get programming?
A Five.
Q And that would be Monday through Friday?

A Except on holidays.
Q Do you get to go outside at some point during the day?
A For two hours.
Q Mr. E.L., looking at this photo do you recognize this area?
A Yes, sir.
Q Can you tell me what this area is?
A The rec pens.
Q Is this hallway an accurate representation of the entrance to the rec pens?
A Yes, sir.
Q Is this the area that you go to when you're going outside?
A Yes, sir.
Q Are each of those doorways an individual recreation pen?
A Yes, sir.
Q How many people are permitted in each individual pen?
A There are four rec pens with usually two people in each and there are four single pens.
Q And what would you be using?
A Up till recently I was using the single, single recs but now I'm in double pens most of the time.
Q And when did that change?
A Ever since the lawsuit.

Q Mr. E.L., do you recognize this photograph?
A Yes, sir.
Q Can you tell me what that is?
A That's the multiple people inside of a pen, rec pen.
Q Is that an accurate photograph of a multiple-person recreation pen?
A Yes, sir.
Q Do you know if that would be the largest of the pens available?
A One of the largest.
Q Do you know about how large that pen is?
A I couldn't give you an explanation of that.
Q And how long are you in these pens in any given day?
A Two hours, maybe two hours.
Q Are you permitted to go in early?
A Yes, at 6, it starts at 5 and early go-back is at 6.
Q And how would you ask to go back in?
A You had to scream can I go back inside.
Q Is this pen open to the weather?
A Yes, it is, little roof covering.
Q When you say little roof, would it cover the entire pen or part of the pen?
A Part of it.
Q Would it be at the front or the back of the pen?
A The back.

Q So looking at this photograph, would that be the door?
A Yes, sir.
Q Would that be the front of the pen?
A Yes, sir.
Q And then looking at the roof, would the covered part be back here?
A Yes, sir.
Q Do you know about how wide the covered area is?
A Um, how wide, it's half the pen, half the pen is, half the pen is out in the weather, half the pen is in.
Q Can you tell me what the temperature is like in that pen in the winter?
A Whatever the weather is, if it's freezing, it's freezing.
Q Are you provided extra warm clothing when you're going to go out in that pen in the winter?
A Provided a sweater and a jacket.
Q Is that sufficient that you'd like to go out there at all times in the winter?
A Usually not.
Q If you suspected it was cold, below freezing in the winter, would you elect not to go outside?
A CO say you have to stay out until 6:00 if you go out, so you had to stay out half the time.
Q Did you ever say you were not going to go out at all to

avoid the weather?

A Yes.

Q About how many days did you do that?

A 15, 20 days throughout the winter.

Q Looking at this photo, Mr. E.L., do you recognize that photo?

A Yes, sir.

Q Can you tell me what that photo is?

A One of the walls of my cell.

Q Is that an accurate photo of the walls of your cell?

A Yes, sir.

Q And I believe right in the middle there is the "I need a doctor" we referenced earlier, is that correct?

A Yes, sir.

Q Mr. E.L., can you describe to me the effects of being locked down 24 hours a day?

A Well, you get more angry, you get like, it's like cooped up like, I don't know how to describe it, it's like you get anxious, you get more panic attacks, start wanting to hurt yourself, it's like your behavior gets worse and worse every day, and it's just you don't feel like yourself. You start to turn on yourself, like if you look at a wall, one time I looked at a wall and I saw the color was brighter and then it got to regular, then it went back to color like being bright.

Q Would you have difficult dreams?
A I wouldn't really be sleeping that well.
Q Did it make it difficult for you to control your emotions?
A Yes, sir.
Q Did you lose track of time when you were on 24 and 0?
A Yes, sir.
Q How frequently?
A Every day, it would be like some days would go quickly, some days would go slowly. I would think an hour went by, in reality like four hours went by, then the next day I would think an hour went by and only like 30 minutes went by.
Q When you're on 24 and 0 deprivation order, how frequently in any given day would you speak to another person?
A You could always speak outside your window or where the other inmates are in they cell, they keep their window open, but staff, they usually just ignore you.
Q How often were you left in your cell for 20 hours a day?
A Hmm?
Q How often were you left in your cell for 20 hours a day?
A Twenty?
Q Yes, sir, only with four hours outside of your cell.

A How often was I left?
Q How often did you spend 20 hours a day in your cell?
A Well, that's every day that I'm not on deprivation.
Q And why do you spend 20 hours a day every day you're not on deprivation?
A Because I go to -- I go to one program and I go to one rec.
Q Why don't you go to the second program?
A I don't go to the first program because I sleep in the morning.
Q And why are you sleeping in the morning?
A Because I go to sleep late because it's loud.
Q And how often are you in your cell 18 hours a day?
A Almost never unless I want to leave and go to morning program.
MR. LePIERRE: If I may have just a moment, your Honor.
Q Mr. E.L., when you're in your cell for 20 hours a day, what are you doing in your cell?
A Reading, working out, that's pretty much all I can do, and I listen to the radio, listen to the radio, on the wall.
Q Does the radio on the wall always work?
A Not always. Right now it's not working, channel 2 is not working.
Q When you're in your cell for 20 hours a day, do you

feel anxious?
A I always feel anxious.
Q Do you have difficulty controlling your emotions when you're in your cell 20 hours a day?
A Yes, sir.
Q Do you have difficulty sleeping when you're in your cell 20 hours a day?
A Some nights.
MR. LePIERRE: Your Honor, I think that's all I have for this witness.
THE COURT: Thank you. Cross-examination.
MS. KRASNOKUTSKI: Yes.

CROSS-EXAMINATION BY MS. KRASNOKUTSKI:

Q Good morning, Mr. E.L.
A Good morning, Miss.
Q My name is Shannan Krasnokutski, we haven't met before, I represent the defendants in this matter. Mr. E.L., you indicated that your morning program, you prefer not to go to that program because you prefer not to wake up and go to that program in the morning, is that right?
A Yes, ma'am.
Q And that's because you prefer to go to sleep very late at night, is that correct?
A Because it's loud, yes.
Q Because it's loud?

A Yes.
Q Is that also because you prefer to listen to your radio late at night?
A Nothing good on the radio late at night, it's just loud.
Q I see. But it's -- there's no one who prevents you from going to your morning program, you just prefer not to?
A Yes, because I'll only be getting about five hours of sleep.
Q So we looked at some photographs of your cell earlier, is that correct?
A Yes, ma'am.
Q It's quite a bit of writing on that wall, would you agree with me?
A Yes, ma'am.
Q And I know your counsel pointed out some of the things you wrote on that wall; you also wrote quite a bit of profanity on that wall, is that right?
A Yes, ma'am.
Q You wrote some profanity about the COs?
A After they punched me, kicked me, yes, ma'am.
Q You wrote "All COs suck dick" on your wall, is that correct?
A After about eight of them punched me and kicked me, yes.

Q We also looked at some pictures that showed the ceiling of your cell; was the fire and smoke alarm system pulled out of the ceiling, is that correct?
A Yes, ma'am.
Q Did you do that?
A On deprivation, yes.
Q Did that knock out the electricity to the entire block?
A Where?
Q In the AOSU when you did that?
A I think so.
Q You don't think so?
A I said I think so.
Q You think so. The, the recreation pen, so you've recently been in a double recreation pen; do you have your recreation time alone or with someone else?
A Someone else.
Q You do your recreation time with someone else these days?
A Ever since, ever since this lawsuit started, yes, ma'am.
Q Had you previously been requesting to do your recreation time with someone else?
A Yes, ma'am.
Q You had?
A Every day.

Q Had you previously assaulted anyone in the recreation pen area?
A Never assaulted anybody inside the recreation pen area.
Q Did you ever spit at any other AOs in the recreation pen area?
A I don't think I ever got a disciplinary report saying that I spit on --
Q Did you ever throw any feces on other AOs in the recreation pen area?
A Actually, I never got a disciplinary report on that, so I don't --
Q So that wasn't actually the question I asked, though. Did you throw feces at other AOs in the recreation pen area?
A Yes, ma'am, after they spit on me.
Q So how many times did you do that?
A One time.
Q How many times would you say you've thrown feces at people overall?
A Two times.
Q How many times would you say you've thrown urine at people overall?
A Never thrown urine.
Q You've never thrown urine at staff, for example?
A Never, Miss, they're saying I threw toilet water on one occasion, I never did that.

Q You never threw feces at staff either?
A Not on staff but at staff, I received a recent ticket, yes, ma'am, about a month and a half ago, or month ago.
Q So if you have 17 misbehavior reports for unhygienic acts, you didn't throw urine or feces 17 times?
A No, unhygienic act is not all urine, feces, that could be flooding your cell.
Q Or it could be spitting, correct?
A It could be spitting, yes, ma'am.
Q How many times would you say you spit at people?
A A good amount of times.
Q Spit at staff quite a few times, right?
A Yes, ma'am, after they rough handled me, couple times.
Q Sometimes you've done it through the hatch of your cell when no one's been inside your cell, right?
A Yes, ma'am.
Q Have you -- you mentioned flooding your cell, have you flooded your cell?
A Yes, ma'am.
Q How many times?
A Two times.
Q And did those two times precede having your water turned off?
A Yes, ma'am.
Q We also talked about the chairs in the programming

room, right; are those called restart chairs?
A Restart, I don't know what they're called.
Q Okay. I guess it doesn't matter what they're called. They have shackles in the ankle area, correct?
A Yes, ma'am.
Q And they restrain your ankles to the chair while you're sitting in the chair?
A Yes, ma'am, so you can't get up.
Q On April 5th of this year, while you were in the programming room, did you throw a chair and break the window?
A Yes, ma'am.
Q Did you do that while you were shackled to a chair?
A Yes, ma'am.
Q So you mentioned that you speak to mental health professionals when they do their rounds and that they do those rounds every day, correct?
A Every day, almost every day.
Q And in addition to those rounds, they also have private therapy meetings with you, is that also correct?
A You want to call it therapy meetings, but yes, ma'am.
Q But they're separate from the rounds that those mental health professionals do, right?
A Yes, ma'am.
Q Did you ever tell any one of your mental health treatment providers that you were self-harming at any point?

A On Monday I was on suicide watch.
Q Right, because did you tell someone prior to that that you were self-harming?
A Yes, ma'am.
Q Before this week, did you tell anyone you were self-harming?
A I mentioned it, I said that I was depressed on numerous, multiple times I said that I'm depressed, I have a history of self-harm, that's all right, that's all right, how about we'll give you this medication, never want to talk to me about it, never asked to see anything that I said that I'm self-harming.
Q You told someone that you were self-harming?
A No, I said that I have a history of self-harming, my bad, and that I'm depressed.
Q Who did you tell that?
A Dr. Tsandikos, Dr. Hughes.
Q Sorry?
A I've been asking for antidepressants for a very long time.
Q Did you tell her you were actually self-harming?
A No, I told her I was self-harming, I went on suicide watch on Monday.
Q So when you actually said that you were self-harming, you were put on a one-to-one watch?

A Yes, ma'am, for one day.

Q So it seems, Mr. E.L., that your incidents in the AOSU kind of go in waves; it seems between January and March you had a time period of about six weeks where you didn't have any incidents, is that correct?

A Yes, ma'am. Yes, ma'am.

Q And you actually received a time cut for -- in the AOSU for your good behavior, is that correct?

A About 90-day time cut, yes, ma'am.

Q And in fact right now you haven't had any incidents in 24 days for which you're to be commended, is that also correct?

A Yes, ma'am, I started my medication, my Abilify, sufficient time to kick in.

MS. KRASNOKUTSKI: Okay, well, I have no further questions at this time. Thank you.

THE COURT: Any redirect?

MR. LePIERRE: Yes, your Honor.

REDIRECT EXAMINATION BY MR. LePIERRE:

Q Mr. E.L., on your earlier testimony you said that when you're in 24/0 and 20-hour-a-day confinement, that you get anxious and angry, is that correct?

A Yes, sir.

Q And would you say that your disciplinary actions have been result of that anger and anxiety?

A Yes, sir.
Q Can you tell me, have your disciplinary actions tended to come more and more the longer you were in confinement?
A Yes.
Q Can you tell me, do they tend to get more serious the longer you're in confinement?
A Yes, sir.

MR. LePIERRE: No further questions.

THE COURT: And what is 24 and 0?

MR. LePIERRE: I apologize, your Honor. Deprivation order for 24 and 0 means you spend 24 hours a day in your cell and zero hours a day outside of your cell. A 20 and 4 is 20 hours a day in your cell, four hours a day outside of cell, two of it in the restart chair for programming, your Honor, and two of it for recreation.

THE COURT: Is that your understanding?

THE WITNESS: Yes, sir -- I mean yes, ma'am.

THE COURT: Okay. Anything further?

MR. LePIERRE: Not from me.

MS. KRASNOKUTSKI: Not at this time.

THE COURT: You're excused, you may step down and sit next to your attorney.

(The witness was excused.)

THE COURT: And you may call your next witness.

MR. LePIERRE: At this time, your Honor, the

plaintiff calls Dr. Kraus to the stand.

THE COURT: Please go ahead and step up and my courtroom deputy will place you under oath.

THE CLERK: Can you please state and spell your name for the record.

THE WITNESS: Louis, L-o-u-i-s, Kraus, K-r-a-u-s, M.D.

L O U I S   K R A U S , called as a witness and being duly sworn, testifies as follows:

MR. LePIERRE: Your Honor, before I start, Dr. Kraus has kindly provided a spelling for Zyprexa. Z-y-p-r-e-x-a.

THE COURT: Thank you.

DIRECT EXAMINATION BY MR. LePIERRE:

Q Could you state your name, please.

A Louis Kraus.

Q And what is your occupation?

A I'm a physician, child and adolescent general forensic psychiatrist.

Q And where are you employed, Dr. Kraus?

A I'm employed at Rush University Medical Center and also I have a private practice.

Q And how long have you been employed there?

A Seventeen years.

Q What's your current title?
A I'm chief of child and adolescent psychiatry, director of forensic psychiatry.
Q Can you describe to me briefly the subject matter of your current specialty?
A Well, it's -- there's a lot of different things. The specialty itself covers work with children and adolescents as well as with young adults. Forensic psychiatry focuses on work within the courts, and the overlap of psychiatric work and court testimony. I do a variety of different things with that, I'm not sure if you want me to go into that.
Q Please.
A Okay. So in regards to my work at Rush, I run a program, we have six child and adolescent psychiatry fellows, an inpatient unit, a large outpatient program, I work in a residential program, as part of that I go with the trainees, I teach the forensic psychiatry class to the University of Illinois and the Rush fellows. Separate from that I do a lot of work with children with autism, I've set up a large program there, I'm the medical director for the Easter Seals therapeutic schools. I have a private practice where I do forensic work both at Rush as well as in my private practice. I do a lot of work with kids in schools in regards to their Individual Education Programs and services they might need or acute risk issues that they might be having at schools. I

get called up to evaluate the kids and in addition, I do a fair amount of treatment for kids, assessment medication therapy, some therapeutic work as well. My forensic work is varied, I'm not sure if you want me to go into that --

Q Sure.

A -- history. I worked for nine years at the maximum security youth center in Joliet, I worked as a consultant with the CRIP division of the Department of Justice, that's the Civil Rights of Institutionalized Persons Act assessing several programs in different states, juvenile correctional programs. I have continued to do work sometimes as a consultant for the ACLU, but also as an independent consultant. I have a large case right now in Illinois, been working on for about four years where I was jointly picked by the state and the ACLU to help restructure their mental health program.

Q Can you tell me what academic degrees you hold?

A I'm sorry?

Q What academic degrees do you hold?

A I have a BS actually from Syracuse, an MD from Chicago Medical School.

Q Can you tell me, are you licensed in any fields?

A Sure, I'm licensed as a physician in the state of Illinois, in Florida, and in Arizona.

Q And how long have you held those licenses?

A The longest would be Illinois, that has been since 1991. Florida for about 10 years, and Arizona for about 10 years.
Q How long have you been practicing in these fields?
A Well, I finished my child and adolescent psychiatry training in 1994.
Q Are you Board certified in any of these fields?
A I am, I'm Board certified in general psychiatry, child and adolescent psychiatry, and in forensic psychiatry.
Q And how long have you been Board certified?
A Long time. 1993 for general psychiatry, 1995 for child and adolescent psychiatry, and I believe 19 -- 1997 or 1999 for forensic psychiatry.
Q Do you do any academic research in addition to your other duties?
A Indirectly. I'm not a -- I get bored with counting numbers, but I put together research programs. Ever since medical school I've been involved with different levels of research, that most notable research now is dealing with autism and the autism program that I've put together where we currently have I think six or seven ongoing research projects.
Q And do you have any experience related to adolescents or the mentally ill in solitary confinement?
A I do.

Q Can you explain that experience to me?
A Sure. You know, as I described, clinical actually working with these kids when I worked at Joliet, I've written a fair amount, I've got a couple books that I've edited and chapters that I've written on juvenile justice issues. I've assisted with policy statements regarding solitary confinement for the American Academy of Child and Adolescent Psychiatry, American Psychiatric Association, and I continue to look at these areas. I, in regards to cases that have come up over the years, probably for the last 15 years or so, I speak on these issues, variety of different, you know, both in regards to national conferences, in my professional agency there was a large bioethics conference last year at Harvard that I presented on actually with Stuart Grassian who's another, a general psychiatrist who has some pivotal papers on the topic.
Q Have you been published in this field?
A Yes.
Q I know you mentioned some books, do you have any articles published in this field?
A I do. I can't tell you what they are off the top of my head. Some of the things I've -- I wrote the practice parameter for child and adolescent forensic evaluations for the Academy of Child and Adolescent Psychiatry which is in a peer-reviewed journal, and I've had two monographs that I've

done on juvenile justice reform, and varying articles over the years.
Q Have you received any honors or awards in your field?
A I have.
Q And can you tell me what those are?
A How far back do you want me to go?
Q Try to keep it to the last 10 years so we can shorten this.
A Okay. So smidgen longer than that, what's called a Laughlin fellow when I was a resident, which is a pretty big deal as a psychiatric resident, there are only a couple of those a year that are given out. I was given an honor when I finished the practice parameter, they gave me an award for writing that, it took about three years to put together. Nothing else is jumping out at me.
Q And have you given testimony in court as an expert witness before?
A I have.
Q I believe you mentioned a couple of highlights but do you know about how many times you've given testimony as an expert before?
A In all courts or --
Q Yes. All courts.
A Several hundred times.
Q And attached to your expert report is a curriculum

vitae; is that an accurate curriculum vitae for yourself?

A It is.

MR. LePIERRE: Your Honor, pursuant to Federal Rules of Evidence 702 I move to admit Dr. Kraus as an expert witness.

THE COURT: Any objection?

MS. KRASNOKUTSKI: No, I have no objection to the expert's qualifications.

THE COURT: Okay, the court accepts Dr. Kraus as an expert witness in the area of I assume child psychiatry, child and adolescent psychiatry, and psychiatry in -- forensic psychiatry?

MR. LePIERRE: Yes, your Honor.

Q Dr. Kraus, you stated that the Academy of Adolescent Child Psychiatry, the American Psychiatric Association, and the American Medical Association all have position statements on solitary confinement, is that correct?

A Yes.

Q Can you tell me what those position statements are?

A Well, they all have certain similarities and then very subtle differences. Probably the most stringent is the American Academy of Child and Adolescent Psychiatry which is essentially against any type of solitary confinement, any, any type of a placement where a child is removed from their regular routine, social interactions, education, dining,

et cetera, essentially without exception. They make a point also of adding, you know, that it is not to be used for punitive purposes. That's something that is consistent with all three of the programs. The AMA and the American Psychiatric Association also are against the use of solitary confinement. They will say in there there's a caveat, you know, except in very extreme circumstances. Typically what they are referring to with that, since I played a part with both of those, have to do with mental health issues. If somebody's acutely suicidal, they need a protective environment that might result in some level of isolation. Medical issues, where somebody might have an infectious disease, broken bone, they'd be at risk if they went with the general population, those are examples of reasons that -- extenuating circumstances where there could be some type of segregation or solitary confinement from the general population.

Q So we can understand the basics, we'll go back to the beginning, so Doctor, could you define for me, what is solitary confinement?

A Solitary confinement is removing of a child and adolescent from -- well, anyone really for that matter, from their typical interactions within a facility. You know, for adolescents, modifying or removing them from school, changing their eating, so for example, eating in their rooms instead

of in the cafeteria with other kids where there's some amount of socializing, having limited rec time, rec time is typically done in group, they play basketball, they do things like that, large muscle type things, whereas most kids in solitary confinement when they describe a rec time, it's almost always in some level of solitary, you know, this example, for example in a cage, probably the most common that you see are cages.

Q Is it defined by a specific number of hours that the individual could spend alone?

A It is not.

Q Is there any concern within the industry -- within the area over the use of incorrect labels?

A There is. Sometimes there can be a bit of a shell game in regards to what is solitary confinement, so the most common you'll see is a general term of segregation. Then you'll see a term such as administrative segregation or administrative holds, or other types of holds. And then most commonly what you'll see is kids that are placed in what are termed behavioral dorms, many different names for these types of behavioral dorms. Some are reasonable programs that focus on behavioral plans that are modified with a goal of getting the kids back into the general population as quickly as possible, and others simply are a type of solitary confinement, just with a different name.

Q Have you reviewed the policies of the defendants describing the Hudson Correctional adolescent offender segregation unit?
A I have.
Q And in reviewing those did you determine whether or not that would be considered a solitary confinement facility or not?
A In my opinion, both in reviewing and observing that, it is a form of solitary confinement.
Q Did you visit the location in which Mr. E.L. is confined?
A I did.
Q Can you tell me, upon your visit, did you determine whether or not that would be a solitary confinement or segregation unit?
A In my opinion it was solitary confinement.
Q And when you first walked into the cell, did you have a reaction to that cell?
A I broke out in a sweat, it was really hot.
Q And when you first walked into the exercise pens, did you have a reaction to that area?
A I was cold. They were -- you know, they were pens, you've shown a picture of them and that's basically what they look like, they were pens where the kids would spend a period of time and they could get some fresh air, but nothing more

than that.

Q So based on your personal review of the policies and based on your personal review of the conditions of E.L.'s confinement, and the standards within your field, does the AOSU constitute solitary confinement that is addressed within those policy statements you spoke of earlier?

A Yes.

Q What are the concerns about the effects of solitary confinement within your field?

A The, you know, you have to understand that 60 to 70 percent of kids that are placed in correctional facilities across the country, including here, and Mr. E.L. in particular, have mental health issues, so they're already going to be at higher risk for sequelae of solitary confinement. That said, and what is written about has to do with worsening mood symptoms, depression, higher risk for suicide, suicide attempt, suicidal thought, self-mutilatory behavior, anxiety, kids will become progressively not trustful of others. What we term in mental health is hypervigilance, a suspiciousness, some kids will even develop a post-traumatic symptomatology. For some, depending on the amount of time, it can become permanent, or have a permanent sequelae from it.

THE COURT: Could you describe what you mean by sequelae?

THE WITNESS: Sure. So worst-case scenario, and we've seen this in the news, are children that have killed themselves as a result of being in solitary confinement. We see kids that have depressions which continue for periods of time, anxiety symptoms, and suspiciousness, you'll see these are -- many of these kids come into a facility already with some lack of trust, sometimes that lack of trust is what's kept them alive on the streets. But these systems isolating them, like putting them in these cells for long periods of time worsens that, and when they leave, often makes what was a very difficult presentation to treat an almost impossible presentation to treat.

Q And when you say that mental illness can be worsened, is that something juveniles are particularly susceptible to?

A Yes.

Q And can you explain that for me?

A Sure, and this is consistent in all the writings on this issue, is that juvenile brains are continuing to develop. Now there are what are called functional MRI studies and all kinds of work that's been done, National Institute of Health to show that the juvenile brain continues to develop until you're about 25, but the easiest way to understand that is actuarialists have known this for years, that's why you have to be 25 to rent a car, they know there's always been a proclivity for impulsiveness, something that

wasn't fully understood until now.

But with the ongoing development of the brain, juveniles are going to be more susceptible compared to their adult counterparts on the impact and effects of solitary confinement.

Q And would they be more susceptible to long-term effects from solitary confinement?

A Yes.

Q Are there any effects of solitary confinement that are unique to juveniles?

A The only thing that I, in my opinion that you could say is unique is their susceptibility, the symptomatology can occur, you know, across developmental lines, but their symptomatology to the impact of solitary is just -- they're much more at risk than their adult counterpart.

Q I'm going to ask the layman question. When you say their symptomatology is a little more acute, does that mean it affects them worse?

A They tend to be more -- the whole reason that there is so much more about juveniles in solitary confinement is because juveniles are more significantly impacted by solitary confinement, are more at risk than their adult counterparts. That's why all the -- all the organizations that you see, American Psychiatric Association, if you see their policy statements regarding juveniles in solitary confinement versus

adults, they're different, it's much more stringent with juveniles.
Q How about the effects on the mentally ill, is that more pronounced?
A So one of the very important things, actually in New York, but also for the American Psychiatric Association, is you don't put the mentally ill in solitary confinement. The mentally ill are going to be at much higher risk for worsening symptomatology, sometimes at a catastrophic level, not just in regards to themselves but the impact that it can have on their behavior and on others.
Q Would a combination of a juvenile who is mentally ill be particularly vulnerable to solitary confinement's effects?
A Yes.
Q Do you know if there's any permanent effects of solitary confinement on mentally ill juveniles?
A It's unclear for certain what effects may be permanent or not. We know that the effects are significant, we know that major disorders such as depression, anxiety disorders and post-traumatic stress disorder can develop as a result. It's unclear whether those will be permanent or not.
Q Would they be long term?
A That's clearly a possibility.
Q Are there any risks to the life of juvenile or mentally ill inmates who are placed in solitary confinement?

A There's a higher risk of suicide, both within solitary confinement and after they get out of solitary confinement compared to their counterparts.
Q And is that increase in risk significant?
A They don't have an exact number in regards to what that -- what that risk is, but when you look at some of the work of the suicidologists, almost all suicides in juvenile correctional facilities, it's extremely rare that you see a serious attempt or completed suicide when they're not in solitary confinement.
Q And when you're testifying as to the effects of solitary confinement of juveniles and the mentally ill, what are the sources of that information that you're getting?
A Well, as I mentioned, there is a really important article by Stuart Grassian, and regarding, what he did was a systematic review of all the articles looking at the impact of solitary confinement but since that time, there have been varying articles written about solitary confinement and the impact.
Q And have those articles and studies been conducted and peer reviewed?
A Yes.
Q Is there a general consensus within the peer-reviewed literature on the effects of juvenile and -- I'm sorry, solitary confinement on juveniles and the mentally ill?

A There's certainly -- it's very hard, you know, peer-reviewed journals try to separate and isolate themselves from their professional societies, so the American Psychiatric Society has their own professional journal, the Academy of Child and Adolescent Psychiatry, the American Medical Association, but they try very hard to keep themselves somewhat insulated so you may not know what their general consensus is, but what I can tell you is that, you know, all of -- the American Psychiatric Association, Academy of Child and Adolescent Psychiatry, and the American Medical Association, not to mention certain accrediting agencies such as National Commission of Correctional Health Care have a very clear policy against the use of solitary confinement on juveniles.

Q I believe you just mentioned the National Commission on Correctional Health Care, is that correct?

A Yes.

Q Can you tell me who that is?

A Sure, it's one of the major accrediting agencies for prisons and jails throughout the country. Actually interestingly, originally created through the American Medical Association some 30 years ago, and one of the things that they look at is solitary -- one of the many things they look at are the use or lack of solitary confinement, and they have very clear policy that they are not in support of the

use of solitary confinement. They also define solitary confinement as not so much in hours but in the removal of youth from their day-to-day activities, and that the reason it's a big issue for the National Commission of Correctional Health Care is that it feels like a de facto option. In other words, that, and I want to point out, I'm saying this, I was on the board of trustees of the National Commission of Correctional Health Care and I was head of their juvenile health division for a period of time, but they look at this as a de facto option, the use of solitary confinement. In other words, if there's not enough staff, not enough mental health interventions, then they can always, you know, isolate a child into a room and keep them there as their option if they -- well, I'll stop there.

Q You say it's a de facto option when there's not enough staff or not enough mental health professionals; do you mean it's a de facto option as opposed to mental health treatment or in addition to?

A The construct is there is not enough mental health interventions, there's not enough put into place for deescalation options, and as a result, you'll see this across the country, facilities will use solitary confinement as an option, you know, the rationale, we're going to protect staff and protect the child by doing this, but in reality, it's because they're not getting enough of the other interventions

which are necessary.

Q Do you know, is there a position within psychiatric and the medical field regarding the use of solitary confinement on juveniles and the mentally ill as a punitive measure?

A Yeah, they're a hundred percent against that, all of them.

Q And so by a hundred percent against that, do you mean there's no situation which it should be used as a punitive measure?

MS. KRASNOKUTSKI: Objection to the leading questions.

THE COURT: Sustained.

Q I apologize, your Honor, let rephrase. What do you mean by they're a hundred percent against that?

A In each policy statement, you will see that it says clearly solitary confinement is not to be used for punitive purposes. Now there's several reasons for that, but one of the key reasons is that there's no benefit. We've discussed the problematic components and all the ill effects that it can have but there's essentially no positive effects of solitary confinement.

MR. LePIERRE: And your Honor, at this time I'm going to begin to go into the portion of Dr. Kraus' testimony that will cover the mental health treatment of Mr. E.L. so I believe we need to clear the courtroom?

THE COURT: Okay. At this point, for the reasons the court stated earlier, the court will order that the courtroom be sealed and that Mr. E.L. be taken out of the courtroom for this portion of the testimony. And that will require all the people in the courtroom to leave the courtroom.

MS. KRASNOKUTSKI: Does that require parties as well?

THE COURT: Let me check with plaintiff's counsel for his view on that.

MS. KRASNOKUTSKI: Did we reach a consensus about parties with respect to the mental health testimony because we were going to have parties removed as well?

MR. LePIERRE: I believe, yes.

MS. KRASNOKUTSKI: Then that's fine.

THE COURT: I'm sorry, was there a consensus?

MS. KRASNOKUTSKI: We'll just have everyone removed.

MR. LePIERRE: Okay.

COURT SECURITY OFFICER: Do you want the gallery cleared, your Honor?

THE COURT: Yes, please.

COURT SECURITY OFFICER: Everyone will have to leave.

(Pages 68-103 contained in separate sealed transcript)

(Open Court, E.L. present.)

THE COURT: And counsel may proceed with the next witness.

MR. LePIERRE: Of course, your Honor, calling Natalya Paykina to the stand.

THE CLERK: Could you please state and spell your name for the record.

THE WITNESS: Natalya Paykina.

THE CLERK: Can you please spell it.

THE WITNESS: N-a-t-a-l-y-a. P-a-y-k-i-n-a.

THE CLERK: Please raise your right hand.

N A T A L Y A   P A Y K I N A , called as a witness and being duly sworn, testifies as follows:

DIRECT EXAMINATION BY MR. LePIERRE:

Q Can you just state your name, please.

A Natalya Paykina.

THE COURT: Ms. Paykina, you may need to be a little closer, not too close.

THE WITNESS: I apologize, I have a cold.

THE COURT: Because the court reporter needs to hear you.

THE WITNESS: Of course. Too close.

Q Ms. Paykina, what's your relationship to Mr. E.L.?

A I'm his mother.
Q How long have you known Mr. E.L.?
A His entire life.
Q Ms. Paykina, have you had custody of Mr. E.L. throughout his life?
A Yes.
Q And did you share that custody, Ms. Paykina?
A Yes.
Q Who did you share with?
A With his father Alexander L.
Q Can you tell me, Ms. Paykina, how old were you when you first realized that Mr. E.L. suffered from a mental illness?
A Officially since the age of 10. Previously, he had symptoms which I discussed with his pediatrician but there was no official diagnosis. So for the record, starting from age 10 he was diagnosed with mental illness.
Q And how old was E.L. when he was first hospitalized?
A 10.
Q And was that when you learned of his mental illness?
A Yes.
Q Can you describe to me briefly how you attempted to help E.L. after his hospitalization?
A We saw therapists, we saw psychiatrists, tried to be supportive. At some point he was -- we decided to send him to a therapeutic boarding school called Diamond Ranch

Academy. We tried two military schools, back then it was popular to believe that behavior could be modified by discipline, and people like E.L. would be commended to be sent to a structured disciplinarian setting, but unfortunately it did not work.

Q Did he eventually leave the military academy?

A Once he was expelled from both.

Q Do you know of any hospitalization that's been able to help E.L.?

A There was one place, it was Red Hook, it was OCFS setting, he was sent there following his placement in Highland OCFS facility and during a couple of months when he was there, he seemed to be doing remarkably better. They used trauma-based therapy approach and he benefited from that a lot, it was also very safe. It was minimal security and he hadn't had a single incident in that placement.

Q Do you know about how long E.L. was there?

A A few months.

Q When was he released from that facility?

A In the summer of 2017 -- 2016?

Q Do you know if, after that time, Mr. E.L. stayed current with medication and treatment?

A We tried. He went to Dr. Blackstein, probably about a dozen sessions, but he felt that he did not want to continue.

Q And did treatment stop at that time?

A Yes. He also went to DayTop Treatment Center, that was his -- for his drug addiction, and that didn't work out well either.

Q Ms. Paykina, do you know if E.L. was eventually arrested?

A He was arrested when he was -- well, he was apprehended when he was 15, he was -- yeah, I guess that was arrested.

Q And was that what resulted in him going into the OCFS custody?

A Yes.

Q And once he came out of Red Hook, was he arrested again?

A Yes, about six months, approximately, maybe, I'm not being precise, but yes, a few months following that, he was arrested.

Q Can you describe to me the events that led up to that arrest?

A E.L. got in touch with his peers from OCFS from the first facility, Highland, and he gravitated toward that crowd and he was introduced to drugs and drug distribution, basically got mixed in, started skipping schools, being defiant, not coming home, eventually one night he shot at a house in the neighborhood, with drug dealers, supposedly they took his drugs, something happened, nobody could really understand what that was all about. It was very sudden. He

was having nervous breakdowns before, he was very anxious, he was concerned about not doing well, not fitting in. It was very hard for him to fit in in the community after he was released from OCFS. It didn't work out with his school, he basically was an outsider in his own community and he, he was rejected by his school, by the school district, he was sent to special school very far away from home, and academically he was not on par with his peers because OCFS did not really provide education on the level that was done in our school district. So he was lagging behind, that created shame. He was different, he acted different, he spoke different, gestures were perceived as threatening, but in OCFS, that was typical behavior, kids curse and they make threatening gestures. To each other, to staff, to the guards. It was a warehouse, and he got many of his habits right there and then, and then when he transferred to the community, it didn't look good, at all.

Q At the time he was arrested, was he on medication?

A He was self-medicating.

Q What do you mean by he was self-medicating?

A He was taking Xanax, he was smoking marijuana, drinking alcohol, and probably doing other drugs, judging by his friends. One of his friends OD'd shortly after E.L. was arrested.

Q Was he in therapy at the time of his arrest?

A No, that's -- he was done with therapy.
Q Ms. Paykina, have you been visiting Mr. E.L. in the AOSU?
A Yes.
Q About how often do you visit Mr. E.L.?
A I try to be there every weekend. Often with his father, sometimes by myself.
Q And when you meet with him, how long do you meet with him?
A Well, at least two, three hours. It takes awhile for him to be produced because he is in segregation unit, and I also live very far away so it's a very long drive and I work full time so it's after a full day of work, full week of work. So I get up in the morning, start driving, get there, and then waiting for him, so it's not as long as I would like it to be, but it's regular.
Q Are you in the same room with E.L. when you visit him?
A Yes.
Q Are you able to speak with him normally?
A Yes.
Q Have you observed any changes in E.L. since he's been in the segregation unit?
A Yes, I have noticed that.
Q Can you tell me what changes you've observed?
A He was becoming a different person, hypervigilant, more

anxious than usual, depressed, he had often trouble formulating thoughts. The way his perception began to work was quite odd. Also, he, he -- his presentation worried me, and his moods worried me. Sometimes he would be okay but then a few seconds later he would get profoundly depressed, then he would look around and tell me, everybody's looking at me, what's going on, and then he would be fine again.

Last time I was there, he was better, he was out of 24 to 0 but the time before, when he was in 24 to 0 we tried playing a game of chess, and he is okay at that game but he couldn't get halfway through it, he felt like everything was overwhelming, there was too much stimuli and he wanted it to end, which is unusual. So I guess that's normal when you sit in a small area without any stimulation, to come out into family meeting room with all the other families and having to play that type of a game. But again, we've played chess in OCFS, E.L. likes that game, and it made me feel concerned like cognitively, is he still the same person, can he really focus or is something off.

Q And did those changes come on immediately?

A Some of them did. I noticed maybe after one or two weeks, he wasn't himself. And he was almost physically scared, and he was scared also because he told me it was very hard for him to control himself, and he felt aggressive, and he felt like everybody was after him, out to get him.

Q And did you notice if things were getting more severe as time went on?
A Yes. Sometimes he's calm, sometimes he's anxious, sometimes he's hypervigilant, it's -- he's just not the same kid anymore.
MR. LePIERRE: If I may have just a moment, your Honor.
THE COURT: Yes.
Q Ms. Paykina, has E.L. always been aggressive?
A Compared to an average child, I would say yes.
Q Ms. Paykina, do you love your son?
A Very much so.
Q Do you want him to receive the treatment he needs?
A Absolutely, he absolutely needs treatment.
Q And do you believe that with appropriate treatment someday your son could come home?
A Oh, I would take him home today and put him in treatment, but I can't, obviously. I think he has matured tremendously. Even with all the negative factors of imprisonment, I do think that E.L. matured and I think he's more than ready to be responsible and start treatment and he was actually accepted to college so he can be in college.
MR. LePIERRE: Thank you. I have no further questions, your Honor.
THE COURT: Cross-examination.

MS. KRASNOKUTSKI: Just a couple questions.

THE COURT: Oh, actually I have one question first. What is OCFS?

THE WITNESS: It's Office of, um, Children and Family Services.

THE COURT: Thank you. I'm sorry, go ahead.

CROSS-EXAMINATION BY MS. KRASNOKUTSKI:

Q Just a couple questions. When we talked about the incident for which E.L. was arrested when he shot at a house?

A Right.

Q That was a house with people in it, correct?

A Correct.

Q And E.L. has been violent in the past, correct?

A Yes.

Q He's actually assaulted you, correct?

A Yes, it's all part of his mental illness, it's one of the main symptoms of the disorder that he has, physical aggression.

Q But he's been aggressive --

A Yes, and unfortunately as ugly as it may seem, it is the true face of his mental illness.

Q But this was -- aggression was something that happened prior to his time in Hudson?

A Absolutely.

Q Um, Ms. Paykina, you mentioned that you visit E.L.

every week, correct, or most weeks?
A Almost, almost, I try my best, but it might not be every consecutive week, but --
Q And you mentioned that there are times when E.L. says that he feels that there are people looking at him when you're visiting him?
A That's correct.
Q Are there any times when you have visited E.L. when you have physically been feeding him?
A Feeding him?
Q Yes.
A Could you elaborate?
Q Like physically giving him food?
A No.
Q You haven't physically given him food in the visiting room?
A Just describe exactly what you mean, I'm not sure I understand. I've been buying him food from the vending machines and heating up the food and giving it to him. You mean like putting food in his mouth like he is a child?
Q That's what I mean, correct.
A No, to my recollection, I have not, but maybe I'm forgetting something.
Q I was just wondering whether you had ever physically been giving him the food, yes, as if he were a child.

A To my best recollection, I have not, but I could be wrong.

MS. KRASNOKUTSKI: Okay, thank you.

A But he eats a lot.

MS. KRASNOKUTSKI: Fair enough, thanks.

THE COURT: Redirect?

MR. LePIERRE: I have no redirect, your Honor.

THE COURT: Okay, thank you, Ms. Paykina, you may step down.

THE WITNESS: Thank you.

(The witness was excused.)

THE COURT: Anything further from plaintiff's counsel?

MR. LePIERRE: Your Honor, we have no further witnesses.

THE COURT: Okay. Then let's start with the defense. I'd like to break at 12:30, 12:40-ish, depending when's a good time to break. Take a shorter lunch break if we can so that we can try to wrap up as much as we can today.

MR. LePIERRE: Of course, your Honor.

MS. KRASNOKUTSKI: Sounds great.

THE COURT: So the defendants may call their first witness.

MS. KRASNOKUTSKI: So our first witness is Bill Vertoske.

THE CLERK: Can you please state and spell your name for the record.

THE WITNESS: My name is Bill Vertoske, B-i-l-l, V-e-r-t-o-s-k-e.

W I L L I A M V E R T O S K E , called as a witness and being duly sworn, testifies as follows:

DIRECT EXAMINATION BY MS. KRASNOKUTSKI:

Q Good morning, Mr. Vertoske.

A Good morning.

Q Can you introduce yourself to the court, where do you work?

A I work for the New York State Office of Mental Health Central New York Psychiatric Center, I am a forensic program administrator.

Q And what is your education?

A I have a Master of Arts in community and clinical psychology and a Bachelor of Science in psychology.

Q And what is your background in terms of work, previous jobs?

A Prior to working for New York State?

Q Correct.

A I worked for county community mental health centers, I worked with Children and Youth Intensive Case Management

Services, and supervised a children and youth day treatment program.

Q And what's your current position?

A I am forensic program administrator by title but I am currently the acting director of corrections-based operations for Central New York.

Q And what does that mean?

A So I have statewide responsibility for the administrative operations associated with all of our prison-based mental health services in the Department of Corrections.

Q And what are your duties broadly in that role?

A Broadly it's to ensure all of our policies for corrections-based operations are supervised and adhered to, I supervise a team of administrators that actually supervise the correctional facilities themselves. So I have forensic administrators who supervise our facility personnel and work with me to ensure program operations are met.

Q Now does that apply to all the correctional facilities in the state of New York?

A It does.

Q And is there any distinction in your role between the adult facilities and the adolescent offender facilities?

A No specific distinction.

Q So you have the same role with respect to adolescent

offender facilities?
A Yes.
Q And with respect to adolescent offenders, do we refer to them sometimes within the Office of Mental Health as AOs?
A Yes.
Q So you'll understand what I'm talking about if I say AO?
A I will.
Q Okay, so with respect to the inmate population, and we're going to talk specifically here about AOs, what are the various levels of care -- actually let's take it out more broadly, with respect to the inmate population as a whole what are the various levels of care that OMH provides to individuals who are in a correctional setting?
A It's a very broad array of mental health treatment services. I would liken it to a community-based mental health treatment model. We have, services are designed by level, so we have a level 1 through 6 system which indicates what the facility service level is that can match the treatment needs of the inmate population that are housed in that facility. So our highest degree of mental health services are in level 1 mental health facilities, and there are at least 15 of those correctional facilities where we have full-time mental health treatment staff, including a full-time psychiatry, we have a nursing staff and in those

facilities in addition to clinic treatment services, we have some facilities that specialize in residential mental health treatment services for the seriously mentally ill.
Q So just to be clear, when you say you have levels 1 through 6 and that applies to both individuals and facilities, do you mean that facilities as well as individuals within OMH are given a number?
A Yes.
Q Now what is the number in terms of level of service at Hudson?
A Hudson is a level 1.
Q Is that the highest level of mental health service available?
A Yes, it is.
Q Now can you just describe for me generally the levels 1 through 6 as they would apply to an individual, what does that mean?
A The -- I'll go by level if that's okay.
Q Yes, please do.
A Level 1, the definition. Level 1 is individuals who have serious mental illness or significant behavioral disorders that require treatment where there's the highest degree of on-site staff available, so like I said, that's psychologists, social workers, psychiatrists, nursing staff, all have a unit administrator, and have the different options

of services available like an intermediate care program, for instance.

Level 2 facilities have full-time mental health staff but may have part-time psychiatry staff, access to psychiatry is matched based on their facility and program level.

Level 3 facilities have at least part-time mental health staff and part-time psychiatric staff. Those facilities are -- we have much fewer of those.

And level 4 facilities, very -- only a couple of facilities have part-time mental health clinical staff but not access to psychiatry, so individuals who are designated level 4 in one of those facilities would only be receiving counseling or psychotherapy services and not psychotropic medication.

And level 6 facilities are facilities within DOCCS that do not have any full time or any mental health staff full or part time.

Q Okay. And within DOCCS what are sort of, what are the different environments in which care can be provided; are there different settings within DOCCS that an inmate patient might be able to receive care?

A Yes, most of the individuals receiving mental health services in DOCCS receive so through clinic model, have a primary therapist, which they see at least monthly, that's

the minimum standard, oftentimes it's, folks are seen more depending on the clinical need, and we do specialized treatment services for the seriously mentally ill in the adult facilities right now, residential mental health treatment units where we have intermediate care -- intermediate care programs where we have four hours of programming out of cell per day for those folks who are designated with serious mental illness.

Q Is that therapeutic programming?

A Yes, it's residential therapeutic programming.

Q And of these levels of care that you just described, are all of those available to adolescent offenders as well?

A The residential mental health treatment unit is not available to the adolescent population right now.

Q So with respect to adolescent offenders specifically then, can you describe what mental health care is available and provided to adolescent offenders?

A Yes. Right now we have, we have full-time clinical staff at the adolescent offender units, individuals who are on the mental health caseload receive two, minimum of two out-of-cell therapy callouts per month, individualized treatment plan is developed in conjunction with the adolescent and the family if indicated, and if there's medications, the medications are prescribed and monitored by a psychiatrist. Mostly it's the clinic model, since we don't

have any residential services available.
Q Now how is it determined what level of services and what treatment plan is going to be provided to a particular AO?
A The primary therapist, the clinician or psychologist, social worker, in conjunction with the unit administrator, for Hudson it's a unit chief and a psychiatrist will collaborate with the adolescent as they would any particular patient and jointly develop treatment goals and objectives with a plan developed to implement those.
Q Is there a particular regime of initial screening that is done at each facility when an AO is admitted?
A Yes, all AOs are screened within 24 hours of admission by a mental health professional.
Q And what screening is done as part of that routine?
A It's a, it's a, it's a -- it's a typical psychosocial interview with, you know, looking at mental status, behavioral observations and presentation, information related to someone's history is often available at the time of an interview; if not, we can seek that to gain further clarification around someone's history and then factor that into the diagnosis and a determination is made at screening whether someone has a diagnosable mental health disorder that we would admit to the mental health caseload and then provide active mental health treatment services to.

Q Are there any specific assessments that are required to be completed?
A Yes, there's a suicide screening assessment that DOCCS does, we always have that in the forefront of our mental status exams. We administer the ACES, the Adverse Child Event Survey, to all individuals in this population looking at their trauma-associated histories, we have a MAYSI screening which looks at, it's a short-term screening looking at mental health-related problems perhaps within the 12- to 17-year-old age range.
Q And does staff at adolescent offender facilities request and review records from any prior treatment that the individual may have received before admission to that facility?
A Yes, they do.
Q Let me finish there.
A I'm sorry.
Q And with respect to the adolescent offender population, the screenings that you mentioned, are those unique to the adolescent offender populations or are those the same screenings that are done for the adult population?
A They're unique to the adolescent population.
Q Which of those are unique?
A The MAYSI 2 and the ACES survey checklist. A-C-E.
Q A-C-E, thank you. Now, after admission to the

facility, how is screening continued by the treatment team to determine that the treatment plan and the care levels continue to be appropriate for the individual?

A That's monitored consistently throughout the therapeutic contact throughout, like I said, with two private sessions offered per month with a primary clinician, that's always part of the -- part of the examination or the assessment if you will, it's an ongoing process where, by virtue of spending time working with someone in a therapeutic context, you're always examining against the treatment goals and progress or the need to revise goals if necessary, if you're not making the progress that you're striving for.

Q And in terms of from an OMH perspective, is there a policy or directive that sets time frames for how often someone is required to meet with their psychiatrist and other treatment providers?

A There is.

Q And what is that policy?

A Minimum standard is one time per month with a primary clinician if you're on the active mental health treatment caseload and a minimum of 90 days, minimum of every 90 days with a psychiatrist or a psychiatric nurse practitioner.

Q And if an individual wishes to see a treatment provider more often, what options are available?

A Many options. Again, if someone is on the caseload and

working actively with mental health treatment, that can be a routine part of their discussion within the context of that therapy process. If between scheduled appointments an AO or an adult wishes to reach out to mental health, they can talk to staff and ask for an immediate referral, they can send a letter, they can -- they can do numerous things to garner our attention so that we can schedule sooner than the anticipated follow-up appointment was.

Q Now if an AO is admitted to the adolescent offender separation unit or the AOSU, is there a policy that requires that person to undergo some type of screening?

A They're screened, we don't have a policy specific for AOSU. We have a protocol, and everybody admitted to AOSU is screened by a mental health clinician within 24 hours of admission to the unit.

Q What does that screening involve?

A Similar, similar description in terms of the typical mental health interview, again, focused on behavioral observations, mental status, look at suicide and self-harm risk factors and ultimately trying to determine if at this particular point in time if there needs to be a change in the treatment plan, given, if they're already working with mental health or if they're not active with mental health, if there's an indication for mental health treatment.

Q And if the individual continues to remain in the AOSU,

are they screened by an OMH professional thereafter?
A They are screened, they're screened, for -- on active mental health caseload or if someone's not on the active mental health caseload?
Q Well, I guess let's handle it both ways. Is an individual screened simply by virtue of being in the AOSU, or --
A On the initial screening.
Q Only for the initial screening?
A Right, that's the requirement.
Q If they're on the mental health caseload, then what would happen?
A Then they would be -- they're again offered out-of-cell therapy, private contacts every two weeks, and then additionally with a psychiatrist.
Q Does OMH have any role in terms of the ongoing therapeutic evaluation of patients in considering the ongoing appropriateness of placement of the individual in the AOSU?
A Insomuch as their -- our staff collaborate with the correctional staff, the security staff and the executive administration regarding anybody who's in that unit. If there's a concern and there was a question for us to be brought into a conversation to examine or reexamine the situation, then certainly.
Q Would part of the role of an OMH clinician be to look

for any deterioration in the individual's mental health condition?

A Absolutely.

Q And if there was such a deterioration observed, what steps would that clinician take?

A Depends on how acute the deterioration or the decompensation would be. If someone was exhibiting self-injurious behavior or felt to be at high risk for suicidal behavior or were demonstrating severe mood symptoms or psychosis potentially, then we would initially look at increasing the observation status of the individual, and if indicated, could access inpatient hospitalization at Central New York Psychiatric Center in Marcy, New York.

Q Now Central New York Psychiatric Center is primarily an adult facility, correct?

A It is.

Q So in terms of placing a juvenile in Central New York Psychiatric Center, would that individual have to be separated from the adults?

A Yes, that would be managed specifically by the inpatient operations unit, and there have been a couple of adolescents that have been admitted there and they're essentially observed continuously so that they're -- while they're at the inpatient unit, not, you know, vulnerable to the adult population.

Q Does OMH have any inpatient secure facilities for juveniles at this time?
A Not that I'm aware of.

MS. KRASNOKUTSKI: Okay. Thank you, I have no further questions at this time.

THE WITNESS: Sure.

MR. LePIERRE: Your Honor, you want to break for lunch at 12:30?

THE COURT: Let me ask, how long do you expect?

MR. LePIERRE: Probably 10 or 15 minutes at least.

THE COURT: Okay, why don't we take our lunch break now, so we'll -- if it works for all counsel, I'd like to return at 1:10, so it's a shorter lunch break since you have a number of witnesses, trying to get through as much as we can.

MR. LePIERRE: Yes, your Honor.

THE COURT: So we'll return at 1:10.

MR. LePIERRE: Yes, your Honor.

THE COURT: There is a cafeteria on the fifth floor.

MS. KRASNOKUTSKI: Thank you.

(Luncheon recess, 12:31 p.m. to 1:16 p.m.)

THE COURT: And Mr. Vertoske, you may return to the witness stand. Cross-examination?

MR. LePIERRE: Thank you, your Honor.

CROSS-EXAMINATION BY MR. LePIERRE:

Q Mr. Vertoske, I believe you said you have a BS and an MA, is that correct?

A That's correct.

Q Are you a licensed clinician?

A I am not.

Q You are aware of the policies of the Department of Corrections in relation to mental health treatment, is that correct?

A I'm not sure I understand the question.

Q You're aware of the policies in the Department of Corrections that cover the provision of mental health to inmates, both adults and juveniles, is that correct?

A Well, they're DOCCS directives and OMH policies, yes.

Q Do you have any policy that is consistent with the American Psychiatric Association's policy position with -- I'm sorry, in relation to the use of solitary confinement on juveniles and the mentally ill?

A We do not.

Q Do you have any policy or directive that is in compliance with the American Medical Association's policy position on the use of solitary confinement on juveniles and the mentally ill?

A No, we do not.

MS. KRASNOKUTSKI: Objection to the extent these

questions -- they're ambiguous questions.

THE COURT: Overruled.

Q Do you have any policy or procedure that -- I'm sorry, policy or directive that is consistent with the National Correctional Institute of Health's policy position on the use of solitary confinement on juveniles and mentally ill?

A We do not.

MS. KRASNOKUTSKI: Objection, to the extent he even knows what that policy is, that position is.

THE COURT: Overruled.

Q And do you know if you have a policy or a directive that is consistent with the Academy of Adolescent and Child Psychiatry's policy position on the use of solitary confinement on children -- or I'm sorry, juveniles and the mentally ill?

A We do not.

Q What agency accredits the AOSU facility at Hudson Correctional?

A That would be the ACA.

Q ACA. I believe you said there was a MAYSI evaluation that's given to individuals as they go into the AOSU?

A Yes.

Q Are you familiar with what that --

A No, I'm sorry, not as they go into the AOSU, as they are evaluated at intake into the facility.

Q I apologize, intake. Are you familiar with what that evaluation tool is used for?
A In general terms, yes.
Q What is it used for?
A Brief mental health screening for individuals between the age of 12 and 17.
Q What does it screen for?
A For mental health symptoms.
Q Do you know if it is intended to be used with any other forms of assessment or treatment?
A I do not.
Q Would it surprise you to learn that it's actually used to determine suicidal behavior or suicidal likelihood?
A Would I be surprised?
Q Yes.
A Since I said I wasn't familiar with the other reasons it's used, then I'll say yes.
Q Are you familiar with the treatment that Mr. E.L. received in the AOSU?
A Not specifically, no.
Q Do you have any evidence that Mr. E.L. received more than a once-monthly visit from his treating physician?
A I do not specifically have that, no.
MS. KRASNOKUTSKI: He just said he's not familiar with it.

THE COURT: Overruled.
Q Do you have any evidence that Mr. E.L. received more than a five-minute visit during his treatment?
A I have no evidence to that.
Q Do you have any policy related to the provision of mental health treatment while an individual is on deprivation orders, specifically a 24-and-0 lockdown?
A No, not specific to that.
Q Would it be appropriate for an individual who's on 24-and-0 lockdown to receive only a visit through his cell door?
A From whom?
Q From his treating physician.
A That they have the opportunity to receive out-of-cell therapy callouts in that condition as well.
Q So it's your position that he has the ability to have an out-of-cell callout while he's under 24-and-0 deprivation?
A Yes, he would.
Q Are you aware that Mr. E.L. has been on 24-and-0 deprivation orders multiple times?
A Only through the testimony provided today.
Q Are you aware that he's asked for mental health treatment and never received while under 24 and 0 other than a brief visit at his cell door?
A I'm not aware of that.

Q Are you aware that Mr. E.L. has requested assistance for mental health treatment more than once and never received it?
A I am not aware of that specifically.
Q I believe you said that inmates in DOCCS facilities under OMH care are graded at level 1 through 5, is that correct?
A 1 through 6.
Q 1 through 6?
A There is no 5.
Q And level 1 is the most severe, is that correct?
A Well, it has the highest available -- highest amount of available services, the most -- the greatest array of services available, yes.
Q That would be the grade of the facility, but grading individual, level 1 would be the most severe psychological need, is that correct?
A It would be, it would -- yes, it would correlate with the need for the most amount of treatment, yes.
Q If an inmate is classified as level 1, what is the typical treatment the policies provide that they should receive?
A As stated earlier, the minimum standard is once a month psychotherapy, private callouts and if on medications, the psychiatry callouts every 90 days.

Q I believe you said you have no facility for providing in-house treatment, residential treatment of a juvenile in DOCCS custody, is that correct?
A That's correct.
Q When DOCCS takes care of an inmate, a juvenile, do you have a responsibility to maintain and provide for his mental and physical care?
MS. KRASNOKUTSKI: Objection to questions as to DOCCS' responsibility, that's not his employer.
THE COURT: Overruled.
A Can you restate the question, please.
Q When DOCCS takes custody of an inmate, do they have a responsibility to take care of his physical needs?
A Yes.
Q And does OMH provide for the responsibility to take care of his mental health needs?
A Yes.
Q And would that include residential inpatient treatment if needed?
A Yes.
Q Do you know how many juveniles have been given inpatient hospitalization in the last five years?
A I believe it's two but I'm not entirely certain.
Q Do you know how many juvenile inmates have been given inpatient hospitalization within the last 10 years?

A I wouldn't know that, no.
Q How many juvenile inmates are under OMH care in any given year?
A I'm not entirely sure, the population's relatively small, I would estimate 40 to 50, at any given time.
Q At any given time?
A Yeah.
Q And how often do the individual inmates tend to change?
A Tend to?
Q How often does that population tend to turn over?
A I'm not entirely sure of that.
Q What's the longest time that a juvenile would be in the adolescent offender care?
A I do not know.
Q Would it be accurate to say 16- to 17-year-olds are in adolescent care?
A Yes.
Q In your opinion, is the use of solitary confinement on mentally ill, documented mentally ill juveniles appropriate?
MS. KRASNOKUTSKI: Objection, outside the scope of direct.
THE COURT: Overruled.
A No.
Q In your opinion, should solitary confinement be used as a punitive measure against juveniles or the mentally ill?

A No.
Q When an inmate is brought into DOCCS custody, do you know if they're given any depression screening?
A Not a specific screening tool, no.
Q When they go into the AOSU, do you know if they're given a depression screening?
A No, they are not.
MR. LePIERRE: Could I have just a moment, your Honor.
THE COURT: Yes.
Q And to your knowledge, did Mr. E.L. get an evaluation for hospitalization during his time in the AOSU?
A I would say that's always a consideration based on the contact with the therapist and a psychiatrist but specific to trying to answer that question, I'm not aware.
MR. LePIERRE: Your Honor, I have no further questions.
THE COURT: Okay. I had a few questions. Can you -- you mentioned there were two juveniles who were -- received inpatient hospitalization in the last five years. Where was that, where is inpatient hospitalization?
THE WITNESS: Central New York Psychiatric Center in Marcy, New York.
THE COURT: And to your knowledge, are there currently juveniles there?

THE WITNESS: I believe there's one.
THE COURT: Thank you.
THE WITNESS: You're welcome.
THE COURT: Cross-examination -- or redirect?

REDIRECT EXAMINATION BY MS. KRASNOKUTSKI:

Q Mr. Vertoske, are you employed by DOCCS?
A No.
Q Who are you employed by?
A The Office of Mental Health.
Q And there was some discussion during cross about a number of policies of various correctional facility accrediting agencies; does OMH develop any policies specific to compliance with, accreditation with a correctional facility accreditation?
A OMH does not develop those specific to that.
Q Does OMH develop any policies regarding correctional facility units, whether separation units or other portions of correctional facilities at all?
A Not from an operational standpoint, no.
Q There -- do you know E.L. at all?
A I do not.
Q And are you familiar with his treatment in any way at all?
A In a very general way.
Q And what do you mean by that?

A That I -- in my particular position, I don't supervise that closely the direct care and treatment of any particular mental health patient, but no, because we have so few patients in the adolescent units, you know, I've worked with our administrators that have helped consult with our staff at OMH to help develop ideas to engage Mr. E.L. in treatment, but only in a general sense, not the details of that.
Q I'm sorry, are you in any way involved in his day-to-day treatment?
A Not at all.
Q I also heard some questions directed to you during cross about your opinion regarding solitary confinement, whether that was directed toward juveniles or toward people with mental illnesses. In your opinion, is the adolescent offender separation unit solitary confinement?
A We, in OMH, from an OMH standpoint we do not treat it as such from a policy and provision of care standpoint. We do so with the adult facilities in special housing unit, in long-term keep-lock units, so we do not.
Q Okay. And why is that?
A Because of the programming that is offered, the out-of-cell program, the educational and therapeutic programming, and in our collaboration with DOCCS, we did not agree that it was separation or segregation or solitary confinement.

MS. KRASNOKUTSKI: Okay, thank you.

THE COURT: Any recross-examination?

RECROSS-EXAMINATION BY MR. LePIERRE:

Q Just to be clear, does OMH develop the policies and procedures, directives for the provision of health care treatment to inmates?

A Not general health care, mental health care?

Q Mental health care, I apologize.

A Yes.

Q Would that include compliance with provisions of the standards of care set out by the APA and the Academy of Adolescent and Child Psychiatry?

A Yes.

Q You just said you would not agree that the segregation unit is solitary confinement within the juveniles but you do within the adults. Can you tell me what the difference is?

A In my experience, the difference is predominantly the degree of freedom or programming that is offered. The amount of in-cell time for the adult population is typically up to 23 hours per day with limited out-of-cell program and treatment, other than in the mental health context also private out-of-cell therapy and frequent contacts and evaluations in rounds.

Q What is it called in the adult facility?

A Special housing unit.

Q What is it called in the juvenile facility?
A The adolescent offender supervision unit.
Q And would that be found under the special housing portion of the AO handbook or the AO program guide?
A That's not an OMH program guide.
MR. LePIERRE: No further questions, your Honor.
THE COURT: Anything further?
MS. KRASNOKUTSKI: No, not for this witness.
THE COURT: Okay, you may step down, you're excused.
THE WITNESS: Thank you.
(The witness was excused.)
THE COURT: Defense may call their next witness.
MS. KRASNOKUTSKI: Defense would like to call Kim Tedaldi, please.
THE CLERK: Please state and spell your name for the record.
THE WITNESS: Kim Tedaldi, T-e-d-a-l-d-i.

K I M T E D A L D I , called as a witness and being duly sworn, testifies as follows:

DIRECT EXAMINATION BY MS. KRASNOKUTSKI:

Q Good morning -- good afternoon.
A Good afternoon.
Q Sorry. Could you introduce yourself to the court, what

is your current position?
A I'm currently the unit chief for Office of Mental Health for Coxsackie, Greene, and Hudson facilities.
Q And could you tell the court what your background is from an educational standpoint?
A I have my master's degree in social work, master's degree in business and certified alcohol and substance abuse counselor.
Q And are you a licensed clinician?
A Yes.
Q And what prior positions have you held prior to this one?
A I worked with adolescent residential programming for 20 years for a substance abuse facility, 7 -- 15 of those were as the clinical director, and I've worked for assessment and referral for homeless people in New York City, and I worked as a social worker for Greene Correctional Facility when they first opened the juvenile program and currently my position.
Q And how long have you been in your current position?
A Three years.
Q Now can you tell me, your current position covers three facilities, correct?
A Mm-hmm.
Q What are those three facilities?
A Coxsackie Correctional Facility, Greene Correctional

Facility, and Hudson.

Q And other than Hudson, those are adult facilities, correct?

A Correct.

Q But you oversee mental health treatment of the population at all three?

A Yes.

Q Okay. So we're going to focus on Hudson today. And we're going to focus on the adolescent offender population of Hudson or AO population of Hudson. So with respect to the AOs at Hudson, can you tell me about the screening process when an AO is first admitted to Hudson?

A When the adolescent first comes into Hudson, they come in the reception building where our offices and our staff are stationed. They usually see them within the same day if not within the 24 hours. We do screening based on the tools that Mr. Vertoske said earlier, biopsychosocial, patient report, we also contact the family immediately, and we gather that information. We do a comprehensive suicide risk assessment, the ACE and MAYSI 2.

Q Okay. And do the OMH providers at Hudson access previous treatment records of the AO as well?

A Yes, as soon as we find out the names of the places.

Q They request those records and do they review those records?

A Absolutely.
Q And how is the treatment plan developed for each AO at Hudson?
A Primarily with the resident and -- I mean inmate or the family, and the family if we have that relationship and they're involved and supportive. And then we also, after they develop the treatment plan with the adolescent, then we review it as a treatment team with the psychiatrist.
Q Now in terms of the treatment team, who is involved when you say the treatment team?
A At Hudson specifically there is a licensed social worker, a licensed psychologist, the psychiatrist, and then on several cases, myself.
Q I think we're going to move at this point here to more specific testimony so I think it will be appropriate to seal the courtroom at this point.
THE COURT: Okay. At this point I'll ask that the courtroom be emptied, and that E.L. leave the courtroom, and this part of the transcript will be filed under seal and we will invite everyone back in as soon as this portion is over.
(Pages 143-181 contained in separate sealed transcript.)

(Open Court, E.L. present.)

THE COURT: And the defense may call your next witness.

MS. KRASNOKUTSKI: Waiting for them to come back, I guess I've got to go find them. Sorry about that. I thought they were going to figure it out. Oh, here they are.

MR. LePIERRE: Your Honor, in light of the conflicting testimony, I wanted to see if you'd like to hear again from Mr. E.L. so we can clarify again his 24 and 0 experience in the AOSU.

THE COURT: We can -- you could do that at the very end.

MR. LePIERRE: Of course, thank you.

THE COURT: It seems to me that should be something everyone could agree on.

MS. KRASNOKUTSKI: I didn't hear the request, I'm sorry.

(A discussion was held off the record between counsel.)

MS. KRASNOKUTSKI: I mean I thought there was always a dispute about that. I thought that was what we were here about in the first place.

THE COURT: Okay, well, let's proceed with the defense case. Would there not be some record of that, when he was in 24/0?

MS. KRASNOKUTSKI: I don't think there's any such thing as 24/0, your Honor, I think that's simply plaintiff's terminology.

THE COURT: Okay. Well, we'll -- I guess we'll clear it up with the defense witnesses.

MR. WILLIAMS: Okay, I was going to say, Honorable Judge Sannes, that typically in a prison setting, at least based on my experience, could be different in this particular prison setting, you have documentation, checklists when the inmate has left the cell, this stuff is documented, or you have video surveillance that can just show someone coming in and out of the cell for a number of times. If your Honor's inclined to do, and wants more information on the situation, I would respectfully request from the plaintiff's side that a representation is made that there is no documentation that demonstrates that when an inmate leaves out of his cell and if there's video evidence, that we could review that. If this conflict continues.

THE COURT: I see. Let's move forward with the defense witnesses, maybe some of it can be cleared up.

MS. KRASNOKUTSKI: There is, there is such documentation, nobody's representing there isn't such documentation.

THE COURT: Okay. You may call your next witness.

MS. KRASNOKUTSKI: Next witness is Superintendent

Donna Lewin.

THE CLERK: Could you please state and spell your name for the record.

THE WITNESS: Donna Lewin, L-e-w-i-n.

D O N N A L E W I N , called as a witness and being duly sworn, testifies as follows:

DIRECT EXAMINATION BY MS. KRASNOKUTSKI:

Q Good afternoon, Superintendent.

A Good afternoon.

Q Could you please tell the court about your educational background?

A I have a bachelor's in business administration.

Q And what was your previous work background prior to this job?

A I've worked, I've been in DOCCS, Department of Corrections for 34 years, I worked in various titles beginning in the business office and working all the way up to deputy superintendent and then superintendent in 2012.

Q So when you became superintendent in 2012, Hudson was not an adolescent offender facility?

A No, it was not.

Q When did it become an adolescent offender facility?

A It became an AO facility in 2016, August of 2016.

Q Can you tell us about the training that you and your

staff underwent at the time that Hudson became an adolescent offender facility?
A So everyone in the transition was given a full week of training, the training was developed by the department of OCFS, Office of Children and Family Services.
Q And can you tell me what that training involved?
A Well, the training involved dealing with adolescent inmates or adolescents in general, we talked about the differences between adolescents and adults, and the communication with them, their temperament, you know, how we needed to do things a little bit different, from when we dealt with the adult population.
Q And now as superintendent of Hudson, what are your primary duties in that position?
A Safety and security of the facility and everyone in it.
Q So if you could turn to in your binder, we've got number 1, I think. Yeah, Defendant's 1. And can you tell me what -- that is a directive from Department of Corrections and Community Supervision if I've got my numbers right. Can you tell me what that directive is?
A This is a directive that describes Hudson AO facility.
Q It is, and I would like to move Defendant's Exhibit 1 into evidence.
THE COURT: Any objection?
MR. LePIERRE: No objection.

Q What is an adolescent offender facility generally?

THE COURT: Let me just say Exhibit D1 is admitted into evidence.

MS. KRASNOKUTSKI: Thank you.

A An AO facility is generally a facility that deals with inmates that are between 16 and 18 years old.

Q Okay. Is there anyone in an adolescent facility that's younger than 16?

A No.

Q And there's no one in the facility older than 18?

A No.

Q So everyone in the facility is 16 or 17 years old?

A Correct.

Q And when an adolescent offender turns 18, what happens?

A They would be placed in an adult facility.

Q So tell me about Hudson generally, how is it laid out, where do the AOs live within the facility?

A Okay. So the facility is -- has cottages for housing purposes. The difference between the adults and the AOs, the adults typically roomed in multi-room units, but the AOs, they all have single-room units in whatever cottages they're housed in. It's laid out where you have a number of cottages, you have school, mess hall, you have the medical unit, vocational programs, et cetera, all around the facility.

Q So there's the general population area, and is that the cottages that you're describing?
A Correct, correct.
Q And then there's also the adolescent offender separation unit?
A Correct.
Q And that's what we've been referring to as the AOSU today?
A That would be correct.
Q Now in the cottages, let's start there, the adolescent offenders also have single rooms as well as in the AOSU?
A That's correct.
Q How big are the AOs' rooms in the cottages?
A I'm not sure of the specific size but sizes are in, in accordance of the accredited standards that are set for the rooms. It's either the size or above. There's small differences but it's appropriate for the size as established by ACA.
Q And ACA stands for what?
A The accreditation association, American accreditation of association -- I forget the exact terminology but it's the folks who accredit us to operate as a correction facility every three years.
Q Is there any difference in size between the rooms for the AOs in the cottages and the AOSU?

A I would say no, it's not, because the AOSU unit was a previous cottage that was converted, so the rooms are similar sizes.
Q What's the difference in terms of the way general population operates and the AOSU?
A General population, inmates are able to move around freely, they go to school, they go to their meals, they go to their programs, they go to recreation, any other program that is established for them. In AOSU, they don't have free movement. The movement is supervised, they're moved singly from their cell to their classrooms, they're moved singly from their cells to the recreation area, and for any other program, they are supervised directly.
Q And what circumstances lead to an AO being housed in the AOSU?
A Any infraction that they -- if they break any of the rules, if they don't conduct themselves according to the rules that we have established, they'll get a misbehavior report, we'll do a hearing, and they'll be sanctioned to the AOSU.
Q Well, let's talk about the rules for a second. What's prohibited at Hudson?
A There's a standard of behavior that's established for them, and you know, any -- there should be no kind of violence from the inmates towards each other or towards the

staff, plus a number of other rules but typically just behavior that's in accordance to the rules that we've established.

Q Are AOs required to follow orders given to them for example?

A Absolutely. Absolutely.

Q Are there different levels of misbehavior within Hudson?

A Yes.

Q What are those levels?

A There's a three-tier level of disciplinary that's established, tier one, two, and three.

Q And what do those different tiers represent?

A Well, they represent the severity of the infraction, the lowest being tier one, the highest being tier three.

Q And what type of misbehavior does tier one reflect for example?

A Tier one is usually, a simple breaking of a rule or direction or something that's -- that can be quickly corrected. Typically we don't record those but it's the lowest level of misbehavior in the facility.

Q When you say we don't record those, does that mean it doesn't go on the AO's disciplinary record?

A Typically not. Typically they get reprimand and some kind of, you know, simple sanction, but typically it's not --

it doesn't rise to the level of separating them further.

Q So can you tell me what type of misbehavior might be reflected by a tier two misbehavior report?

A Tier two is a little bit more serious, it could be something that comes from repeated direction from an officer, a staff, a teacher, that they continue to ignore and it has to be kicked up to another level. It could be something that they have been disciplined for before at a level one and they have continued and then, you know, it's bumped up to level two.

Q And how about tier three?

A Tier three is typically the more serious level. Typically it's physical, it is more serious, it's something that calls into, you know, the safety of the other inmates or staff or breaking of a rule that we, you know, we feel is very serious and, you know, we tier it as a tier three.

Q And just as background, how many AOs are in Hudson currently?

A Currently approximately 33 or 34 as of yesterday.

Q And how many of those are in the AOSU?

A I believe there's 11 in the AOSU right now.

Q So if you could turn, Superintendent, to Defendant's Exhibit 2, and tell me what that is, please.

A This is the directive for standard of adolescent offender behavior and allowances.

Q And when did that directive become effective?
A October 3rd, 2018.
Q And who, who publishes these directives?
A This specific directive was authorized by Deputy Commissioner O'Gorman, comes out of our Central Office.
Q And what does this directive cover?
A It covers just the rules and regulations of adolescent behavior in Hudson.
Q Does it cover the disciplinary sanctions as well?
A It does, it does.
Q And are those some of the behaviors that you and I just talked about?
A Yes.
Q And are the adolescent offenders provided with some sort of list or handbook of those rules --
A They are.
Q -- when they come into Hudson?
A Yes, they are.
MS. KRASNOKUTSKI: I'd like to move Defendant's Exhibit 2 into evidence if I may.
THE COURT: Any objection?
MR. LePIERRE: No objection.
THE COURT: Defendant's Exhibit 2 is admitted into evidence.
Q So within this directive, what type of sanctions are

provided for violations of the rules?
A In general?
Q In general.
A Like I said, it goes from something as minimal as a reprimand, as high as separation into the AOSU, doing time in the AOSU.
Q So the AOSU is the highest level of sanction that's provided for the adolescent offenders?
A Correct.
Q Do you know what a special housing unit is?
A I do.
Q Did you have a special housing unit when Hudson was an adult facility?
A No, we did not.
Q You did not. Did you sometimes send the adult offenders to other facilities to do time in the special housing unit?
A We did, we did.
Q So you're familiar with a special housing unit, correct?
A Right, right.
Q Does Hudson have a special housing unit?
A We do not.
Q Does Hudson place adolescent offenders under 24-hour confinement under any circumstances?

A No, we do not.
Q Under the directive that you're looking at, Defendant's Exhibit 2, are there any provisions in that directive for considering the age of an AO when establishing disciplinary sanctions?
A Yes, there is.
Q And if I could refer you actually even to the very first paragraph, right, to 1A, is there a provision even in the first paragraph regarding that?
A Are you --
Q Sure, why don't you read it?
A Yeah, okay. "Adolescent offenders are required to follow the rules of conduct that have been designed to support their rehab process. AOs require special attention when attempting to modify a negative behavior to within department standards. Several methods of response are available to staff to curtail negative behavior. Not all negative behavior should rise to the level of misbehavior report. If a staff member feels it necessary to issue a misbehavior report and in the course of the hearing, the hearing officer affirms the charges, the hearing officer must carefully consider the age of the AO when determining the penalty. Whenever possible, penalties should be graduated according to the AO's previous behavior."
Q Is there a review procedure in place at Hudson for

disciplinary proceedings?

A Yes.

Q And what is that review procedure?

A So all misbehavior reports, upon completion, is reviewed by myself and my deputy superintendent of security.

Q And how do you, generally speaking, apply this section of the directive that asks you to take the AO's age into account?

A We take a look at what the infraction is, we take a look at what -- if he had an infraction before, we take a look at the severity of it and we take a look at the sanctions that are imposed and we will either uphold it, change it, adjust it, depending on what we believe is appropriate and fair to that AO.

Q So there's been some testimony today about E.L.'s sentence and his time in the AOSU and how long he'll be there and when he might get out. In reality, is there actually some discretion in terms of application of time and sentence and these provisions?

A Absolutely.

Q And how does that work?

A So whenever an AO is sanctioned, they have an opportunity to get a reduction in their sentence by requesting it. They have an opportunity to get reduction in their sentence by a group of staff who do a review on a

weekly basis. They have an opportunity to, you know, based, like I said, on their behavior, have their sentence or that time in the AOSU reduced based on a number of different factors, and we review that on a regular basis to do that.

Q Do you have an understanding as to whether Mr. E.L. has actually requested such a review with respect to his time?

A He -- I mean I'm not sure if he has requested it directly but we have reviewed him, we speak to him on a regular basis, executive team and the staff at Hudson, we see him, I see him on a weekly basis, the deputy superintendents see him on more regular basis, et cetera. And we have discussed reducing his time based on his behavior, et cetera, and we have done that in the past. We have reduced his time.

Q If you could turn to Defendant's Exhibit 3 in your binder. And tell me what that exhibit is, if you could.

A This is the standard of behavior -- no, sorry, this is adolescent offender separation unit directive.

Q And when did that directive become effective?

A October 3rd, 2018.

Q And who published that directive?

A DC James O'Gorman.

Q What does that directive cover?

A It covers the operation in the AOSU unit.

MS. KRASNOKUTSKI: And I'd like to move Defendant's Exhibit 3 into evidence also if I could.

THE COURT: Any objection? Any objection to Defendant's Exhibit 3?

MR. LePIERRE: No objection.

THE COURT: Exhibit 3 is admitted into evidence.

Q So what's the purpose of the AOSU?

A The AOSU is primarily to separate inmates that are not compliant to our rules and to give them an opportunity to become compliant and be put back into general population.

Q When an AO is admitted into the AOSU, is there a procedure in terms of screening or exams that's done?

A Yes.

Q What's that procedure?

A They're seen by OMH within 24 hours, they're seen by security staff, they're given a questionnaire to, you know, figure out, you know, what the issues are with them, and there's a group of staff that goes up to see them once they're admitted into AOSU.

Q Do you, Superintendent, have any mental health education or experience?

A Absolutely none.

Q Do you have any role in screening any of the AOs for mental health?

A No.

Q Do you have any role in determining whether someone's mental health condition is deteriorating while they're in the

AOSU?
A No.
Q Can you tell me about the schedule that an AO would have during the time he's in the AOSU?
A His daily schedule?
Q What kind of schedule applies in the AOSU, yes.
A So the schedule that applies in the AOSU is that he has two hours of education instruction, two hours of therapy instruction, and two hours of recreation instruction. They also come out for, you know, showers, and any other -- meetings they have with any other staff that request it, and they have visits on the weekend.
Q And can you tell me what each of -- what each of those, just generally what each of those items involves? They have two hours of education, what is that?
A Two hours of education, typically with AOs at Hudson, we tend to encourage that they study for their HSE, high school equivalency exam, while they're there, it's mandatory if they're in general population, so while they're in the AOSU we continue that with a full-time teacher in that unit, so they come out for instruction. They also come out for therapy that is designed for that population as well, and they come out for recreation for two hours.
Q And recreation is two hours of time outside, correct?
A Outside, correct.

Q And what is the schedule on the weekends?
A The schedule on the weekends is two hours out of cell for recreation and visitation if they have any visits on the weekends.
Q And if you could turn just to the last page of Defendant's Exhibit 3, there is something there called APMS levels, can you tell me just generally what that system is?
A Okay, so we have APMS system where the inmates in AOSU, the adolescents in AOSU, they get an opportunity to earn their way to certain privileges while they're there. So you have level 1 which is the lowest level, they get specific privileges, when they go up to level 2, they get additional privileges, and when they go up to level 3, it's even more privileges than before.
Q Is there a certain amount of time you have to spend on each level?
A Repeat.
Q Is there a certain amount of time that you spend on each level to earn the next level?
A Yes, the first level is 10 days, the second level is 20 days, and I think once they get to level 3, they maintain that level to maintain those privileges.
Q In AOSU, does the AO still have full access to medical and mental health services?
A Absolutely.

Q Does the -- an AO in the AOSU have access to reading materials?
A Yes, they do.
Q How do they get those?
A So we have a system where we have a librarian who takes reading material to the unit on a regular basis, it's rotated every 30 days, but while the material is on the unit, they can -- the officers will rotate amongst the inmates as they return, as they complete the material, the officer has the option of just kind of rotating it upon -- you know, during that period on a daily basis.
Q Does an AO while they're in the AOSU, do they have the right to receive visitors?
A Yes, they do.
Q Is that taken away generally as punishment?
A No, no. Visitation is never a sanction that's used for anyone unless there is an infraction based on the visit itself so we don't use that, we don't take that.
Q Do AOs in the AOSU have the right to send and receive mail the same as everyone else?
A Yes, they do.
Q Is there any access to media at all?
A Yes, they have -- they have what we call headphones and they have, they can listen to three options of radio, I think music and different shows, and that's inside their cell, each

of them have it inside their cell.
Q Is that ever taken away as a disciplinary sanction?
A No.
Q Do you know Mr. E.L.?
A I do.
Q And how do you know him?
A He's an adolescent offender in my facility at Hudson.
Q Do you know when he came into Hudson?
A He came in I think in August of 2018.
Q Do you know when he was transferred to the AOSU?
A Around November of 2018.
Q Do you know why?
A He -- yes, I do.
Q Why was that?
A He had a ticket I believe that involved him cheeking his meds and I believe he had a fight as well, some combination of that.
Q If you could turn, Superintendent, to -- go to the smaller binder. And turn to Exhibit 42 for me. Do you know what this document is?
A Yes.
Q What is it?
A This is the disciplinary history for E. -- Mr. E.L.
Q And you said history, you mean disciplinary history, right?

A Disciplinary history, sorry.
Q And this goes back to the time he was first admitted into Hudson?
A That's correct.
Q And this consists of tier II and tier III incidents that Mr. E.L. has had since that time?
A Yes, it does.
Q Do you know how many incidents there are in here total?
A I'm not sure, I think it's somewhere between 39 and 40, I'm not sure.
MS. KRASNOKUTSKI: I'd like to ask that Defendant's Exhibit 42 be admitted into evidence.
THE COURT: Any objection?
MR. LePIERRE: No objections, your Honor.
THE COURT: D42 is admitted into evidence.
Q If I were to represent to you that there are in fact 39 so you're very close, does that sound about right?
A All right.
Q Do you know how many of these were tier IIIs?
A I'm not sure.
Q Did any of them involve violence?
A Yes. There were a number of them that involved use of forces that I know of.
Q So have you personally interacted with Mr. E.L.?
A Yes, I have.

Q How many times would you say?
A I typically visit the AOSU on a weekly basis, so whenever I'm there, I interact with all the inmates, so I would say I've interacted with him on weekly basis, unless I was not at work for one reason or other, but generally on a weekly basis I'm there.
Q And what would you say the tone of your interactions with Mr. E.L. has been like overall?
A I think it's been congenial. We typically talk about, you know, what's going on with him, sometimes it's -- he's, you know, coming off a very difficult week or not, sometimes he's calm, sometimes he's agitated but the communication between us has usually been pretty respectful.
Q Have you been involved in managing Mr. E.L.'s privilege levels or his behavior issues?
A Specifically?
Q Well, have you had, have you been involved in any meetings regarding managing Mr. E.L. in the facility?
A We have had -- I've been involved in a number of meetings about managing his behavior in the facility, yes.
Q Can you give me some examples of your involvement?
A My involvement has been with my deputy superintendent of programs, my education supervisor, some of the counselors there, we have discussed ways that we could improve or give him something that would engage him to improve his behavior,

and we've come up with a number of different things that we have tried with him.

Q And what were some of the -- what were some of the things discussed?

A One of the things that we discussed was getting him into a writing, a creative writing class. We had a young lady who worked with us who was a creative writing teacher on the outside, she did recreation with us and she worked with the inmates in the general population. She agreed to work with him and she worked with him giving him creative writing courses for a while, which I think worked because he, you know, during that period that he was working with her, his behavior absolutely improved.

Q Was she working with him on a one-to-one basis?

A She was. She was.

Q And during what time period was that?

A That was I believe sometime in February, early February to sometime in March when, again, his behavior spiked and it was not conducive for her to be in that area, and we had -- they removed her from that area so she was not giving him classes. We spoke, myself and Mr. E.L. spoke about it, I spoke to her, she was willing to continue, she said yes, and we orchestrated getting him back some of those creative writing classes, which I believe he's currently attending.

Q So Mr. E.L. is attending creative writing classes again

at this time?

A I believe he is, yes.

Q Did you also, were you involved at all, there was some testimony this morning about college classes for Mr. E.L., were you involved in that decision?

A Yes. Not all AOs or inmates are afforded that. I also spoke to the education supervisor who worked with I believe his parents in securing correspondence college class for him and I believe, I don't think he started yet but I believe that is in the process and he probably will be starting classes shortly.

Q And who else was involved in that process?

A The -- my deputy superintendent for programs, my education supervisor, and coordinating with his school and his parents.

Q Let me -- I want to take you through a few exhibits, Superintendent, as long as we're here.

THE COURT: Why don't we take our afternoon break now, so we -- if you could return at, in about 10 minutes, like 3:25.

MS. KRASNOKUTSKI: No problem.

(Court in recess, 3:12 p.m. to 3:24 p.m.)

THE COURT: Ms. Lewin, you may step back to the witness stand. Let me ask counsel just logistically, do counsel expect we will finish today? I have to stop today at

5.

MS. KRASNOKUTSKI: I don't expect that, as we actually do have two witnesses following Superintendent Lewin.

THE COURT: Okay, thank you. And you may proceed.

MS. KRASNOKUTSKI: So I just logistically again, I had spoken, your Honor, with opposing counsel regarding -- we have a rather large number of exhibits in our binder as you may note and we had spoken about whether we could, the vast majority of these relate to the disciplinary incidents which we just looked at the entire history of but we talked about whether we could sort of admit them in in groups and so I'd like to do that if the court doesn't have a problem with that, I think opposing counsel is amenable to doing it that way.

MR. LePIERRE: Yes, your Honor, I have no objection admitting in groups same type of documents, disciplinary reports, use-of-force reports, et cetera.

THE COURT: That's fine.

Q So we have exhibits Exhibits D6 through D41 as reflected on defendant's exhibit list, are each, I'm sorry, it's D5 through D41, are all disciplinary packets, each relating to a discrete incident and all of which are itemized on defendant's exhibit list, and, if you can just flip through those, Superintendent, you can see that those are

what those are, D5 through D41.

THE COURT: And are you seeking to admit those?

MS. KRASNOKUTSKI: And I am seeking to admit those into evidence.

THE COURT: Any objection?

MS. KRASNOKUTSKI: There is no objection.

MR. LePIERRE: No objection.

THE COURT: D5 through D41 are admitted into evidence.

MS. KRASNOKUTSKI: As to D43 through 47, those are unusual incident reports for, respectively, November 3rd, 20 -- that should read 2018, December 6th, 2018, December 20th, 2018, and January 13th, 2019, those are unusual incident reports that go with disciplinary packets with incidents from the same dates. And also January 23rd, 2019, that's D47, so these are D43 through D47 that I'd also like to admit into evidence.

THE COURT: Any objection to D43 through D47?

MR. LePIERRE: No objection, your Honor.

MS. KRASNOKUTSKI: And then finally --

THE COURT: Those are admitted into evidence.

MS. KRASNOKUTSKI: Thank you. I'm sorry. And then finally we have D48 through 52, which are use-of-force reports dated, respectively, December 20th, 2018; 22nd, 2018; then January 11, 13th, and 23rd, 2019, and I would like to

move D48 through 52 into evidence as well.

THE COURT: Any objection?

MR. LePIERRE: No objection, your Honor.

THE COURT: Okay. D48 through D52 are admitted into evidence.

MS. KRASNOKUTSKI: Thank you.

Okay, Superintendent, I think when we left off, we were speaking about some of your involvement in I guess management of E.L. and his behaviors within the facility, as well as some of your interactions with E.L. Do you recall any other specific incidents where you had interactions with Mr. E.L. or you intervened on his behalf with some issue he was having in the facility?

A Well, there's a number of them. I'll just identify the ones that I kind of recall right now. I know that when he's on -- in the AOSU, he has to be, like we indicated before, a particular PMS level, APMS level to get his phone calls back, et cetera, and I know that there were some issues with him where he wanted -- he needed to contact his mom, one of his parents and I coordinated with the chaplain to make sure he got that phone call and if he didn't get the phone call, to have a chaplain intervene on his behalf by speaking to his parents and communicate whatever it was that he needed to communicate.

I remember one incident where he had torn up

all his clothing by sticking it through the hatch, tying them to leave the hatch open in order for him to kind of throw stuff through the hatch, so he was down to one shirt. And when I spoke to him I wanted to know why the shirt was so dingy, he said that's the only shirt I have. I said what happened to the other shirts, and he kind of held his head down. I go, oh, you tore them all up, so I, you know, told the staff to make sure he got replacement shirts at that time.

Q So let me stop there for just for a second. So with respect to the first incident you mentioned, you talked about getting him a phone call, was this phone call he otherwise would have been entitled to based on his PMS level?

A No, absolutely not, but we recognize that, you know, there are certain things that we can make a call on as a superintendent. So in speaking with him, that's one of the things that he indicated that he needed to do and we facilitated it for him, but it's not something that he would have normally at his level with his infractions be entitled to, so --

Q And when respect to -- with respect to the shirts, how many shirts do the AOs normally receive?

A I don't remember specifically but there is a set level of clothing that all AOs are entitled to, number of shirts, either three or four white shirts, three or four green

shirts, sweaters, pants, et cetera, so they have a specific number of clothing that they're given when they come in, and like I said, he had kind of ripped up and gone through a number of those shirts, and was wearing one shirt I believe every day, so...

Q Is that -- is there a procedure that an AO would normally have to go through to get another shirt; would they normally be charged for it or something like that?

A Typically he would, yes, if -- there is a schedule where he's allotted a number of shirts and those shirts are laundered on a regular basis and if they need shirts before the time that they're allotted replacements, I believe it's six months for some items, a year for some items, if they require replacements before that time, they are charged for that, so --

Q Did you charge Mr. E.L. for it?

A No, no, absolutely not.

Q What about packages, has Mr. E.L. been on package restriction at times?

A Yes. That is, his restriction for packages is part of his sanctions, and I know that we've spoken to, you know, Mr. E.L. along with some other AOs and we've indicated that if they could be compliant, that we would restore packages for them with specific items. That is something that we coordinate with the deputy superintendent of security, he

speaks with them, we identify the items that they require and then we will approve it.

Q Is that something that's pursuant to policy generally?

A It's pursuant to policy in that we have the discretion to review and approve it if we deem, deem it appropriate.

Q Has his package sanction actually expired or is he still on package restriction?

A He's still on package restriction, yes, it's not expired.

Q So it's a special exception?

A It is.

Q And did he receive a package already?

A I'm not sure, I know we took care of it maybe a week or two ago and I'm not sure if he got anything this past weekend on visit, I'm not sure.

Q So you did authorize something?

A We did. We did.

Q Superintendent, do you have any concerns about Mr. E.L.'s safety if he were housed in general population?

A Absolutely.

Q What are those concerns?

A Well, one of the concerns we have is he's pretty, proven himself to be very temperamental, we don't know, he'd be compliant one week, the next week not so compliant. He has, you know, kind of attacked some of the inmates in AOSU

who were not very happy with him. You know, if we put him back in general population, I'm not sure, his behavior is so unpredictable that we're not sure what will happen. So for himself and for the staff and for the facility, I would not put him back unless he demonstrates that he can, you know, be compliant in general population, so ... we would like to put him back, I mean, but he -- I mean, over and over he has racked up all the disciplinary tickets, that's why he is where he is right now, so...

MS. KRASNOKUTSKI: Thanks, Superintendent, no further questions at this time.

THE COURT: Cross-examination.

MR. LePIERRE: Yes, your Honor.

CROSS-EXAMINATION BY MR. LePIERRE:

Q Superintendent Lewin, juveniles are placed in the AOSU as a disciplinary measure, are they not?

A Repeat.

Q Juveniles are placed in the AOSU as a disciplinary measure for rules violations, correct?

A Yes.

Q And when juveniles are in the AOSU they spend a minimum of 18 hours a day in their cell, correct?

A Yes.

Q Would you define 20 hours a day in your cell as solitary confinement?

A No.
Q Would you define 18 hours a day in your cell as solitary confinement?
A No.
Q In your experience, what would you define as solitary confinement?
A I don't have a definition in front of me right now, so --
Q Based on your experience, what do you believe would constitute --
A I've never worked in a facility where there's solitary confinement so I apologize.
Q Were you aware that in some, in adult facilities where solitary confinement exists, those people in solitary confinement still get yard time?
A I'm aware of that, yes.
Q Are you aware that people in solitary confinement at adult facilities still have access to books?
A I am aware of that.
Q Are you aware that in federal super max prisons for solitary confinements they have access to a television?
A I have no idea about federal super maxes, sorry.
Q E.L. went into the AOSU in November 2018, is that correct?
A Repeat that question, please.

Q E.L. went into the AOSU in November of 2018, correct?
A Approximately, yes, he did.
Q Has he been there ever since?
A Yes, he has.
Q Has Mr. -- I'm sorry, has E.L. left the AOSU at any time since that appointment, or that move?
A Repeat.
Q Has E.L. left the AOSU at any time since he was moved there, been reassigned to a different housing?
A Since he's been there?
Q Correct.
A He's been there since November.
Q Earlier you said that inmates in the AOSU receive instruction in the yard, or instruction at rec time. Can you tell me what instruction they receive in the recreation?
A I don't believe I said that.
Q I believe you said they receive program --
A Educational instruction.
Q And then programming, or I'm sorry, therapeutic instruction?
A Therapy.
Q And recreation?
A Two hours of recreation.
Q Okay, so there is no instruction in the recreation yard?

A No.
Q Sorry, I just wanted to clarify that, I was confused.
I'm sorry, I have one last question, your Honor. Is it true that just because you have access to books and yard time that you're not -- and a shower, that you're not necessarily not in solitary confinement?
A I have -- I can't comment on that.
MR. LePIERRE: No further questions, your Honor.
THE COURT: Superintendent Lewin, given E.L.'s mental health history and the number of disciplinary violations at your institution, did you consider inpatient hospitalization?
THE WITNESS: That is not under my purview to consider. That would be under the direction of OMH staff.
THE COURT: Thank you.
THE WITNESS: Thank you.
THE COURT: Anything further?
MS. KRASNOKUTSKI: I have nothing further, thank you.
(The witness was excused.)
THE COURT: And defense may call their next witness.
MS. KRASNOKUTSKI: We'd like to call Anita Tomlin.
THE CLERK: Please state and spell your name for the record.

THE WITNESS: Anita Tomlin, T-o-m-l-i-n.

A N I T A T O M L I N , called as a witness and being duly sworn, testifies as follows:

DIRECT EXAMINATION BY MS. KRASNOKUTSKI:

Q Good afternoon.
A Good afternoon.
Q Can you introduce yourself to the court, tell the court your position.
A My name is Anita Tomlin and I'm the deputy superintendent of programs.
Q What is your educational background?
A I have a bachelor's in forensic psychology and a master's in social work.
Q And what is your prior work experience prior to your current position?
A I worked in an outpatient drug rehab for adolescents, I worked in the New York City school system as a prevention and intervention specialist, I worked in the employment and training office for adolescents upstate when I moved to assist at-risk youth in the school system. I've worked in residential drug treatment with both adolescents and adults, primarily adults, however, prior to DOCCS.
Q And when did you start with DOCCS?
A 1999.

Q And what were your prior positions with DOCCS?

A I was -- I started off as an offender rehabilitation counselor, they called them counselors at that time, I worked in the domestic violence chemical dependency program, that facility closed as part of the closures and I was sent to another facility. I was also, I worked in reception centers, and then through the years just received different promotions to more supervisory positions.

Q And what's -- you're currently deputy superintendent of programming?

A Yes.

Q And how long have you been in that position?

A I've been in that position at Hudson since October of 2017. I was, prior to that I was the assistant deputy superintendent at Sing Sing, since approximately March of 2017.

Q So as deputy superintendent of programming, what are your duties?

A I basically supervise all the staff that are involved in programming for the inmates, in this case now the adolescent offenders, so that would be ministerial services, volunteer services, academic programming, vocational programming, guidance services, library services.

Q And in terms of all of those types of programming that you described, what are the goals of programming for the

adolescent offenders?

A The goal of the programming in the department in general is of course to reduce recidivism, the adolescents in particular, there's a focus on, there's a focus on trauma, there's a focus on identifying triggers, helping them make better decisions so that they can be successful and not come back. It is the same for the adults but there's a difference with the adolescents in terms of they're just being more unpredictable, having an array of issues that the adults don't seem to have, so we try to address those things so that we can make the appropriate plan for them, either when they go to another facility or when they're released to the community.

Q What types of programming are available to adolescent offenders at Hudson currently?

A We have, it's -- we are primarily, the difference between us and an adult facility is that the primary focus is by state education. So we, the adolescents are mandated to go to school and we have a very high success rate in having them get their high school equivalency, that's the primary goal. We have vocational programs, we try to get, right now we have barbering program, we have horticulture, however he retired, we're going to be replacing that with masonry, we have small engines, we have computer repair, but we are basically open to everything and anything that can possibly

come in to assist somebody in being successful. We have therapeutic programs for groups run by the offender rehabilitation coordinators again on making -- they're cognitive behavioral programs to assist in making better decisions. That's to name a few.

Q So how many hours per day generally would an AO be scheduled for programming?

A The AO is generally scheduled for programming, we're mandated for five hours, we provide six, and then there's an hour for structured recreation during evening, so approximately six to seven hours.

Q And when you say an hour of structured recreation, is that, you're talking about general population?

A Yes.

Q Is it different in the adolescent offender separation unit?

A It's different in that their recreation isn't structured, they are -- they have access, they actually have two hours that are afforded to them in the yard where the rec pen is.

Q And time is unstructured you said?

A It's unstructured.

Q So each of the types of programming that you talked about, who offers each of these types of programming, the educational programming, who offers that?

A We have teachers, we are mandated to have special ed teachers so we have special ed teachers, we do have general ed teachers, if we have more students because we can never tell what our population is going to be, if we have any, all of our special ed students must be with special ed teachers, we can have some that are -- where there's a consulting model but we need -- they need to be general education and special ed teachers.

Q And the -- I think you said that the therapeutic programming is provided by offender rehabilitation coordinators?

A Yes, we also have licensed social workers that are mandated to see each of the adolescent offenders on a monthly basis, they have to, we have to discuss them once a month, so they see them once a month for individual sessions and we discuss them once a month in a team meeting.

Q And is that true for both AOs in general population and in the AOSU as well?

A It is.

Q And as far as the location for programming, where is programming offered?

A The programming is offered throughout the facility, we have our education program that's offered in the academic school building on the first and second floor, our vocational programs are spread out through the cottages.

Q And what about for the AOSU?
A We offer them, there's probably about two or three classrooms downstairs and then there is one classroom upstairs.
Q So when AOs come into the facility, is there screening done for them in terms of academics and special education?
A Yes, there are, there is. When an AO comes into the facility, they are within -- OMH sees them I believe within 24 hours. Our staff, the rest of the staff must see them within five days. So they get educational testing, the school, we have a school psychologist which is also different than the adult facilities, adult facilities generally do not have a school psychologist. We have a school psychologist, he contacts the school districts, sends for records. Sometimes the AOs will come in and say that they got their -- it's no longer their GED, it's an HSE, but they'll come in and they'll say we have it, they have a way of looking on a system, if we can verify that they have it, we may not go any further because that's the ultimate goal is for them to get their high school equivalency. If we are having difficulty accessing it at that moment because of one reason or another, maybe a wrong Social Security number, we absolutely send for the records immediately, get the records and look at the records and they are given, the social worker gives them, takes like kind of a bio -- in addition to OMH, takes kind of

a biopsychosocial approach so that we know how, when we discuss them at team meeting and for discharge planning what exactly we're dealing with. And again, I'm sure there's more as well.

Q So with respect to an AO that comes in with the high school equivalency, what does DOCCS do with an AO that has that, are they screened for special education and academic needs?

A Typically they are not screened if they come in with it and we can verify it, however, if the screening process started let's say because they are going to be in for vocational counseling so if we've already started the process because of one reason or another, maybe they've come in with it but like I said, maybe it couldn't be verified and we've already started the process and started the IEP, that IEP will follow them in vocational programming as well. It will not follow them in academic programming because we don't, we, right now we don't have college courses. We are in the process of getting college courses, you know, again, we believe that college will assist adolescents in moving forward and in discharge planning. We did have college courses, unfortunately it was the adolescents that refused to go so the college kind of no longer is coming but we're again actively pursuing it. In that case, if somebody had an IEP, then we would pass that information along so that we would

make sure that they were successful in college as well.

Q What about transitional type services for an AO that has their high school equivalency?

A What do you mean transitional?

Q Transitioning to I guess the work world beyond high school.

A What we do, if an adolescent is leaving into the community, we have three conference calls with the parole officer, OCFS, reentry staff, and anybody else that's involved in the case. And we will look at what is, first of all, what is the person's goal, what do they want to do, is that goal realistic, do they need prior treatment -- I mean do they need extenuating treatment, do they need drug treatment, where is the best placement for that person and then make that plan accordingly. So to answer your question, yes, if they -- if they are ready for college, most of our students would be more ready for what they call a precollege and have to take remedial classes. Again, we hope to, if we can get college up and running at Hudson, we hope that they would be actually ready to start college on the outside. Some may be ready to go to cosmetology, if they have enough from our barbering program. So everything is individualized because their issues are just so unique and complex and you can't just tailor one thing, even when there's let's say a diagnosis for one thing, it doesn't mean that that person and

the behaviors that are being exhibited, that this is going to work for them, so we always try to meet and see what works for this individual.

Q Programming wise, is there any difference between what's available in general population and what's available in the AOSU?

A In population we have -- the difference is basically we run the therapeutic groups that are run in population is New Freedom and Thinking for a Change. In AOSU it's called Risks and Decisions. Again, it's just like New Freedom, it's actually part of New Freedom, it's an evidence-based program that the difference is that it deals with more of, okay, now you exhibited certain behaviors that require that you -- that this is the direction, this is where you're at, your current situation, what happened, how can we help you in this particular -- so it's more in the here and now, although it does have a lot of other -- it does deal with past issues as well. So it's Risks and Decisions as opposed to New Freedom but the academic program is the same, yeah.

Q So when you say deals with past behaviors, you're talking about behaviors within the facility as well as outside the facility?

A Right, it goes into a little bit more of, where New Freedom is designed for more generalities, I think that the Risks and Decisions takes it into more of a trauma form care.

Q Is programming something that's taken away from AOs for disciplinary reasons at any time?
A Not for disciplinary reasons, no, not for disciplinary.
Q Is there any reason an AO might not go to scheduled programming?
A They can -- we don't want them to refuse to go to programming, but yes, I mean if they refuse, we're not going to physically take them out and have them go to programming.
Q Do you know Mr. E.L.?
A I am familiar with him, I don't know him well, I'm familiar with him, I've spoken to him maybe a handful of times. My basic role has been more in supervising the staff that have interacted with him.
Q Have you met him before personally?
A Yes.
Q How many times would you say?
A A handful of times, maybe about five times.
Q And in what context was that?
A There was -- the last instance was maybe last week, he was actually in program and prior to that, I did a couple of his hearing, his disciplinary hearings, and I think a couple of times in the -- months ago was probably when I do rounds, if he was, if he comes to the cell. I don't call him to, you know, come up to the cell if he isn't by the door. So if he was by the door, we would have a conversation, so it was

maybe about a couple of times in the beginning, once in programming, couple of times in disciplinary.

Q So do you do rounds through the whole facility?

A Yes.

Q And what's the purpose of that?

A To be familiar with the facility, make sure that there's a presence, make sure that the protocols and things are being followed.

Q And how often do you do that?

A Weekly.

Q And do you ever talk with the AOs when you walk through?

A Yes.

Q What sorts of concerns might they discuss with you?

A They'll discuss anything from, they want rap stars to come, actually, they want different volunteer programs to come in, they want, when can we have a rap star come in, why can't we sing, why can't we -- and we do try to get a lot of volunteers to come in. The superintendent is always trying to have a new group come in to assist them and exposing them to new and different things that maybe they were not exposed to in the past. And we do, we are actually looking to have in those cases AO -- the AOSU has not benefited from that, and we are looking to bring the volunteers to them as well now.

Q Are you familiar with Mr. E.L.'s records in terms of attendance at programming?
A From what I understand and from what I've seen on rounds, as his own, as he testified to this morning, he doesn't particularly care for Risks and Decisions.
Q Is that the morning program?
A It depends. It goes both a.m. and p.m.
Q That's the therapeutic programming?
A Yes, he doesn't really care for that. But I do understand that the program that he has come out, he didn't also care for from what I understand for the academic program, but then again he actually has his high school diploma, not equivalency, because he passed three Regents and he also passed two subjects with a TASC so he was able to get under state ed law his high school diploma. So I think that the classes, the academic classes were boring for him, but -- and again, that would just be a guess, but he, when he was involved with Miss Gooch and the creative writing, he seems to be more apt to participate in that.
Q So let's talk about his background a little bit. What level of education did Mr. E.L. have when he came into the facility?
A He came in, according to state ed regulations, with his actual high school diploma.
Q He had the high school diploma at the time he came in?

A Yes, he did not earn that when he was with us, he came in with it. And that was because his records indicated that he had passed three Regents prior and he passed two subjects with a TASC test, so that -- that combination allowed him to get his high school -- be considered for his high school diploma as opposed to equivalency.
Q Had he actually received the high school diploma at that point in time?
A I don't know that, but it was a matter of record so I believe he had, yes.
Q So given that Mr. E.L. came in with such a high level of education relative to many of his peers, what have you and your colleagues done, if anything, in order to assist him with educational programming?
A In the beginning when he first came in, in fairness to him we did not, we were looking to, had he stayed in general population, we were looking to get him into college. And we certainly, I believe his mother had a discussion with him and talked about correspondence and that certainly would have been available to him, we would have encouraged that. In the AOSU we did the exact same thing, when it was mentioned that he might benefit from correspondence courses, we met, myself, the ed supervisor, the superintendent, and we said what do you think and, you know, again, in looking to be proactive and assisting him, we said absolutely, let's give it a shot.

Q Is this something that's otherwise in place at the facility?
A No, it's not.
Q Is there anyone else in the facility that's currently working toward a college degree?
A Not currently, no.
Q In terms of educational programming, what educational programming, if any, is E.L. currently attending at the facility?
A Well, right now he was not, we were working on getting him accepted into Ohio and I guess there was administrative issues going on back and forth so he was finally I believe accepted. So what Ms. Gooch was working with him on was, she submitted a syllabus that would be considered precollege and then that would be upon his admission to Ohio University which is where the correspondence courses were, she would submit what he had already done to see if he could get credit for that as well.
Q So let's just back up a little, make sure that the court understands everything and when it started. Who's Ms. Gooch?
A I'm sorry, Ms. Gooch is our -- she was actually a volunteer that we hired in the summer to do yoga and meditation with the adolescent offenders, and she also has done creative writing, as I said we were trying to get

college into the program and I submitted her resume to Columbia-Greene and they were able to accept her as an adjunct professor. So we were able to actually hire her as a recreational program leader which we have, and her role, you know, the staff does multiple roles so she's actually a recreation program leader but as an adjunct professor she also works with -- she was the teacher that we chose, we thought she would be best to work with Mr. E.L.

Q So what courses does she currently teach?

A She teaches, she only -- she does not, in the facility she, as a recreation leader, she will do some creative writing but it's not really her role, she does yoga and meditation, with Mr. E.L. she does the creative -- it's not so much physical yoga but it is a lot of meditation and calming exercises to hopefully assist him, and the creative writing.

Q So she works with Mr. E.L. one on one?

A Yes.

Q And that's outside her ordinary role?

A Yes.

Q And is -- I think you mentioned a teacher that's assisting Mr. E.L. with his college prep courses, is that Ms. Gooch as well?

A Yes, that's Ms. Gooch.

MS. KRASNOKUTSKI: Okay, thank you, no further

questions.

THE COURT: Cross-examination.

MR. LePIERRE: Yes, your Honor.

CROSS-EXAMINATION BY MR. LePIERRE:

Q I believe you said earlier that people in Hudson's AO, the general population have access to vocational training such as masonry, computer science, and small engines?

A Yes.

Q Do people in the AOSU have access to that?

A They currently do not, although we were looking to get computers, but they currently do not.

Q So right now there's the educational two hours and then there's the therapeutic Risks and Decisions two hours and that's the only program, right?

A And recreation as well.

Q And recreation as well?

A Yes.

Q Does the ability to attend college courses mean that E.L. is okay being housed 18 to 24 hours a day in his cell?

MS. KRASNOKUTSKI: Objection.

A I'm not sure --

THE COURT: Hold on. What's your objection?

MS. KRASNOKUTSKI: It's outside the scope and outside her area of expertise.

A Well, I --

THE COURT: Hold on. Sustained. I'm not sure what your question is.

Q See if I can rephrase it a way that makes it easier. Does the ability to attend college courses change whether or not E.L. is being housed in his cell 18 to 24 hours a day?

A No, I mean he can attend the college courses when Ms. Gooch is there, however, any adolescent offender in the AOSU, if they request to have an offender rehabilitation counselor come up or a teacher come up to do extra work with them, that's always -- that can be afforded to them, so it would actually not be within the 18 hours so that's why I'm -- I want to answer your question but I don't want to be stuck to the 18 hours. Because it could be different.

Q And you said Risks and Decisions was designed to address past behavior problems and future behavioral choices, is that correct?

A It's a cognitive behavioral program that is designed for the most part to look at the correlation between what you're feeling now and how you're behaving, if that's -- and it does look at, many of the, it's a 30-day curriculum, and in some of those curriculums they'll talk about things that may not be applicable to every adolescent offender, it may talk about substance abuse and peer pressure and different things like that, so it does also go into past behaviors as well as present, but it's all designed to look at what

decisions am I making now that is affecting my life currently.

Q But it's not designed to treat mental illnesses, is it?

A No, it's not designed to treat mental illnesses, per se, I mean I don't know, I have not, I don't know what other -- this is an evidence-based program and I don't know what other populations has used Risks and Decisions.

Q It's also not designed to address any specific inmate's individual mental health needs, is it?

A Again, I -- I don't know if this particular curriculum has been used with other populations. So if it has been used with other populations then the answer would be yes and I don't know that.

Q To your knowledge, it's not, though?

A To my knowledge it's not.

MR. LePIERRE: Your Honor, I have no further questions.

THE COURT: Okay. To your knowledge, during the time he was in AOSU, did E.L. regularly come out for two hours of education?

THE WITNESS: I -- I want to say that he did not, again, that was his choice, I believe that he did -- he did not want to come out, until Ms. Gooch.

THE COURT: And to your knowledge during the time he was in AOSU did he regularly come out for two hours of the

therapy you've described?

THE WITNESS: I believe he did not, it was irregular. I'm not going to say he never did but he was irregular and as he testified he didn't really -- he didn't really like it.

THE COURT: Any redirect?

MS. KRASNOKUTSKI: No.

THE COURT: Any recross?

MR. LePIERRE: No, your Honor.

THE COURT: Okay, you're excused, thank you.

(The witness was excused.)

THE COURT: Defense may call their next witness.

MS. KRASNOKUTSKI: We would like to call Deputy Superintendent of Security Adam Ramirez.

THE CLERK: Can you please state and spell your name for the record.

THE WITNESS: Adam Ramirez, R-a-m-i-r-e-z.

THE CLERK: Raise your right hand.

A D A M R A M I R E Z , called as a witness and being duly sworn, testifies as follows:

DIRECT EXAMINATION BY MS. KRASNOKUTSKI:

Q Good afternoon, Deputy.

A Good afternoon.

Q Can you tell the court your educational background?

A I have three years of college, I've never finished my degree, that's the extent of it.
Q And what is your previous work history?
A Previous work history prior to the department, for very short time, I was in the military, had military and then for a short time, waiting for this job, I worked for Rite Aid Pharmacy company as a divisional supervisor for about a year and a half and then I started with Department of Corrections, I've been in there for 33 years.
Q And what positions have you held with the Department of Corrections?
A I've held all the security ranks, officer, sergeant, lieutenant, captain, dep. security.
Q And how long have you been the deputy superintendent of security?
A I'm in my fourth year.
Q And have you been deputy superintendent of security at Hudson that whole time?
A Yes.
Q And that included prior to Hudson's conversion to an adolescent offender facility?
A Yes, ma'am.
Q And what are your primary duties of your job as a deputy superintendent of security?
A I oversee all the security measures at the facility for

compliance. I oversee the AOSU for compliance with the different agreements we had, *Cookhorne*, NYCLU, and Raise the Age. I'm in charge of the training to make sure we're compliant with the training and I oversee the disciplinary and all the other aspects of the day-to-day operations under the superintendent.

Q Have you ever worked in a facility that has a special housing unit?

A Yes.

Q What is a special housing unit?

A Special housing unit is a disciplinary unit in which, again, they go up there based on tier II or tier III disposition and they are confined for, in some cases 22 to 23 hours depending on the level of facility.

Q Special housing unit, is that also known as an HSU -- or S-H-U or SHU?

A Yes, it is.

Q Is a SHU the same thing as an adolescent offender separation unit or AOSU?

A No.

Q Can you tell me how they are different?

A In AOSU, which is a separation unit, there's more entitlements, more mandates for out of cell, two hours of recreation, two hours of mandatory therapy and two hours of mandatory programming, along with come out during shower

periods, and sometimes for meetings, counseling sessions, which normally does not happen in an SHU setting.
Q Now in terms of the programming, recreation, therapy in the adolescent offender separation unit, the adolescent offenders are entitled to that time but are they forced to come out of their cell for that time?
A No, it is a mandatory time, but if they refuse, we don't force them to come out because, you know, we can't -- we'd have to use a use of force to force them out to put them in a setting, it's not conducive.
Q Are there any other differences between a SHU and an AOSU?
A As far as what?
Q As far as the conditions in which the population live?
A Well, specific to the adolescents, in the AOSU when we put them in they have their property, they have more, there's a PMS system for an SHU and we have an APM system for an AOSU which is -- in the SHU setting it's a five-step program, in AOSU it's a three-step program to help get the adolescent, and a shortened program, too, to help get the adolescent to the step 3 which they are able to have more privileges.
Q What about deprivation of privileges in the AOSU for disciplinary reasons; are there more privileges that can be restricted in the SHU than the AOSU?
A Deprivation order is a measure that we use, it's not a

punishment. Why do we use a deprivation? It's based on a behavior, which we make a determination that the individual coming out of his cell could create a situation for himself as well and jeopardize the safety and security of the staff, other inmates in the unit.
Q Okay. We actually went to a different place than I was trying to go but that's all right.
A I'm sorry.
Q That's just fine, we can talk about deprivation orders. What is a deprivation order?
A Again, deprivation order is a result of an incident that happens amongst an adolescent and we make a determination that in taking that adolescent out for a shower, recreation, it's very limited, it's strictly for recreation, showers. If we deprive water, if we take property away, that's strictly what that's used for, and then we would fill out the form, the watch commander would notify myself or the captain if he can't get ahold of me to approve it and it would go into place at that point.
Q So what, for example, if you had an AO that was presenting a security risk because of violence or assaultive behavior, what would be a typical deprivation order during that period that they were presenting the security risk, what's the typical deprivation order?
A Typical deprivation is usually shower and recreation

and it will reflect, you know, their behaviors, a fight as you just said, they just had a fight, they continue to be in an angered state, kicking, screaming, threatening staff, any one of those things that are just not a normalcy for the unit.

Q And can you tell me why shower and recreation would be the items that would be restricted during that time period, why do those present a security concern?

A Because they have to be removed from their cell to go to either recreation or shower, so that movement would be determined to be possibly a threat to the AO themselves because of their actions, we don't know what they're going to do, or to staff or anybody else on the unit.

Q And what's the typical time period of a deprivation order for shower and recreation?

A A deprivation order is issued on a day, if you look at the form, it's reviewed daily, I review it every morning when I come into the facility, every day, and then normally at night because that's when we do the recreation, they, the supervisor for the unit will, it has a start and then it has six other areas where they fill in for a daily basis, that supervisor will put the reasoning why they wanted to continue the deprivation, it will get reviewed by the watch commander and if it's good, then he'll agree with it. You can also on a deprivation order put that for that particular evening that

the inmate was cooperative and behaved, it works both ways. And then after seven days, it can be renewed again depending on the behaviors. Typically within three, maybe the five days, usually the deprivation order is removed based on behavior.

Q Who can initiate a deprivation order within a facility?

A Who can initiate it?

Q Yes, who can put one in place?

A Well, the supervisor for the unit would write it based on whatever the incident, would be reviewed with the watch commander and normally on the initial one I will get a phone call or the captain.

Q You or I'm sorry, the captain?

A The captain. And in some cases if they don't get us, the superintendent.

Q You mentioned deprivation order relating to water. When would that type of a deprivation --

A That's an instance where the inmate attempts to flood their cell or continues to throw water at staff when they're walking back and forth, and that's usually limited, I don't think I've seen anyone go more than two days, maybe a day.

Q And what type of restriction is placed on the AO if they're on water deprivation?

A Well, the water is shut off and then by our guidelines there's certain times in which we do turn the water on,

before meals, they use the bathroom, it's very clear what's required, minimum of five times in that given day.

Q And are there any other typical deprivation orders that are commonly issued?

A We have other orders that we can issue. We have an exceptional circumstance, that deals specifically with school, therapy, in which if, and it's kind of similar to the deprivation, in which time that if, like let's say they have a fight in the AOSU, two inmates, we'll put an exceptional circumstance in there for probably a day or two. We have a lot of issues with fights in the AOSU. Prior to October 1st, we had, we had, you've already discussed the restart chairs, we have restart chairs but we didn't utilize them in the matter we do now. When Raise the Age came into effect, they just used them as a regular classroom chair, we had fights, numerous fights and everything.

Q We actually haven't discussed that yet in detail but we will. First of all, what's a -- what's an exceptional circumstance?

A Exceptional circumstance is similar to a deprivation order in which, but it works a little bit differently in which we have to stipulate the reason why we are not allowing the individual to go to class. That gets sent to me along with a misbehavior report that must be followed with a disciplinary misbehavior report. I review it, I sign it, the

superintendent then reviews it, if she's got questions, we'll discuss it, she signs it, and then we are required to send that up with the misbehavior report to the assistant commissioner for special housing, for his final review and approval.

Q And so exceptional circumstance applies to all programming then?

A Yes.

Q And does it apply to rec and showers as well?

A No.

Q It does not. It applies only to programming?

A No, we utilize that only for educational programming and therapy.

Q So there would have to be exceptional circumstance and a deprivation order for showers and rec in place to keep an AO from leaving their cell at any time in a day as plaintiffs are contending?

A Yes.

Q Okay. Who has to authorize an exceptional circumstance order?

A The -- well, normally what would happen depending on the situation, again, the supervisor, area supervisor, sergeant would generate it, and then it would be reviewed by the lieutenant, the watch commander, and then at that point if I'm not working, if it's off hours or something or late in

the day, I've already left, I'm not there, I'll get a phone call, we'll review it, and then it will be authorized by me when I come in, if it's after hours, I'll sign it, and again, like I said, superintendent will then review it, sign it and approve it, and then we again send it up to the assistant commissioner. But it must be followed with a disciplinary misbehavior report, to justify the exceptional circumstance.

Q And I think there was some testimony from Ms. Tedaldi that at least if the person's on the mental health caseload there would be notification to OMH as well?

A Yes.

Q Okay. Let's go back and talk about some other topics. Who cleans the AOs' cells on the AOSU?

A The AOs themselves.

Q And how often do they do that, is there a --

A Three times a week, they have the opportunity three times a week.

Q And how does that work?

A Basically, we have, you know, they go around, I think the officer does it when he does his rounds, asking the AO if he's going to clean his cell. If he does, then we do them one at a time, and then they will bring them cleaning supplies, a broom, a mop, germicidal, toilet brush, whatever he needs to sweep, clean, and organize his cell, and then also collect any garbage that the AO has he wants to dispose

of.

Q Anybody else responsible for cleaning the AOs' cells besides the AOs?

A If it's occupied it's the AO that occupies the cell. If they're empty cells which we have, then we have volunteer porters, AOs that are interested in coming out of the cell to do floors and clean.

Q If a cell is occupied, is there any time that staff would ever clean that cell?

A Staff?

Q Yes.

A No.

Q So let's talk about programming and the restart chairs that you mentioned a moment ago. What are the restart chairs?

A Restart chairs are a security chair which was designed, department put into effect several years ago. Basically it's a desk chair, and they're able to secure the leg irons for the individual in the chair, so they can't -- they can stand, they can move a little bit but they can't come away from the chair.

Q And what's the purpose of them?

A Security reasons.

Q What do you mean by security reasons?

A Well, perfect example is prior to October 1st of 2018,

the restart chairs were always in the unit, we didn't utilize them in that fashion, they were just utilized as a regular school chair, and we had numerous problems with fights constantly in there to the point where we had a lot of AOs that wouldn't even come out for program because they feared of getting jumped or punched or hit in the classroom setting.
Q So when did you begin using the restart chairs?
A The right way we started October 1st of 2018 with the Raise the Age legislation as part of Directive 4933C and 4932A and which now they were -- two things. Well, basically now they are put in the chair with leg restraints and they're locked into the chair -- secured into the chair, not locked in.
Q What impact has that made on the number of inmates that come out for programming?
A Our attendance went up drastically, because the AOs, in talking with them, felt safe at that point.
Q So can you describe the recreation areas in which the AOs have recreation for the AOSU?
A Yes. We have eight recreation pens, there are four large pens that can take up to four AOs and we have four individual pens. Originally, the design of the -- and we encourage congregative recreation or interaction. The four single pens initially were utilized when an AO was under a restraint order, that's the only time we used them. We had

in the last several months probably since November had experienced a lot of issues with fights within the recreation pens amongst the AOs and we have a lot of them that were on separatees, can't rec with this one, can't rec with that one because of their hostilities. So in conjunction with the superintendent, I had spoken to our assistant commissioner regarding our problem with the congregative rec and he gave us the authority to use all eight pens individually for separation purposes and safety purposes for recreation.
Q So let me just unpack a couple pieces of your answer there. When you say congregative rec, what you mean is two or more of the AOs in a pen together?
A Yeah, two to four, four max for each large pen is what we can put in.
Q They're designed for two to four?
A Yes.
Q And the smaller ones are designed for how many?
A Single.
Q They're designed for one person?
A One.
Q And you also were talking about the reasons that you were using them as single pens and you were talking about separatees, what are separatees?
A Separatees basically are the AOs on the unit that have had negative interaction amongst each other and that we know

that if we put them in the same pen, sometimes in the same classroom, there's going to be conflict and a fight.

Q And who determines that certain individuals are, with respect to each other, separatees?

A That's done by staff on the unit, they track that and we monitor that on the board like you know this inmate had a fight with this inmate and this inmate did this with this inmate so we have a lot of turnover of staff, different staff, different supervisors and what happens there is that they make the determination of who's going where, they make the listing.

Q So I think you testified there was a certain time period when basically everyone on the unit was in a situation where there was no one you could put together essentially?

A We've had AOs up there that have had like three or four separatees up on the unit, so yes.

Q Out of how many in the unit?

A Well, the unit will hold 16 now, and we've just recently got under double digits, we've been averaging pretty much one-third of the population being up there, about, up to 14, 15.

Q So for what period of time would you say you had everyone doing rec in single pens?

A We probably had that pretty much for, I'm gonna say three, three-and-a-half months.

Q So from November through about February or so?
A Yes.
Q And so how many people would you say are in each of the pens doing rec together now?
A I think it's been averaging, because our numbers are down to eight and nine, I think they've been averaging two, two to three.
Q Okay. So there was some discussion this morning about the time outside during recreation and the temperature. Is there a requirement if an AO goes outside and they feel cold, is there a requirement they stay outside some particular amount of time?
A No.
Q Is there any rule at all about when they can go back inside?
A No. You know, things we have to consider out there is there's no bathroom facility so we have cases which the inmate needs to use the bathroom, we have cases in which the inmate is cold, doesn't want to be out there, is not feeling well, we bring him back to his cell. And that's beneficial for the staff because it just, it makes it easier with less out there, so with the movements and stuff.
Q Is there any consideration at all in terms of when an AO can go back into the facility once they've come out for recreation?

A A time limit, I'm sorry?
Q Just any considerations that you and your staff need to take into account in terms of when they can bring an AO back into the facility?
A You mean as far as behavior or something?
Q As far as when you can move them back in.
A They can bring them back any time. You know, the only thing we probably won't do, if somebody goes out there immediately and we're still moving the AOs out to rec, we'll probably wait until we're completed and bring them in so it could be 15, 20 minutes because it takes a little bit of time to, you know, take them out there, got to be pat frisked, got to be put in handcuffs, escorted down.
Q Is there any rule they have to spend one half of their recreation time outside?
A Not that I'm aware of, no. We actually have an early go-back as I think was said earlier at 6:00 that the AOs can go back if they choose.
Q If you could turn to Defendant's Exhibit D, the last page of D3, where we have the APMS or APMS levels that you were talking about a little bit earlier.
A Yes.
Q Can you tell the court in a little bit more detail what those levels are and how they work in terms of privileges to the AOs?

A The Program Management System for the adolescents was developed in October 1st, went into effect October 1st, 2018, in conjunction with the directive here, and basically they wanted a plan there that, a staging plan in order to some extent have good behaviors, give the adolescent something to work for, PMS level one is basically an entry level, usually when they come into -- get admitted to the AOSU it's a ten-day period. They still have daily exercise two hours, they still participate in programming, two hours for rec -- excuse me, two hours for therapy, two hours for classroom, they institute restraints and they're cuffed behind the back, they get no telephone calls for the first ten days, they're entitled to get their phone -- headphones for radio, they can only get, commissary stamps only permissible and they get showers once a day.

Q And then they progress from there?

A Progress from there, they go to PMS level 2 which is a 20-day period. They, again, that lasts for 20 days, now it doubles. They get, again, cuffed behind the back, they're allowed one phone call in their 20-day period -- I'm sorry, I missed, they also get PMS level 1. PMS level 2 they get one visit per week, same with the headphones, they're allowed to get commissary based on Directive 4933C, they get some more items, and again, they get shower daily.

Q And then you have PMS level 3?

A PMS level 3, that's the highest level, they can get, they're cuffed in the front, they get one phone call every 30 days, they get two visits versus one, they get commissaries, they get up to $5 worth of noncookable foods, playing cards, and again, a shower a day. And what happens with the PMS level, at any point if they get a disciplinary sanction, they go back to PMS level 1 and they start over.
Q So in your role as deputy superintendent of security, are you familiar with E.L.'s disciplinary record?
A Yes.
Q And -- well, what do you know about his record?
A It's pretty extensive. He's somewhere in the neighborhood probably, I think he's had a couple of recent hearings, probably about 40 plus, they're about 50 percent tier II, tier III, and some of the tier IIIs are pretty severe to include assault on staff, unhygienic acts, which is pretty severe in our department, and he's -- he has a lot.
Q How does his disciplinary history compare with the rest of the population of the AOSU; are there other individuals who have as extensive a disciplinary history?
A As of right now, and I've been there since day one, there's only one other inmate who's no longer at Hudson who had a more extensive disciplinary than he does.
Q So I'd like to look at a couple of specific incidents if you don't mind. If we could turn to Defendant's

Exhibit 22. There are actually two different misbehavior reports, if you look through that exhibit, combined into one hearing.

A Yes.

Q Do you recall looking at these misbehavior reports, either of the incidents that gave rise to --

A I'm sorry?

Q Do you recall either of the incidents that gave rise to these misbehavior reports on January 11th --

A Yes.

Q -- this year?

A Yes.

Q What do you recall?

A Well, one of the incidents, the second ticket was he was being served a copy of his misbehavior report, when the officer serves it he gives him the form to sign, they ask him if he wants an assistant, if he understands, at that point he had scribbled all over it, some obscenities, put it in the tray, had feces in the tray, gave it back to the officer.

Q Was there also a note in that tray to the officer?

A Yes. It was specific to Officer Bender who was there at the time.

Q And what sort of language, you don't have to read it to me exactly but what sort of language did he write in the note to the officer?

A It was pretty vulgar.
Q Was it threatening at all?
A Yes.
Q So the second incident on January 11th involved both a threatening note to the officer as well as defecating on that note and giving it to the officer?
A Yes. The other incident was he was getting his evening meds and they had observed a large pile of urine in the bottom of his cell.
Q I'm sorry, I didn't hear what you just said.
A The second incident was he was getting his medication, his evening meds, I'm sorry, and that he passed a cup through the -- under the door through Pizarro which had urine. Well, had a yellow liquid which was later identified as urine.
Q And the -- I believe the charges on these two misbehavior reports are unhygienic acts?
A Yes, ma'am.
Q Threats, being untidy, and improper use of utensils?
A Yes. I'm sorry, I have to make a correction. I thought -- I said he was serving his misbehavior report, he was serving him his food.
Q Ah, so this was a food tray?
A Yes.
Q Rather than a misbehavior report?
A Yes.

Q If we can go to January 13th. This is December -- I'm sorry, Defendant's 24. Do you recall the incident that's described in that misbehavior report?
A Yes, ma'am.
Q Can you tell me what happened there?
A That was a cell cleanup, at which time the officer had noticed Mr. E.L. there had -- they left the hatch open and Mr. E.L. had opened the bottom hatch and had actually taken his clothes and stuff and tied it around the hatches so that they couldn't close it. The officer attempted to deescalate and have him comply, he did not. The officer, sergeant came down, at that point they tried to get compliance with him, they started to take the -- cut the items off of their hatch so they could secure it, at which time then the AO started hanging his hands out of the hatch. They attempted to -- then he took hostage of the bottom hatch, there's a foot hatch down there, he had his hands through there, they couldn't get it closed. At one point the sergeant actually grabs his hands and puts them inside the cell at which time he bites the sergeant, and they were finally able, shortly after that, to get it secured.
Q So on that instance we have assault on staff, violent conduct?
A Yes.
Q Violation of direct order and unhygienic act as well?

A Yes.

Q By the way, we saw some pictures this morning of Mr. E.L.'s cell?

A Yes.

Q With a lot of writing on the walls but we also saw significant amount of damage to the ceiling. Do you remember an incident where Mr. E.L. damaged his cell?

A Yes. That was actually the second cell that he damaged.

Q Can you tell me about his damage to the cells?

A The initial cell he was in was on the first floor, cell number 2, which he ripped off the conduit and the fire alarm system in that cell, wrote a little bit over the walls. Based on, because of security issues and safety issues for the unit, he was moved to cell number 4, which he proceeded to now rip down the fire alarm again which caused issues with lighting in the unit, the fire system, alarm system was, could not work at that point basically and we had to -- we had a couple of inmates that were also locked in that lower unit that we moved out of there. We had to bring staff in to bypass because everything was in series there, to make the other, to make it so that the alarm system would work if any kind of smoke was detected at all and to get the lighting back on, the electric for the lighting.

Q So while we're talking about destructive incidents, if

I could refer you to Defendant's 29, January 23rd of this year. We had a incident involving the bathroom in the AOSU.
A Yes.
Q Can you tell me about the incidents leading up to, I believe there are two misbehavior reports here. January 23rd.
A Well, the incident was that Mr. E.L. was given his shower, he was put into the shower, the showers are 15 minutes, and in actuality when I reviewed the film of this incident he was actually in there 20 minutes. They went, knocked on the door for him to come out, he began to argue and claimed that he was not given his due time of 15 minutes, and then he proceeded to damage the interior of the bathroom. He broke the window off, he smashed the light, he pulled the curtain off, the curtain rod down, banging on the mirror that's in there, trying to break the window, he pulled the window apart, he attempted to break the glass on the window, and would not comply with any orders to stop.
Q What happened after that?
A At that point it was decided to do an extraction, I authorized that after conferring with the lieutenant on the telephone. Extraction team basically is individuals who are trained, we have special equipment that we utilize, our shield, the officers are dressed in protective head gear. We had made a -- they did, one of our protocols is to use

chemical agents, that was discussed but based on the fact that the window had been removed, it was a windy day and the wind was actually blowing in back towards the unit, we did not use gas. And I authorized them to go in to remove the inmate and put him back in his cell, which they did. Once they entered and opened the door, AO E.L. laid on the floor, they handcuffed him and they removed him from the bathroom.

Q Can you tell me by the way, these two, you just described two incidents that caused destruction to portions of the unit, can you tell me how that impacted the operation of the unit and the other AOs who reside there?

A Well, the situation in the cell with the fire alarm system and the electricity, we had to call in staff to get that fixed. We had to bring in a specialist with the fire alarm system to be able to, to make the system work, he had to bypass and do some extra wiring.

As far as the bathroom, A, because of the -- both times, when we have an incident all action stops on the unit, so in the instance where with the fire alarm, and dealing with that, none of the AOs on the unit had recreation because we had to deal with that, we couldn't take them through that, it affected the lighting in the rec pens also, it was dark. In this situation here, basically we could not use the shower because of the amount of showers we had to do that night, some AOs did not get showers that evening, which

upset them. One thing they get upset about is their recreation and the showers.
Q How long was the power out on the unit for a period of time after the fire alarm system was destroyed?
A Probably about, by the time we got maintenance electrician to come there it was probably a couple hours.
Q And how long was that bathroom out of service?
A The bathroom was out of service probably for 10 days, 12 days.
Q And where did the -- how long were AOs unable to shower?
A Well, they weren't, it's not that -- they were unable to shower that particular night because of the time span, because we have a limited crew for midnight shift, some were not able to shower that night. We did get them into the shower later on but we had, we have a secondary shower on the second floor that we had to get cleaned up and put into operation to use to help alleviate the backlog.
Q So if we could turn to Defendant's ... Defendant's 32, please. This looks like two misbehavior reports from March 13th --
A Yes.
Q -- this year. Are you familiar with the incidents that gave rise to these misbehavior reports?
A Yes.

Q What happened there?

A First misbehavior report, he had a cell search done and they were looking for handcuffs ... um, if I, the particulars on the first one I think is that he was placed in handcuffs, I think he was coming back from the recreation pen and they basically, when they put him in the cell, he took possession and would not allow the officers to remove the handcuffs, that's where they later found them in his contraband on the cell search. They were in the pants, and they made a weapons charge because swinging the pants could have been like a billy club with the handcuffs in there.

The second misbehavior report was in the rec pen specific, and again had to do with the handcuffs, in the rec pen. Mr. E.L. is unique to us because he does have the ability, he seems to be double jointed in his hand area and is able to slip handcuffs which is being reviewed right now, so we have to use a lot of precaution with him in handcuffing him, it's a talent he has. But he utilizes that talent to be able to get out of it, and just not be compliant with following the direction and giving it back. And in this particular case also, Mr. E.L. decided that it was okay to defecate in the middle of the rec pen.

Q Have there been other issues with Mr. E.L. defecating in the rec pen?

A Not that I'm aware of, but there's been other issues

with him with his feces, throwing them at staff and stuff.
Q Were there any --
A He had one instance down there where he did -- yeah, he had another instance where he defecated there, not -- but he reached into his own pants, got his defecation and actually threw it at other AOs in the rec pen area and I had to -- nobody wrote a misbehavior report, why, I don't know, but I had to bring in staff, maintenance staff so that they could power wash and clean the rec pen so we can use them for rec, sterilize them.
Q So that was in the rec pen area?
A Yes.
Q And you said he's also thrown feces at staff?
A Correct.
Q Let's see if I can go to --
THE COURT: And why don't we break here for the night.
MS. KRASNOKUTSKI: Sure.
THE COURT: And so we'll return tomorrow, is -- can counsel be here at 8:30, is that --
MR. LePIERRE: Yes, your Honor.
MS. KRASNOKUTSKI: Sure, we can do that.
THE COURT: We'll return tomorrow at 8:30 and you may step down.
THE WITNESS: Thank you, ma'am.

THE COURT: I had a couple of questions.

MS. KRASNOKUTSKI: You need it on the writ for 8:30?

MR. SHKOLNIK: For these guys to cover their bases.

MS. KRASNOKUTSKI: Because the previous writ had mentioned 9.

THE COURT: Then let's just stick with 9 because that might be a little complicated to do at this late hour. We'll stick with 9:00, start time of 9:00.

MS. KRASNOKUTSKI: Okay.

THE COURT: And just looking through the exhibits, I don't think we have admitted as an exhibit the plaintiff's expert report. Did you intend to seek to admit that?

MR. LePIERRE: Yes, your Honor.

THE COURT: Any objection to the plaintiff's expert report?

MS. KRASNOKUTSKI: I do, actually, we have the expert's testimony, I think the report is hearsay, I don't know why we would need to admit the report.

THE WITNESS: Your Honor, may I interrupt one minute, I'm going to be sending my staff back, do you want AO E.L. back here tomorrow?

THE COURT: Yes.

THE WITNESS: Okay, all right, I will call and notify the facility.

THE COURT: And you may step down, thank you.

THE WITNESS: Thank you.

(The witness was excused.)

THE COURT: Okay, we'll address that tomorrow, unless you have some response right now.

MR. LePIERRE: Yes, your Honor, actually I have a quick response. Looking at that, I do believe the expert report is typically not considered anything other than hearsay, but however, in situations like this where we're dealing with preliminary hearings, it's very clear within the case law that the court is free to consider things that would typically be considered hearsay that would provide them a full and quick resolution of the issue because they don't have time to have a full and complete discovery process and trial before the decision is made. For that purpose, your Honor, so that you'd understand fully the underlying evidence that we are not able to get out in a longer hearing with more witnesses, we would ask that it be admitted.

MS. KRASNOKUTSKI: I am aware of no authority that the hearsay rules are disregarded in a preliminary hearing context.

MR. LePIERRE: I can cite them for you.

THE COURT: Yes, I greatly appreciate citations, yes.

MR. LePIERRE: Specifically, Courts are permitted

to consider hearsay evidence when ruling on a motion for preliminary injunctions, that's *Sills Road Realty, LLC v. Town of Brookhaven*, 2008 WL 11449282, at *1, your Honor, that's Eastern District New York, July 10th of 2008, your Honor, and it's one of multiple different courts that have said the same thing within both the Second Circuit and New York.

THE COURT: Okay. So I will look into that and have a ruling tomorrow, tomorrow morning on that. Both counsel agree that this is governed by the Eighth Amendment?

MR. LePIERRE: Yes, your Honor.

THE COURT: And so what the court needs to consider is whether these conditions, these separation conditions posed an unreasonable risk of serious damage to the health of E.L., obviously taking into consideration the fact that he's a minor who has some pretty, you know, some mental health issues, and then whether the prison officials knew of and disregarded an excessive risk to inmate health or safety.

Have counsel considered what other options there are for someone who has these kinds of disciplinary and mental health issues?

MR. LePIERRE: Yes, your Honor, I've actually been speaking with our expert who obviously deals with these cases throughout the country and has specific experience in Illinois, Arizona, and Florida. One of the typical things

that's done is that they are presented to a residential treatment facility in a secure, some level secure facility. He has had situations where they have come up with the fact that the facilities just simply do not have such available to him. In his experience courts have been ruling that he find somewhere that you can put him that you can then house him appropriately. And I believe in that case they actually had a secure facility for another institution that they then housed him at with joint agreement that they would provide for the appropriate security at that facility. So that's what we are looking for, your Honor, is residential permanent treatment to give him the effective treatment that E.L. needs on a much more frequent basis than once a month.

THE COURT: And is that different than inpatient, the inpatient residential program at, for example, the Central New York Psychiatric Center?

MR. LePIERRE: My understanding the Central New York Psychiatric Center is, that is a suicide facility where they treat them for suicide risks, review them for that, kind of turn them back over, not a long-term treatment facility for that. If you have long-term cognitive behavioral therapy, as Dr. Kraus was recommending two, three times a week necessarily, cognitive behavioral therapy treatment, I would be fine with that.

MS. KRASNOKUTSKI: I think with respect to

juveniles, certainly it's a very short-term option because there is not a general population to speak of of underage individuals at CNYPC. I think there are also a broader range of options as Mr. Vertoske testified that will become available when E.L. becomes an adult because there is a slightly broader range of treatment within the -- in terms of behavioral health units, residential mental health units within the facilities once E.L. turns 18 which is within a few weeks. All that being said --

THE COURT: Wait, I thought it was a year, I thought it was June of '20.

MS. KRASNOKUTSKI: It is not.

MR. LePIERRE: Actually I believe, your Honor, he is turning 18 soon.

MS. KRASNOKUTSKI: He's turning 18.

THE COURT: I thought the testimony was 2020 I thought, I could be wrong.

MS. KRASNOKUTSKI: I believe his birthday is on June 24th of 2019, your Honor, and all of that being said, OMH is not a party to this action, and it's not my understanding that this motion therefore seeks any relief from OMH, it's my understanding that this motion seeks his discharge from the AOSU. That doesn't mean that no one's willing to talk about what conditions would be appropriate for his long-term treatment, I think we've got a lot of

individuals who are trying to work toward what's appropriate for his long-term treatment. All that being said, those are not the parties that the plaintiffs have sued.

THE COURT: Well, as I understand the motion, it would -- it's requesting an order directing that he not remain in these conditions.

MS. KRASNOKUTSKI: In the AOSU.

THE COURT: Yes. So I'm not sure what the meaning of what you just said is.

MS. KRASNOKUTSKI: Well, it's not my understanding, though, that he can be ordered into some OMH facility when OMH is not a party.

THE COURT: I understand.

MS. KRASNOKUTSKI: Yes.

THE COURT: If the court granted the order, then he would --

MS. KRASNOKUTSKI: He would go to general population I believe.

THE COURT: I guess that's why I'm -- I'm curious because it sounds like that's not a very good option.

MS. KRASNOKUTSKI: I agree that that's not a very good option but I didn't bring the motion, your Honor.

MR. LePIERRE: And your Honor, our position is that DOCCS is the entity that has custody of E.L. and is going to have custody of E.L. so that if they can provide treatment,

they can obviously coordinate with OMH to have him somewhere where they can provide treatment, still be the person responsible for housing E.L. My understanding of the law is they have to maintain custody of him when they house him so there may be a need to coordinate with other individuals but that's the person that we have to deal with now.

MS. KRASNOKUTSKI: Respectfully, if they want inpatient treatment in an OMH facility, OMH would have to be a party to that.

MR. LePIERRE: We can add them, your Honor, if necessary, but I mean we don't, we did not know exactly who --

MS. KRASNOKUTSKI: That's not the motion you made.

THE COURT: And let me just ask, is it the case that he does turn 18 on June 24th of this year?

MR. LePIERRE: My understanding is yes, he does turn 18 on June 24th of this year, not 24 on June 18th.

THE COURT: Okay. So we'll finish up the testimony tomorrow morning then at 9:00.

MS. KRASNOKUTSKI: Thank you.

THE COURT: Anything further before we retire for today?

MS. KRASNOKUTSKI: No.

MR. LePIERRE: Yes, your Honor, did you want us to leave the documents we've been using in the courtroom today

for reuse tomorrow?

THE COURT: I think they can stay in the courtroom.

THE CLERK: Yeah, they can.

MS. KRASNOKUTSKI: Thank you so much, they're very heavy.

THE COURT: Okay, thank you.

MR. LePIERRE: Thank you.

(Court Adjourned, 4:56 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, JODI L. HIBBARD, RPR, CRR, CSR, Federal Official Realtime Court Reporter, in and for the United States District Court for the Northern District of New York, DO HEREBY CERTIFY that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 11th day of July, 2019.

/S/ JODI L. HIBBARD

JODI L. HIBBARD, RPR, CRR, CSR
Official U.S. Court Reporter